# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

D.J.B.,
B.G.C.,
S.F.F.,
A.D.J.,
C.A.J.,
J.L.M.,
D.M.,
C.M.,
R.E.P.,
B.J.S.,
J.M.W.,
S.D.W.,
A.L.W.
and G.L.W.,

       Plaintiffs,

v.                                Case No.:

CITY OF MILWAUKEE,
EDWARD A. FLYNN,
REBECCA L. PIXLEY,
EDITH HUDSON,
TERRENCE T. GORDON,
REGINA HOWARD,
MICHAEL A. VAGNINI,
JACOB K. KNIGHT,
JEFFREY P. DOLLHOPF,
ANDREW P. DAANE,
DAYON NINKOVIC,
MATTHEW L. TRACY,
RAYMOND J. BROCK,
PAUL A. MINER,
TIMOTHY M. WILGER,
ANTHONY T. SMITH,
STEPHANIE SEITZ,
AMY BARTOL,
ZACHARY E. THOMS,
JASON MUCHA,
JEFFREY CLINE,
MICHAEL J. BRUNSON,

JOSEPH ESQUEDA,
LISA BRADLEY,
JAMES SOMMER,
GREGORY M. KUSPA,
JOHN R. SHIPMAN,
LORI M. KOWALEFSKI,
SHAWN M. BURGER,
DANIEL J. VANDERVAST,
PAUL D. MARTINEZ,
ANDREW J. MOLINA,
CHRISTOPHER D. CONWAY,
STEVEN KUSPA,
JOHN IVY,
CHRISTOPHER S. NAVARRETTE
and BRIAN KOZELEK,

    Defendants.

---

## FEDERAL COMPLAINT

---

  **NOW COME** the above-named Plaintiffs, by their attorneys, SAMSTER, KONKEL &

SAFRAN, S.C., and as for their causes of action against the above-named Defendants, the

Plaintiffs allege and show claims for relief as follows:

# INTRODUCTION

1.      The following is a synopsis of the Plaintiffs' cause of action: This is a civil action under the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States and Title 42 of the United States Code, Section 1983, brought to redress the serious personal injuries, and to obtain compensatory damages, punitive damages, fees, costs and equitable relief, for the unreasonable searches, the uses of excessive force and the false arrests and/or unlawful detentions suffered by the Plaintiffs, as a result of the acts and omissions of individual Defendant City of Milwaukee Police Department ("MPD") officers, while other individual Defendant MPD officers failed to intervene and prevent the constitutional violations, which occurred with the knowledge and approval of individual Defendant MPD supervisors and as a direct result of the unconstitutional polices of Defendant, City of Milwaukee.

# JURISDICTION AND VENUE

2.      This action arises under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution and Title 42 of the United States Code, Section 1983. The Court has jurisdiction pursuant to Title 28 of the United State Code, Sections 1331 and 1343(a)(3) and (4). The Court also has supplemental jurisdiction over the Plaintiffs' state law claims for indemnification under Wisconsin Statute Section 895.46 pursuant to Title 28 of the United States Code, Section 1367.

3.      The Eastern District of Wisconsin is the proper federal venue for this action, pursuant to Title 28 United States Code, Section 1391(b), because it is judicial district where the constitutional rights violations of the Plaintiffs were committed.

3

## PARTIES

4. That Plaintiff, D.J. B., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

5. That Plaintiff, B.G.C., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

6. That Plaintiff, S.F.F., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

7. That Plaintiff, A.D.J., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

8. That Plaintiff, C.A.J., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

9. That Plaintiff, J.L.M., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

10. That Plaintiff, D.M., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

11. That Plaintiff, C.M., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

12. That Plaintiff, R.E.P., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

13. That Plaintiff, B.J.S., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

14. That Plaintiff, J.M.W., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

4

15.     That Plaintiff, S.D.W., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

16.     That Plaintiff, A.L.W., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

17.     That Plaintiff, G.L.W., is an adult and was, at all times material hereto, residing at his address in the City and County of Milwaukee, State of Wisconsin.

18.     That Defendant, City of Milwaukee ("Milwaukee"), is a municipal corporation, organized and existing under the laws of the State of Wisconsin, whose principal offices are located at 200 East Wells Street, City and County of Milwaukee, State of Wisconsin, 53202.

19.     That Defendant, MPD Chief of Police Edward A. Flynn ("Flynn"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as Chief of Police for the MPD. That, at all times material hereto, Flynn was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

20.     That Defendant, MPD Captain Rebecca L. Pixley ("Pixley"), upon information and belief, at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as the Captain of District 2 for the MPD. That, at all times material hereto, Pixley was acting under color of law, was carrying out her duties as an officer and employee of Milwaukee, and was acting within the scope of her employment for Milwaukee.

21.     That Defendant, MPD Assistant Chief of Police Edith Hudson ("Hudson"), upon information and belief, was an adult resident of Milwaukee and was employed by Milwaukee as the Captain of District 5 for the MPD from March 2009 to September 2011. That, at all times

material hereto, Hudson was acting under color of law, was carrying out her duties as an officer and employee of Milwaukee, and was acting within the scope of her employment for Milwaukee.

22. That Defendant, MPD Deputy Inspector Terrence T. Gordon ("Gordon"), upon information and belief, was an adult resident of Milwaukee and was employed by Milwaukee as the Captain of District 5 for the MPD from September 2011 through March 2012. That, at all times material hereto, Gordon was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

23. That Defendant, MPD Captain Regina Howard ("Howard"), upon information and belief, at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as the Captain of District 7 for the MPD. That, at all times material hereto, Howard was acting under color of law, was carrying out her duties as an officer and employee of Milwaukee, and was acting within the scope of her employment for Milwaukee.

24. That Defendant, MPD Officer Michael A. Vagnini ("Vagnini"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Vagnini was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

25. That Defendant, MPD Officer Jacob K. Knight ("Knight"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Knight was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

6

26.     That Defendant, MPD Officer Jeffrey P. Dollhopf ("Dollhopf"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Dollhopf was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

27.     That Defendant, MPD Officer Andrew P. Daane ("Daane"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Daane was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

28.     That Defendant, MPD Officer Dayon Ninkovic ("Ninkovic"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Ninkovic was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

29.     That Defendant, MPD Officer Matthew L. Tracy ("Tracy"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Tracy was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

30.     That Defendant, MPD Officer Raymond J. Brock ("Brock"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Brock was acting under color of law, was

carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

31.  That Defendant, MPD Police Officer Paul A. Miner ("Miner"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police aide for the MPD. That, at all times material hereto, Miner was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

32.  That Defendant, MPD Sergeant Timothy M. Wilger ("Wilger"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a sergeant for the MPD. That, at all times material hereto, Wilger was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

33.  That Defendant, MPD Captain Anthony T. Smith ("Smith"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a captain for the MPD. That, at all times material hereto, Smith was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

34.  That Defendant, MPD Officer Stephanie Seitz ("Seitz"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Seitz was acting under color of law, was carrying out her duties as an officer and employee of Milwaukee, and was acting within the scope of her employment for Milwaukee.

35.     That Defendant, MPD Officer Amy Bartol ("Bartol"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Bartol was acting under color of law, was carrying out her duties as an officer and employee of Milwaukee, and was acting within the scope of her employment for Milwaukee.

36.     That Defendant, MPD Officer Zachary E. Thoms ("Thoms"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Thoms was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

37.     That Defendant, MPD Sergeant Jason Mucha ("Mucha"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a sergeant for the MPD. That, at all times material hereto, Mucha was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

38.     That Defendant, MPD Officer Jeffrey Cline ("Cline"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Cline was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

39.     That Defendant, MPD Captain Michael J. Brunson ("Brunson"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a captain for the MPD. That, at all times material hereto, Brunson was acting under color of law,

was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

40.     That Defendant, MPD Officer Joseph Esqueda ("Esqueda"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Esqueda was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

41.     That Defendant, MPD Officer Lisa Bradley ("Bradley"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Bradley was acting under color of law, was carrying out her duties as an officer and employee of Milwaukee, and was acting within the scope of her employment for Milwaukee.

42.     That Defendant, MPD Officer James Sommer ("Sommer"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Sommer was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

43.     That Defendant, MPD Officer Gregory M. Kuspa ("GKuspa"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, GKuspa was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

44.     That Defendant, MPD Officer John R. Shipman ("Shipman"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Shipman was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

45.     That Defendant, MPD Officer Lori M. Kowalefski ("Kowalefski"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Kowalefski was acting under color of law, was carrying out her duties as an officer and employee of Milwaukee, and was acting within the scope of her employment for Milwaukee.

46.     That Defendant, MPD Officer Shawn M. Burger ("Burger"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Burger was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

47.     That Defendant, MPD Officer Daniel J. Vandervast ("Vandervast"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Vandervast was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

48.     That Defendant, MPD Officer Paul D. Martinez ("Martinez"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Martinez was acting under color of law, was

carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

49. That Defendant, MPD Officer Andrew J. Molina ("Molina"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Molina was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

50. That Defendant, MPD Officer Christopher D. Conway ("Conway"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Conway was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

51. That Defendant, MPD Officer Steven Kuspa ("SKuspa"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, SKuspa was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

52. That Defendant, MPD Officer John Ivy ("Ivy"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Ivy was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

53. That Defendant, MPD Officer Christopher S. Navarrette ("Navarrette"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Navarrette was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

54. That Defendant, MPD Officer Brian Kozelek ("Kozelek"), at all times material hereto, was an adult resident of Milwaukee and was employed by Milwaukee as a police officer for the MPD. That, at all times material hereto, Kozelek was acting under color of law, was carrying out his duties as an officer and employee of Milwaukee, and was acting within the scope of his employment for Milwaukee.

## FACTS RELATING TO MILWAUKEE'S UNCONSTITUTIONAL POLICIES

55. That there is a long, tragic history of a widespread pattern of constitutional violations committed by MPD officers.

56. That some famous names in Milwaukee history, including, but not limited to, Daniel Bell, Ernest Lacy, Tandy O'Neal, Justin Fields, Curtis Harris, Frank L. Jude, Jr., Wilbert Prado and Derek Williams, were victims of constitutional rights violations committed by MPD officers.

57. That the latest victims of the widespread pattern of constitutional rights violations committed by MPD officers are the many people, including, but not limited to the Plaintiffs in this action, who have suffered unreasonable searches, uses of excessive force, false arrests, and/or unlawful detentions.

58. That the moving force behind the widespread pattern of constitutional violations committed by MPD officers, including the violations suffered by the Plaintiffs in this action, are

Case 2:13-cv-00771-LA   Filed 05/16/14   Page 13 of 107   Document 133

the unconstitutional policies of Milwaukee including: (a) the deficient hiring policy; (b) the failure to train policy; (c) the failure to discipline policy; and (d) the custom of condoning constitutional rights violations.

## Deficient Hiring Policy

59. That the City of Milwaukee Fire and Police Commission ("FPC") is the policy-maker for Milwaukee with respect to the hiring of MPD officers.

60. That, in September 1987, the Journal of Police Science and Administration, a publication of the International Association of Chiefs of Police, included an article titled "Psychological Screening of Police Candidates: Current Perspectives."

61. That a copy of the article titled "Psychological Screening of Police Candidates: Current Perspectives," published in the Journal of Police Science and Administration in September 1987, is attached to this Federal Complaint as Exhibit A, and is incorporated as part of this Federal Complaint.

62. That, upon information and belief, Milwaukee had actual notice and/or knowledge of Exhibit A and its contents in September 1987, or shortly thereafter.

63. That Exhibit A contains many facts regarding the psychological testing of police officers, as will be set forth in the following paragraphs.

64. That, in 1967, the President's Commission on Law Enforcement and the Administration of Justice stated that "psychological tests . . . to determine emotional stability should be conducted in all [police] departments." (*See* Exhibit A at p.210).

65. That, in 1967, the National Advisory Commission on Criminal Standards and Goals stated that:

> Police officers are subject to great emotional stress and they are
> placed in positions of trust. For these reasons, they should be very

14

carefully screened to preclude the employment of those who are emotionally unstable, brutal, or who suffer any form of emotional illness. A growing number of police agencies have turned to psychological screening to eliminate those who are emotionally or otherwise unfit for the police service.

(*See* Exhibit A at p.210).

66. That, in 1967, the National Advisory Commission on Criminal Standards and Goals issued the following recommendation:

Every police agency, by 1975, should retain the services of a qualified psychiatrist or psychologist to conduct psychological testing of police applicants to screen out those who have mental disorders or are emotionally unfit for police work.

(*See* Exhibit A at p.210).

67. That, in 1986, International Association of Chiefs of Police President John J. Norton stated that "psychological services are now recognized as a vital component for a well-run and responsible [police] department." (*See* Exhibit A at p.210).

68. That, in 1977, a book titled "The Police Personnel Selection Process" stated the following:

[L]aw enforcement agencies are under a heavy obligation to improve their techniques for detecting the high-risk applicant before hire. A high-risk applicant is one whose psychological make-up is such that he will quite likely be unable to cope with the responsibilities and authority inherent in the position of police officer. The responsibility is placed more and more directly on the police agency to include a program of psychological testing aimed at screening-out applicants who potentially represent a risk to the public, to fellow officers, or to themselves.

(*See* Exhibit A at p.212).

69. That, in 1983, an article titled "A process for screening out law enforcement candidates who might break under stress" stated that psychological testing of police officer applicants would screen out candidates with "such personal attributes as excessive fearfulness,

phobias, uncontrolled impulsivity, inability to handle hostility, self-destructive behaviors, paranoid tendencies, and delusional thinking, as well as clearly psychotic conditions and character disorders." (*See* Exhibit A at p.212).

70.     That, in 1980, an article titled "Police officer selection in the medium-sized department" stated the following:

> [T]he psychological examination provides an excellent balance for the oral interview and polygraph examination, and is principally of value in identifying the person who is clearly not suited to police employment. This phase of testing appears to be critical in terms of negating liability where charges of negligent admission might arise as a result of misconduct of an officer following employment.

(*See* Exhibit A at p.212).

71.     That the article titled "Psychological Screening of Police Candidates:  Current Perspectives" stated the following with respect to the clinical interview portion of pre-employment psychological testing of police officer candidates:

> While the information from tests and inventories is essential and tends to be more objective than other sources, there is also a need for a more individualized, in-depth method of assessing the candidate. Specific areas of concern can be probed by a professional trained in the identification of emotional and psychological difficulties. Face-to-face observation of the individual's behavior can be a valuable component when the psychologist must make critical decisions. Most psychologists feel that no candidate should be eliminated from consideration for a job based on written psychological tests alone. The clinical interview is a critical step in the screening process.

(*See* Exhibit A at pp.212-213).

72.     That, on August 6, 1991, in response to citizen complaints about the MPD, then City of Milwaukee Mayor John O. Norquist announced the formation of the Mayor's Citizen Commission on Police-Community Relations to examine the performance of MPD officers.

73.     That the Mayor's Citizen Commission on Police-Community Relations issued "A Report to Mayor John O. Norquist and the Board of Fire and Police Commissioners," dated October 15, 1991.

74.     That a copy of "A Report to Mayor John O. Norquist and the Board of Fire and Police Commissioners," dated October 15, 1991, is attached to this Federal Complaint as Exhibit B, and is incorporated as part of this Federal Complaint.

75.     That, upon information and belief, Milwaukee had actual notice and/or knowledge of Exhibit B and its contents on October 15, 1991, or shortly thereafter.

76.     That the Mayor's Citizen Commission on Police-Community Relations recommended that Milwaukee consider psychological testing of police officer candidates. (*See* Exhibit B at p.30).

77.     That, in October 1994, the United States Department of Justice, National Institute of Justice, issued a Report titled "Controlling Police Use of Excessive Force:  The Role of the Police Psychologist," by Ellen M. Scrivner, Ph.D.

78.     That a copy of the United States Department of Justice, National Institute of Justice Report titled "Controlling Police Use of Excessive Force:  The Role of the Police Psychologist," by Ellen M. Scrivner, Ph.D., dated October 1994, is attached to this Federal Complaint as Exhibit C, and is incorporated as part of this Federal Complaint.

79.     That, upon information and belief, Milwaukee had actual notice and/or knowledge of Exhibit C and its contents in October 1994, or shortly thereafter.

80.     That the United States Department of Justice, National Institute of Justice, recognized that police departments have conducted psychological testing of police officer candidates since the 1980's. (*See* Exhibit C at p.1).

81.     That, in the Report attached as Exhibit C, the United States Department of Justice, National Institute of Justice, stated that psychological testing and clinical interviews are tools which "are valid and reliable measurements" and are "used to prevent problem behaviors, including use of excessive force." (*See* Exhibit C at p.4).

82.     That, upon information and belief, by no later than July 1999, Milwaukee's own consultant with respect to the hiring of MPD officers told the FPC that psychological testing is the only method for screening out police officer candidates who are capable of pathological or abnormal patterns of behavior.

83.     That complete psychological testing of police officer candidates consists of:  (a) requiring candidates to take a written psychological test and (b) requiring candidates to participate in a clinical interview conducted by a psychologist or psychiatrist.

84.     That, prior to 2001, it was the explicit policy of Milwaukee to not conduct any psychological testing of police officer candidates.

85.     That, upon information and belief, between 2001 to 2005, it was the explicit policy of Milwaukee to conduct incomplete psychological testing of police officer candidates, by requiring candidates to take a written psychological test, but not requiring candidates to participate in clinical interviews conducted by a psychologist or psychiatrist.

86.     That, upon information and belief, starting in 2005, Milwaukee required police officer candidates to participate in an in-person mental health exam.

87.     That, prior to 2005, Milwaukee made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would preclude the employment of some candidates who were emotionally unstable, brutal and/or who suffered from emotional illness.

88.     That, prior to 2005, Milwaukee made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would screen out some candidates who had mental disorders and/or who were emotionally or otherwise unfit for police work.

89.     That, prior to 2005, Milwaukee made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would detect some candidates whose psychological make-up makes them high risk because they are unable to cope with the responsibilities and authority inherent in the position of police officer.

90.     That, prior to 2005, Milwaukee made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would screen out some candidates who present a risk to the public, their fellow police officers and themselves.

91.     That, prior to 2005, Milwaukee made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would screen out some candidates with excessive fearfulness, phobias, uncontrolled impulsivity, inability to handle hostility, self-destructive behaviors, paranoid tendencies, delusional thinking, psychotic conditions and character disorders.

92.     That, prior to 2005, Milwaukee made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that the failure to conduct such testing could lead to liability for police officer misconduct.

93.     That, prior to 2005, Milwaukee made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that the National Advisory Commission on Criminal Standards and Goals recommended that every police agency, by 1975,

should conduct psychological testing of police officer candidates to screen out some candidates who have mental disorders or are emotionally unfit for police work.

94.     That, prior to 2005, Milwaukee made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that, in 1991, the Mayor's Citizen Commission on Police-Community Relations recommended that Milwaukee consider psychological testing of police officer candidates.

95.     That, prior to 2005, Milwaukee made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that police departments had been conducting psychological testing of police officer candidates since the 1980's.

96.     That, prior to 2005, Milwaukee made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing is a valid and reliable measurement and is used to prevent problem behaviors by police officers, including the use of excessive force.

97.     That, prior to 2005, Milwaukee made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing was the only method to screen out candidates who are capable of pathological or abnormal patterns of behavior.

98.     That, prior to 2005, Milwaukee made a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would screen out some candidates who would commit constitutional violations.

99.     That, upon information and belief, Milwaukee presently fails to conduct complete psychological testing of police officer candidates.

100.    That, upon information and belief, Milwaukee hired the individual Defendant MPD officers, and allowed said Defendants to remain employed with the MPD, without conducting complete psychological testing of said Defendants, despite knowing that failing to conduct complete psychological testing would result in said Defendants committing constitutional violations.

101.    That the explicit policies of Milwaukee, with respect to the failure to conduct complete psychological testing of MPD officer candidates, were the moving force behind the constitutional violations suffered by the Plaintiffs in this action.

102.    That the actions and/or inactions of the individual Defendant MPD officers, during the incidents which are the subject matter of this action, demonstrate that said Defendants, upon information and belief, were emotionally unstable and brutal.

103.    That the actions and/or inactions of the individual Defendant MPD officers, during the incidents which are the subject matter of this action, demonstrate that said Defendants, upon information and belief, had mental disorders and were emotionally unfit for police work.

104.    That the actions and/or inactions of the individual Defendant MPD officers, during the incidents which are the subject matter of this action, demonstrate that said Defendants, upon information and belief, were unable to cope with the responsibilities and authority inherent in the position of police officer.

105.    That the actions and/or inactions of the individual Defendant MPD officers, during the incidents which are the subject matter of this action, demonstrate that said Defendants, upon information and belief, presented a risk to the public.

106.    That the actions and/or inactions of the individual Defendant MPD officers, during the incidents which are the subject matter of this action, demonstrate that said Defendants,

upon information and belief, had uncontrolled impulsivity, inability to handle hostility, self-destructive behaviors, delusional thinking, psychotic conditions and character disorders.

107.    That the actions and/or inactions of the individual Defendant MPD officers, during the incidents which are the subject matter of this action, demonstrate that said Defendants, upon information and belief, were capable of pathological and abnormal patterns of behavior.

108.    That, had Milwaukee conducted complete psychological testing on the individual Defendant MPD officers, said Defendants would not have been hired by the MPD and/or would not have remained employed by the MPD, and, as a result, the constitutional violations suffered by the Plaintiffs in this action would not have occurred.

**Failure to Train Policy**

109.    That the FPC and MPD Chief of Police are the policy-makers for Milwaukee with respect to the training of MPD officers.

110.    That conducting strip searches and facilitating body cavity searches are recurring situations that MPD officers are certain to face.

111.    That, upon information and belief, prior to 2008 and continuing to the present, it was/is the explicit and/or implicit policy of Milwaukee to have a training program that was/is not adequate to train MPD officers to properly conduct strip searches and facilitate body cavity searches, because the program failed/fails to train MPD officers that:  (a) strip searches must be conducted by a person of the same sex as the person to be searched; (b) the person to be strip searched cannot be exposed to the view of any person not conducting the search; (c) strip searches must not be conducted in public unless there are exigent circumstances or some other justification; (d) the person conducting the strip search must obtain prior written permission for the search, unless there is probable cause to suspect that the person to be searched is concealing a

weapon; (e) the person conducting the strip search must prepare a report identifying the person detained, the person(s) conducting the search, the time, date and place of the search and the prior written authorization for the search, and then provide a copy of that report to the person who was searched; and (f) a body cavity search must be conducted by a physician, a physician assistant or a registered nurse who is licensed to practice in the State of Wisconsin.

112. That, as set forth in the subsequent paragraphs, the individual Defendant MPD officers engaged in a pattern of constitutional violations by conducting unreasonable strip searches and body cavity searches.

113. That, upon information and belief, after learning of the pattern of constitutional violations committed by the individual Defendant MPD officers, it was the explicit and/or implicit policy of Milwaukee to fail to train MPD officers to avoid conducting unreasonable strip searches and body cavity searches.

114. That, as a result of Milwaukee's failure to train MPD officers to avoid conducting unreasonable strip searches and body cavity searches, the individual Defendant MPD officers continued to conduct unreasonable strip searches and body cavity searches, including the searches conducted of the Plaintiffs in this action.

115. That Flynn, one of Milwaukee's policy-makers with respect to training MPD officers, has stated that the issue of conducting strip searches and body cavity searches is "a serious, serious, training issue."

116. That the President of the Milwaukee Police Association, the union that represents non-supervisory MPD officers, has stated that the unreasonable strip searches and body cavity searches conducted by MPD officers occurred as a result of "a lack of training."

117.    That the explicit and/or implicit policies of Milwaukee with respect to the failure to train MPD officers, as set forth in the preceding paragraphs, were the moving force behind the constitutional violations suffered by the Plaintiffs in this action.

118.    That, had Milwaukee trained MPD officers to avoid conducting unreasonable strip searches and body cavity searches, the constitutional violations suffered by the Plaintiffs in this action would not have occurred.

**Failure to Discipline Policy**

119.    That the FPC and MPD Chief of Police are the policy-makers for Milwaukee with respect to the discipline of MPD officers.

120.    That Milwaukee has a long history of failing to discipline its police officers for misconduct, including, but not limited to, the commission of constitutional rights violations.

121.    That, in 1991, the Mayor's Citizen Commission on Police-Community Relations identified significant problems with the FPC citizen complaint process, which resulted in only one police officer being disciplined between 1985 and 1990. (*See* Exhibit B at pp.35-38).

122.    That, upon information and belief, Milwaukee took no action to address the problems with the FPC citizen complaint process identified by the Mayor's Citizen Commission on Police-Community Relations in 1991.

123.    That, in June 2006, the Police Assessment Resource Center and Richard Jerome, PC issued a Report titled "Promoting Police Accountability in Milwaukee: Strengthening the Fire and Police Commission" ("the PARC Report"), which details the problems with the FPC citizen complaint process.

124.    That a copy of the PARC Report is attached to this Federal Complaint as Exhibit D, and is incorporated as part of this Federal Complaint.

125.    That Milwaukee had actual notice and/or knowledge of the PARC Report and its contents by June 2006, or shortly thereafter.

126.    That the PARC Report stated that "[t]he FPC citizen complaint process is broken beyond repair." (*See* Exhibit D at p.46).

127.    That the PARC Report stated that "[t]he FPC complaint process is structurally flawed in ways that make it very difficult for a citizen to establish a claim of misconduct, even if meritorious." (*See* Exhibit D at p.46).

128.    That the PARC Report stated that the results of the FPC citizen complaint process "are troubling, and demonstrate the FPC's structural defects." (*See* Exhibit D at p.49).

129.    That the PARC Report indicated that, out of the 550 complaints filed from 1992 to 1999, only six cases resulted in sustained charges against only eight MPD officers. (*See* Exhibit D at p.49).

130.    That the PARC Report indicated that, out of the 437 complaints filed from 2000 to 2005, charges were sustained against only two MPD officers. (*See* Exhibit D at p.49).

131.    That the PARC Report recommended significant changes in the procedures for addressing citizen complaints against MPD officers. (*See* Exhibit D at pp.49-56).

132.    That, upon information and belief, Milwaukee took insufficient action to address the problems with the FPC citizen complaint process or to adopt the recommendations set forth in the PARC Report.

133.    That the PARC Report stated that "one of the goals of police oversight is to go beyond the review of individual citizen complaints to assess trends or patterns of police misconduct, as well as to address community concerns about police policies and practices." (*See* Exhibit D at p.67).

134.    That the PARC Report found that the FPC has failed to use its power and fulfill its responsibility to conduct policy reviews of the MPD. (*See* Exhibit D at p.68).

135.    That the PARC Report stated that, "[w]hile the [FPC] has responsibility for policy review, it has not established a program of systematic monitoring or auditing of the MPD, analysis and study of MPD policies and procedures, or of trends in complaints or the MPD use of force." (*See* Exhibit D at p.73).

136.    That the PARC Report found that the FPC performed "[n]o audits of FPC citizen complaints, nor any audit or evaluation of complaints received and investigated by MPD." (*See* Exhibit D at p.73).

137.    That the PARC Report found that the FPC performed "[l]imited collection and analysis of MPD use of force information, or evaluation of MPD's efforts to analyze its own use of force statistics." (*See* Exhibit D at p.74).

138.    That the PARC Report found that the FPC performed "[n]o review of civil actions and tort claims relating to MPD actions." (*See* Exhibit D at p.74).

139.    That the PARC Report made several recommendations for the FPC to utilize its policy review and oversight functions. (*See* Exhibit D at pp.74-76).

140.    That, upon information and belief, Milwaukee took insufficient action to adopt the recommendations set forth in the PARC Report with respect to policy review and oversight functions.

141.    That, prior to 2008 and continuing to the present, it was/is the explicit and/or implicit policy of Milwaukee to fail to maintain a computer database of citizen complaints against MPD officers.

142. That, prior to 2008 and continuing to the present, it was/is the explicit and/or implicit policy of Milwaukee to fail to properly investigate citizen complaints against MPD officers.

143. That, prior to 2008 and continuing to the present, it was/is the explicit and/or implicit policy of Milwaukee to fail to maintain a computer database of uses of force by MPD officers.

144. That, prior to 2008 and continuing to the present, it was/is the explicit and/or implicit policy of Milwaukee to fail to properly investigate uses of force by MPD officers.

145. That, prior to 2008 and continuing to the present, it was/is the explicit and/or implicit policy of Milwaukee to delay conducting internal investigations into allegations of MPD officer misconduct, sometimes using a pending criminal investigation against the MPD officer as an excuse for the delay.

146. That the existence of a pending criminal investigation against an MPD officer provides no justification to delay an internal investigation into police officer misconduct, because statements made by police officers during internal investigations cannot be used against them in criminal proceedings.

147. That, following the October 24, 2004 incident where Frank L. Jude, Jr. was severely beaten by several MPD officers ("the Jude incident"), the MPD did not begin an internal investigation for almost four months.

148. That the MPD only initiated an internal investigation into the Jude incident after an article appeared in the *Milwaukee Journal Sentinel* reporting on the lack of such an investigation.

149.    That, in September 2013, Milwaukee refused an open records request regarding a February 2012 incident which is part of the subject matter of this action, claiming that an MPD internal investigation into the incident had yet to be completed.

150.    That there is no justification for the MPD taking over 19 months to complete an internal investigation into MPD officer misconduct.

151.    That, prior to 2008 and continuing to the present, it was/is the explicit and/or implicit policy of Milwaukee to permit a belief among MPD officers that they can commit constitutional rights violations without ever facing consequences for their misconduct.

152.    That the explicit and/or implicit policies of Milwaukee with respect to its failures to discipline MPD officers, as set forth in the preceding paragraphs, were the moving force behind the constitutional violations suffered by the Plaintiffs in this action.

153.    That, on March 22, 2012, Flynn, one of Milwaukee's policy-makers with respect to the discipline of MPD officers, admitted that the MPD received complaints of illegal strip searches and body cavity searches "a couple of years ago," but did not begin an investigation into the complaints because the MPD "did not pick up a pattern."

154.    That, upon information and belief, Milwaukee received complaints regarding unreasonable strip searches and body cavity searches starting in 2008, or possibly at an earlier date, well before the dates of the incidents which are the subject matter of this action.

155.    That, upon information and belief, Milwaukee had actual knowledge and/or notice that MPD officers were committing unreasonable strip searches and body cavity searches prior to the dates of the incidents which are the subject matter of this action.

156.    That, upon information and belief, despite having actual knowledge and/or notice that MPD officers were committing unreasonable strip searches and body cavity searches,

28

Milwaukee took no action to discipline the MPD officers involved prior to the dates of the incidents which are the subject matter of this action.

157.    That, as a result of Milwaukee's failure to investigate complaints of unreasonable strip searches and body cavity searches and to discipline the MPD officers involved, the unreasonable strip searches and body cavity searches were allowed to continue, including the unreasonable searches suffered by the Plaintiffs during the incidents which are the subject matter of this action.

158.    That, as a result of Milwaukee's failure to discipline MPD officers for conducting unreasonable strip searches and body cavity searches, the individual Defendant MPD officers were allowed to remain employed as MPD officers and to conduct the unreasonable searches suffered by the Plaintiffs during the incidents which are the subject matter of this action.

159.    That, upon information and belief, the individual Defendant MPD officers conducted the unreasonable strip searches and body cavity searches of the Plaintiffs during the incidents which are the subject matter of this action because they believed that they would not be disciplined for their misconduct.

160.    That, if Milwaukee had not failed to discipline MPD officers for conducting the prior unreasonable strip searches and body cavity searches, the unreasonable searches suffered by the Plaintiffs during the incidents which are the subject matter of this action would not have happened.

161.    That, upon information and belief, Milwaukee presently maintains an explicit and/or implicit policy of failing to discipline MPD officers for engaging in misconduct, including, but not limited to, conducting unreasonable strip searches and body cavity searches.

## Custom of Condoning Constitutional Rights Violations

162.     That, prior to 2008 and continuing to the present, Milwaukee maintained/maintains a custom of condoning constitutional rights violations by MPD officers.

163.     That, prior to 2008 and continuing to the present, the custom of condoning constitutional rights violations by MPD officers was/is so persistent and widespread that it was/is the official policy of Milwaukee.

164.     That part of Milwaukee's custom of condoning constitutional rights violations by MPD officers was/is the failure to discipline MPD officers for misconduct, as set forth in the preceding paragraphs.

165.     That part of Milwaukee's custom of condoning constitutional rights violations by MPD officers was/is the "code of silence" that exists within the MPD, even though this code may be contrary to the express policies of Milwaukee.

166.     That the MPD's "code of silence" is where MPD officers do not report the misconduct of their fellow officers due to the fear of retaliation.

167.     That, in 1991, the Mayor's Citizen Commission on Police-Community Relations identified the MPD's "code of silence." (*See* Exhibit B at pp.21-22).

168.     That, upon information and belief, Milwaukee took insufficient action in response to the Mayor's Citizen Commission on Police-Community Relations identifying the MPD's "code of silence."

169.     That, during the MPD investigation into the Jude incident, former MPD Chief of Police Nannette Hegerty expressed frustration that MPD officers were following the "code of silence" by refusing to cooperate with the MPD investigation.

170. That, during the state criminal investigation into the Jude incident, former Milwaukee County District Attorney E. Michael McCann stated that the MPD's "code of silence" hampered the investigation.

171. That the MPD's "code of silence" required the request and order for a John Doe proceeding so that MPD officers could be compelled to testify regarding their knowledge of the Jude incident.

172. That, when MPD Officer Nicole Belmore came forward to report the misconduct of her fellow officers during the Jude incident, thereby violating the MPD's "code of silence," Officer Belmore suffered retaliation by MPD officers, including, but not limited to: (a) MPD officers calling Officer Belmore a "rat;" (2) MPD officers vandalizing Officer Belmore's property; (c) MPD officers interfering with Officer Belmore's police radio communications; and (d) MPD officers refusing to provide back-up to Officer Belmore when it was requested.

173. That, despite having actual knowledge and/or notice of the retaliation suffered by MPD Officer Nicole Belmore, Milwaukee took no action to investigate the retaliation or to discipline the MPD officers involved in the retaliation.

174. That, upon information and belief, current MPD Officer Bradley Blum followed the "code of silence" when he refused to answer questions regarding his knowledge of the Jude incident during a May 13, 2009 deposition in *Frank L. Jude, Jr. v City of Milwaukee, et al.*, United States District Court for the Eastern District of Wisconsin Case Number 06-CV-1101 ("the *Jude* civil case").

175. That, upon information and belief, despite current MPD Officer Bradley Blum following the "code of silence" and refusing to answer questions during his deposition in the

*Jude* civil case, Milwaukee has taken no action against Officer Blum and has allowed him to remain employed as an MPD officer.

176. That, upon information and belief, several MPD officers followed the "code of silence" by refusing to testify during the Inquest into the police custody death of Derek Williams.

177. That several other MPD officers have followed the "code of silence" by refusing to testify in various other civil and criminal proceedings.

178. That, upon information and belief, Milwaukee has taken no action with respect to any MPD officer following the "code of silence" by refusing to testify in a civil or criminal proceeding.

179. That, upon information and belief, in 2011 and 2012, when two MPD officers violated the "code of silence" by reporting the misconduct of a fellow police officer, the MPD retaliated against the two officers in the terms and conditions of their employment.

180. That, in 2009, Flynn admitted that the "code of silence" exists within the MPD.

181. That, upon information and belief, the "code of silence" presently exists within the MPD and is currently the custom and policy of Milwaukee.

182. That part of Milwaukee's custom of condoning constitutional rights violations by MPD officers is the concept of "noble cause corruption" that exists within the MPD, even though this concept may be contrary to the express policies of Milwaukee.

183. That the concept of "noble cause corruption" is where MPD officers engage in misconduct because they believe they are accomplishing a greater good.

184. That, upon information and belief, in 2012, Flynn has admitted that the concept of "noble cause corruption" exists within the MPD.

185.    That Milwaukee's custom of condoning constitutional rights violations by MPD officers was the moving force behind the constitutional violations suffered by the Plaintiffs during the incidents which are the subject matter of this action.

186.    That the constitutional violations suffered by the Plaintiffs during the incidents which are the subject matter of this action happened because the individual Defendant MPD officers were following the "code of silence" by not reporting the prior misconduct of their fellow officers.

187.    That the constitutional violations suffered by the Plaintiffs during the incidents which are the subject matter of this action happened because the individual Defendant MPD officers knew that their fellow officers had followed the "code of silence" by not reporting prior misconduct.

188.    That the constitutional violations suffered by the Plaintiffs during the incidents which are the subject matter of this action happened because the individual Defendant MPD officers were following the concept of "noble cause corruption," engaging in unreasonable strip searches and body cavity searches because they believed they were accomplishing a greater good of potentially seizing illegal drugs and potentially arresting drug dealers.

189.    That, had Milwaukee not maintained a custom of condoning constitutional violations, the constitutional violations suffered by the Plaintiffs during the incidents which are the subject matter of this action would not have occurred.

**Widespread Pattern of Constitutional Violations**

190.    That, as stated above, there is a long history of constitutional violations committed by MPD officers that were caused by the policies and customs of Milwaukee.

191.    That, in 1958, MPD Officer Thomas Grady shot Daniel Bell in the back, killing Mr. Bell.

192.    That MPD Officer Thomas Grady then planted a knife on Daniel Bell to support his false claim that Mr. Bell was armed and attacked him.

193.    That, upon information and belief, MPD Officer Louis Krause followed the MPD's "code of silence" by conspiring with MPD Officer Thomas Grady to lie about the incident which led to the fatal shooting of Daniel Bell.

194.    That, between 1979 and 1980, the United States Department of Justice ("DOJ") conducted an investigation into a possible pattern of misconduct within the MPD.

195.    That former MPD Chief of Police Harold Brier refused to cooperate with the DOJ investigation.

196.    That the DOJ investigation found that 22 people died in MPD custody between 1975 and 1979.

197.    That the DOJ investigation determined that there was no accountability for former MPD Chief of Police Harold Brier.

198.    That, in 1981, Ernest Lacy died in MPD custody after MPD officers used excessive force against him and then failed to provide him with medical assistance.

199.    That, despite a medical examiner documenting over 30 cuts and bruises on Ernest Lacy's body, and witnesses accounts describing MPD officer use of excessive force against Mr. Lacy, former MPD Chief of Police Harold Brier claimed that MPD officers did nothing wrong during the incident that resulted in the death of Mr. Lacy.

200.    That former MPD Chief of Police Harold Brier refused to cooperate with any federal investigation into the death of Ernest Lacy.

201. That, in 1988, MPD officers shot Tandy O'Neal in the back, rendering Mr. O'Neal a quadriplegic.

202. That, upon information and belief, an MPD Detective, following the MPD's "code of silence," initially stated that Tandy O'Neal struggled with MPD officers prior to being shot.

203. That the MPD Detective eventually admitted that his statement regarding Tandy O'Neal struggling with MPD officers was not true.

204. That, in 2003, MPD Officer Craig Nawotka shot and killed Justin Fields.

205. That, upon information and belief, MPD Officer Craig Nawotka shot Justin Fields in the back as Mr. Fields was slowly driving away from MPD officers.

206. That MPD Sergeant Harold Hampton, who conducted the MPD internal investigation into MPD Officer Craig Nawotka's shooting of Justin Fields, testified under oath that the head of the MPD internal affairs division ignored Sergeant Hampton's findings that Officer Nawotka violated several MPD rules during the incident that resulted in the shooting of Mr. Fields.

207. That, in 2003, MPD Officer Kevin Clark slammed Curtis Harris' head into the wall and floor of the MPD District 3 Police Station booking room.

208. That, as a result of MPD Officer Kevin Clark's actions, Curtis Harris was rendered a quadriplegic.

209. That MPD Officer Kevin Clark claimed that Curtis Harris was trying to hit him, but video from the incident refuted Officer Clark's claim.

210. That Curtis Harris filed a federal civil rights action against Milwaukee, and Milwaukee paid three million dollars to Mr. Harris to settle his federal civil rights action.

35

211. That Milwaukee took no action against MPD Officer Kevin Clark for his actions during the incident with Curtis Harris.

212. That MPD Officer Kevin Clark was later fired from the MPD after he pleaded guilty to insurance fraud after collecting worker's compensation benefits for injuries he sustained while sledding on duty.

213. That MPD Officer Kevin Clark and other MPD officers, upon information and belief, followed the MPD's "code of silence" by covering up the sledding while on duty incident.

214. That, on October 24, 2004, several MPD officers brutally beat and tortured Frank L. Jude, Jr. during the Jude incident, although they initially denied any involvement in the Jude incident.

215. That several MPD officers ultimately pleaded guilty in federal court to violating Frank L. Jude, Jr.'s constitutional rights.

216. That, following a federal criminal trial, a jury determined that several other MPD officers violated Frank L. Jude, Jr.'s constitutional rights.

217. That Milwaukee settled Frank L. Jude, Jr.'s federal civil rights action for two million dollars.

218. That, in March 2005, MPD Officer Alfonzo Glover shot and killed Wilbert Prado.

219. That, following a federal civil trial, a jury determined that MPD Officer Alfonzo Glover violated Wilbert Prado's constitutional rights.

220. That, in a three-year time period, Mucha was accused at least ten times of using excessive force and/or planting drugs on citizens.

221. That, in August 2005, the Milwaukee County Circuit Court, the Honorable Charles F. Kahn, Jr. presiding, ruled that several persons who had accused Mucha of using

36

excessive force and/or planting drugs could testify in a criminal case where the defendant accused Mucha of using excessive force and/or planting drugs. (*State of Wisconsin v. Lemar Barnes*, Milwaukee County Case Number 04-CF-1001, Amended Decision of Admissibility of Evidence, dated August 10, 2005).

222.    That, on March 14, 2006, the Court of Appeals of Wisconsin issued an opinion reversing a trial court decision that denied a criminal defendant's request to introduce evidence that Mucha had used excessive force and/or planted drugs on other persons. (*State of Wisconsin v. Walter T. Missouri*, 2006 WI App 74).

223.    That, between 2000 and 2007, the MPD investigated Mucha for seven battery complaints, four unreasonable search complaints, two theft complaints and one false arrest complaint.

224.    That the MPD claimed that all the complaints against Mucha set forth in the preceding paragraph were either unfounded or unsubstantiated.

225.    That the MPD either failed to notice or intentionally disregarded a pattern and/or trend with respect to Mucha's misconduct.

226.    That on July 6, 2011, Derek Williams died in MPD custody after MPD officers, upon information and belief, may have used excessive force against Mr. Williams and then failed to provide Mr. Williams with medical assistance, despite the fact that Mr. Williams was in the back seat of an MPD squad car struggling to breathe and begging MPD officers for help.

227.    That an Inquest was held to determine whether any of the MPD officers involved should face criminal charges as a result of the death of Derek Williams.

228.    That, following the conclusion of testimony, the Derek Williams Inquest jury issued an advisory verdict that MPD Officer Richard Ticcioni, MPD Officer Jason Bleichwehl,

and Cline should be criminally charged pursuant to Wisconsin Statute Section 940.291, Law Enforcement Officer; Failure to Render Aid.

229.    That, despite the Derek Williams Inquest jury's advisory verdict, the special prosecutor who conducted the Inquest refused to bring criminal charges against MPD Officer Richard Ticcioni, MPD Officer Jason Bleichwehl and Cline.

230.    That Milwaukee took no action against MPD Officer Richard Ticcioni, MPD Officer Jason Bleichwehl, Cline, or any other MPD officers involved in the death of Derek Williams.

231.    That, on September 22, 2011, MPD Officer Richard Schoen used excessive force against a woman in his custody by punching her in the face multiple times, grabbing her by the hair as he removed her from an MPD squad car, and kneeing her in the stomach.

232.    That the MPD fired MPD Officer Richard Schoen as a result of his actions on September 22, 2011.

233.    That the FPC then reversed the MPD's decision to fire MPD Officer Richard Schoen and instead gave him his job back, suspending him for 60 days.

234.    That, following a public outcry, the FPC reinstated the MPD's decision to fire MPD Officer Richard Schoen.

235.    That, in 2013, a jury determined that MPD Detective Rodolfo Gomez either intentionally, or with reckless disregard for the truth, made false or misleading statements in an affidavit accompanying a search warrant application, awarding the victim of Detective Gomez's misconduct $1,000,000. (*Richard Betker v. Rodolfo Gomez*, United States District Court for the Eastern District of the United States Case Number 08-CV-760, Verdict Form dated November 20, 2013).

236.    That the latest example of the widespread pattern of constitutional violations committed by MPD officers is the widespread pattern of MPD officers conducting unreasonable strip searches and body cavity searches.

237.    That Flynn, Pixley, Hudson, Gordon, Howard, Brunson, Mucha and other MPD supervisors knew of the widespread pattern of MPD officers conducting unreasonable strip searches and body cavity searches.

238.    That Flynn, Pixley, Hudson, Gordon, Howard, Brunson, Mucha and other MPD supervisors approved, assisted, condoned and/or purposely ignored the widespread pattern of MPD officers conducting unreasonable strip searches and body cavity searches.

239.    That, in this action alone, there are 14 victims of unreasonable strip searches and/or body cavity searches involving 36 individual Defendant MPD officers, as well as numerous other currently unknown MPD officers and supervisors.

240.    That the incidents which are the subject matter of this action involve three of the seven MPD District Police Stations.

241.    That there are currently nine pending lawsuits alleging that MPD officers conducted unreasonable strip searches and body cavity searches.

### FACTS RELATING TO THE INCIDENTS
### WHICH ARE THE SUBJECT MATTER OF THIS ACTION

### D.J.B.

242.    That, on September 30, 2011, D.J.B. was lawfully operating his vehicle near the intersection of North 11th Street and West Capitol Drive in Milwaukee.

243.    That, without reasonable suspicion or probable cause to suspect that D.J.B. had committed, was committing or was about to commit a crime or a violation of the rules of the road, Vagnini and other currently unknown MPD officers stopped D.J.B.'s vehicle.

244.    That, without reasonable suspicion or probable cause to suspect that D.J.B. had committed, was committing or was about to commit a crime, Vagnini ordered D.J.B. to exit his vehicle.

245.    That, without reasonable suspicion or probable cause to suspect that: (a) D.J.B. had committed, was committing, or was about to commit a crime; (b) D.J.B. was armed and/or dangerous; or (c) D.J.B. was concealing weapons and/or contraband on his person, Vagnini conducted a pat-down search and attempted a body cavity search of D.J.B., on the street, in public view, and in view of other currently unknown MPD officers, by: (a) searching D.J.B.'s pockets; (b) placing his hands in between D.J.B.'s pants and underwear; and (c) attempting to search D.J.B.'s rear body cavity.

246.    That D.J.B. did not consent to the pat-down search or the attempted body cavity search conducted by Vagnini.

247.    That, upon information and belief, Vagnini did not have a warrant for the pat-down search and the attempted body cavity search of D.J.B.

248.    That there were no exigent circumstances surrounding the pat-down search and the attempted body cavity search of D.J.B. conducted by Vagnini.

249.    That the currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the pat-down search and the attempted body cavity search of D.J.B. conducted by Vagnini.

250.    That the currently unknown MPD officers took no action to prevent the pat-down search and the attempted body cavity search of D.J.B. conducted by Vagnini.

251.    That, without reasonable suspicion or probable cause to suspect that D.J.B. had committed, was committing, or was about to commit a crime, Vagnini searched D.J.B.'s vehicle.

252.     That, without reasonable suspicion or probable cause to suspect that D.J.B. had committed, was committing or was about to commit a crime, Vagnini arrested D.J.B. and conveyed D.J.B. to the MPD District 5 Police Station.

253.     That Vagnini took D.J.B. into a room inside the garage area of the MPD District 5 Police Station.

254.     That Vagnini stated the following with respect to D.J.B.:  "I want to see what he's got in his butt."

255.     That, without reasonable suspicion or probable cause to suspect that D.J.B. had committed, was committing, or was about to commit a crime, or that D.J.B. was armed and/or dangerous, Vagnini conducted a strip search and a body cavity search of D.J.B., in view of Knight and Dollhopf by:  (a) removing D.J.B.'s shirt and pants; (b) placing his bare hand inside D.J.B.'s underwear and; (c) inserting his bare fingers inside D.J.B.'s rear body cavity four or five times.

256.     That Knight and Dollhopf held onto D.J.B. as Vagnini conducted the strip search and the body cavity search.

257.     That as Vagnini was conducting the strip search and the body cavity search, D.J.B. stated the following to Vagnini:  "This ain't right! Call my attorney!"

258.     That Vagnini ignored D.J.B.'s statement about the propriety of the strip search and the body cavity search, and ignored D.J.B.'s request that his attorney be contacted; and instead laughed at D.J.B. and continued conducting the strip search and the body cavity search.

259.     That D.J.B. did not consent to the strip search or the body cavity search conducted by Vagnini.

260. That, upon information and belief, Vagnini did not have a warrant for the strip search and the body cavity search of D.J.B.

261. That, upon information and belief, Vagnini did not have prior written permission for the strip search and the body cavity search of D.J.B.

262. That, upon information and belief, Vagnini was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of D.J.B.

263. That, upon information and belief, Vagnini did not prepare any report regarding the strip search and the body cavity search of D.J.B., and did not provide a copy of any such report to D.J.B.

264. That the strip search and the body cavity search of D.J.B. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived D.J.B. of the liberty interests set forth in Section 968.255, without any process or procedure.

265. That there were no exigent circumstances surrounding the strip search and the body cavity search of D.J.B. conducted by Vagnini.

266. That Knight and Dollhopf were present during, and had a realistic opportunity to prevent, the strip search and the body cavity search of D.J.B. conducted by Vagnini.

267. That Knight and Dollhopf took no action to prevent the strip search and the body cavity search of D.J.B. conducted by Vagnini.

268. That, as a result of the actions and/or inactions of Vagnini, Knight, Dollhopf and the other currently unknown MPD officers, D.J.B. suffered physical injuries, including, but not limited to, injuries to his rear body cavity, experienced pain and suffering, and suffered and

continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

269.     That, upon information and belief, the actions and/or inactions of Vagnini, Knight, Dollhopf and the other currently unknown MPD officers were motivated by evil motive or intent.

270.     That the actions and/or inactions of Vagnini, Knight, Dollhopf and the other currently unknown MPD officers involved reckless and/or callous indifference to the federally protected rights of D.J.B.

## B.G.C.

271.     That, on January 28, 2012, B.G.C. was operating his vehicle near the intersection of North 29th Street and West Glendale Avenue in Milwaukee.

272.     That Vagnini, Knight and other currently unknown MPD officers stopped B.G.C.'s vehicle, allegedly because B.G.C. was not wearing a seat belt.

273.     That, without reasonable suspicion or probable cause to suspect that B.G.C. had committed, was committing, or was about to commit a crime, Vagnini forcibly removed B.G.C. from his vehicle.

274.     That, without reasonable suspicion or probable cause to suspect that B.G.C. had committed, was committing or was about to commit a crime, Vagnini and the other currently unknown MPD officers searched B.G.C.'s vehicle.

275.     That, without reasonable suspicion or probable cause to suspect that B.G.C. had committed, was committing, or was about to commit a crime, or that B.G.C. was armed and/or dangerous, Vagnini conducted a strip search and a body cavity search of B.G.C., on the street, in public view, and in view of Knight and the other currently unknown MPD officers, by:  (a)

43

placing his bare hand in between B.G.C.'s pants and underwear and (b) inserting his bare fingers inside B.G.C.'s rear body cavity.

276.    That B.G.C. did not consent to the strip search or the body cavity search conducted by Vagnini.

277.    That, upon information and belief, Vagnini did not have a warrant for the strip search and the body cavity search of B.G.C.

278.    That, upon information and belief, Vagnini did not have prior written permission for the strip search and the body cavity search of B.G.C.

279.    That, upon information and belief, Vagnini was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of B.G.C.

280.    That, upon information and belief, Vagnini did not prepare any report regarding the strip search and the body cavity search of B.G.C., and did not provide a copy of any such report to B.G.C.

281.    That the strip search and the body cavity search of B.G.C. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived B.G.C. of the liberty interests set forth in Section 968.255, without any process or procedure.

282.    That there were no exigent circumstances surrounding the strip search and the body cavity search of B.G.C. conducted by Vagnini.

283.    That Knight and the other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the strip search and the body cavity search of B.G.C. conducted by Vagnini.

284.    That Knight and the other currently unknown MPD officers took no action to prevent the strip search and the body cavity search of B.G.C. conducted by Vagnini.

285.    That, as a result of the actions and/or inactions of Vagnini, Knight and the other currently unknown MPD officers, B.G.C. suffered physical injuries, including, but not limited to, injuries to his rear body cavity, experienced pain and suffering, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

286.    That, upon information and belief, the actions and/or inactions of Vagnini, Knight and the other currently unknown MPD officers were motivated by evil motive or intent.

287.    That the actions and/or inactions of Vagnini, Defendant, Knight, and the other currently unknown MPD officers involved reckless and/or callous indifference to the federally protected rights of B.G.C.

**S.F.F.**

288.    That, on February 26, 2012, S.F.F. was lawfully at the address of 3909 North 10th Street in Milwaukee.

289.    That, without reasonable suspicion or probable cause to suspect that S.F.F. had committed, was committing, or was about to commit a crime, Vagnini detained and interrogated S.F.F.

290.    That, without reasonable suspicion or probable cause to suspect that:  (a) S.F.F. had committed, was committing, or was about to commit a crime; (b) S.F.F. was armed and/or dangerous; or (c) S.F.F. was concealing weapons and/or contraband on his person, Vagnini arrested S.F.F., conducted a pat-down search of S.F.F., handcuffed S.F.F, and placed S.F.F. in the back seat of an MPD squad car.

291.     That, without reasonable suspicion or probable cause to suspect that S.F.F. had committed, was committing, or was about to commit a crime, or that S.F.F. was armed and/or dangerous, Vagnini removed S.F.F. from the MPD squad car and conducted a strip search and a body cavity search of S.F.F., on the street, in public view, and in view of Knight and other currently unknown MPD officers, by:  (a) putting his bare hands inside S.F.F.'s pants and underwear; (b) running his bare hand down S.F.F.'s butt crack to S.F.F.'s scrotum; and (c) inserting his bare fingers inside S.F.F.'s rear body cavity.

292.     That S.F.F. did not consent to the strip search or the body cavity search conducted by Vagnini.

293.     That, upon information and belief, Vagnini did not have a warrant for the strip search and the body cavity search of S.F.F.

294.     That, upon information and belief, Vagnini did not have prior written permission for the strip search and the body cavity search of S.F.F.

295.     That, upon information and belief, Vagnini was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of S.F.F.

296.     That, upon information and belief, Vagnini did not prepare any report regarding the strip search and the body cavity search of S.F.F., and did not provide a copy of any such report to S.F.F.

297.     That the strip search and the body cavity search of S.F.F. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived S.F.F. of the liberty interests set forth in Section 968.255, without any process or procedure.

298. That there were no exigent circumstances surrounding the strip search and the body cavity search of S.F.F. conducted by Vagnini.

299. That Knight and the other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the strip search and the body cavity search of S.F.F. conducted by Vagnini.

300. That Knight and the other currently unknown MPD officers took no action to prevent the strip search and the body cavity search of S.F.F. conducted by Vagnini.

301. That, during his search, Vagnini placed S.F.F. in a choke hold, pressing and pulling back on S.F.F.'s neck so hard that S.F.F. began slobbering, and S.F.F.'s feet were nearly off the ground.

302. That, as Vagnini was choking S.F.F., Knight and a currently unknown MPD officer were hanging onto S.F.F.'s arms, and another currently unknown MPD officer was holding a gun against S.F.F.'s head.

303. That, without reasonable suspicion or probable cause to suspect that S.F.F. had committed, was committing, or was about to commit a crime, or that S.F.F. was armed and/or dangerous, Vagnini conducted a second strip search and a second body cavity search of S.F.F., on the street, in public view, and in view of Knight and other currently unknown MPD officers, by: (a) putting his bare hands inside S.F.F.'s pants and underwear; (b) grabbing S.F.F.'s buttocks; (c) inserting his bare fingers inside S.F.F.'s rear body cavity; and (d) pulling at S.F.F.'s rear body cavity.

304. That S.F.F. did not consent to the second strip search or the second body cavity search conducted by Vagnini.

305.    That, upon information and belief, Vagnini did not have a warrant for the second strip search and the second body cavity search of S.F.F.

306.    That, upon information and belief, Vagnini did not have prior written permission for the second strip search and the second body cavity search of S.F.F.

307.    That, upon information and belief, Vagnini did not prepare any report regarding the second strip search and the second body cavity search of S.F.F., and did not provide a copy of any such report to S.F.F.

308.    That the second strip search and the second body cavity search of S.F.F. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived S.F.F. of the liberty interests set forth in Section 968.255, without any process or procedure.

309.    That there were no exigent circumstances surrounding the second strip search and the second body cavity search of S.F.F. conducted by Vagnini.

310.    That Knight and the other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the second strip search and the second body cavity search of S.F.F. conducted by Vagnini.

311.    That Knight and the other currently unknown MPD officers took no action to prevent the second strip search and the second body cavity search of S.F.F. conducted by Vagnini.

312.    That, as a result of the actions and/or inactions of Vagnini, Knight and the other currently unknown MPD officers, S.F.F. suffered physical injuries, including, but not limited to, injuries to his rear body cavity, experienced pain and suffering, and suffered and continues to

suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

313.     That, upon information and belief, the actions and/or inactions of Vagnini, Knight and the other currently unknown MPD officers were motivated by evil motive or intent.

314.     That the actions and/or inactions of Vagnini, Knight and the other currently unknown MPD officers involved reckless and/or callous indifference to the federally protected rights of S.F.F.

**A.D.J.**

315.     That, on March 3, 2012, A.D.J. was lawfully operating his vehicle near 3202 South 13th Street in Milwaukee.

316.     That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing or was about to a crime or a violation of the rules of the road, Daane, Ninkovic and Tracy stopped A.D.J.'s vehicle.

317.     That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, Daane ordered A.D.J. to step out of his vehicle.

318.     That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, or that A.D.J. was armed and/or dangerous, Daane conducted a strip search of A.D.J., on the street, in public view, and in view of Ninkovic and Tracy by:  (a) pulling up A.D.J.'s pants; (b) feeling A.D.J.'s waist; (c) sliding his hand in between A.D.J.'s testicles and legs; and (d) feeling all the way down to A.D.J.'s ankles.

319.     That A.D.J. did not consent to the strip search conducted by Daane.

320.    That, upon information and belief, Daane did not have a warrant for the strip search of A.D.J.

321.    That, upon information and belief, Daane did not have prior written permission for the strip search of A.D.J.

322.    That, upon information and belief, Daane did not prepare any report regarding the strip search of A.D.J., and did not provide a copy of any such report to A.D.J.

323.    That the strip search of A.D.J. conducted by Daane violated the provisions of Wisconsin Statute Section 968.255, and deprived A.D.J. of the liberty interests set forth in Section 968.255, without any process or procedure.

324.    That there were no exigent circumstances surrounding the strip search of A.D.J. conducted by Daane.

325.    That Ninkovic and Tracy were present during, and had a realistic opportunity to prevent, the strip search of A.D.J. conducted by Daane.

326.    That Ninkovic and Tracy took no action to prevent the strip search of A.D.J. conducted by Daane.

327.    That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, Daane and a currently unknown MPD officer searched A.D.J's vehicle.

328.    That A.D.J. did not consent to the search of his vehicle conducted by Daane and the currently unknown MPD officer.

329.    That Daane and the currently unknown MPD officer did not have a warrant to search A.D.J.'s vehicle.

330.    That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, or that A.D.J. was armed and/or dangerous, Ninkovic conducted a second strip search of A.D.J., on the street, in public view, and in view of other currently unknown MPD officers, by:  (a) feeling A.D.J.'s legs down to the feet; (b) placing his hand between A.D.J.'s legs and scrotum; and (c) cupping A.D.J.'s scrotum.

331.    That A.D.J. did not consent to the second strip search conducted by Ninkovic.

332.    That, upon information and belief, Ninkovic did not have a warrant for the second strip search of A.D.J.

333.    That, upon information and belief, Ninkovic did not have prior written permission for the second strip search of A.D.J.

334.    That, upon information and belief, Ninkovic did not prepare any report regarding the second strip search of A.D.J., and did not provide a copy of any such report to A.D.J.

335.    That the second strip search of A.D.J. conducted by Ninkovic violated the provisions of Wisconsin Statute Section 968.255, and deprived A.D.J. of the liberty interests set forth in Section 968.255, without any process or procedure.

336.    That there were no exigent circumstances surrounding the second strip search of A.D.J. conducted by Ninkovic.

337.    That the other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the second strip search of A.D.J. conducted by Ninkovic.

338.    That the other currently unknown MPD officers took no action to prevent the second strip search of A.D.J. conducted by Ninkovic.

339.    That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, or that A.D.J. was armed and/or

dangerous, Ninkovic conducted a third strip search of A.D.J., on the street, in public view, and in view of other currently unknown MPD officers, by ordering A.D.J. to lower his pants and lift his testicles so that Ninkovic could shine his flashlight on A.D.J.'s groin area.

340. That A.D.J. did not consent to the third strip search conducted by Ninkovic.

341. That, upon information and belief, Ninkovic did not have a warrant for the third strip search of A.D.J.

342. That, upon information and belief, Ninkovic did not have prior written permission for the third strip search of A.D.J.

343. That, upon information and belief, Ninkovic did not prepare any report regarding the third strip search of A.D.J., and did not provide a copy of any such report to A.D.J.

344. That the third strip search of A.D.J. conducted by Ninkovic violated the provisions of Wisconsin Statute Section 968.255, and deprived A.D.J. of the liberty interests set forth in Section 968.255, without any process or procedure.

345. That there were no exigent circumstances surrounding the third strip search of A.D.J. conducted by Ninkovic.

346. That the other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the third strip search of A.D.J. conducted by Ninkovic.

347. That the other currently unknown MPD officers took no action to prevent the third strip search of A.D.J. conducted by Ninkovic.

348. That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, Daane searched A.D.J's vehicle for a second time, causing damage to A.D.J.'s vehicle.

349.    That A.D.J. did not consent to the second search of his vehicle conducted by Daane.

350.    That Daane did not have a warrant for the second search A.D.J.'s vehicle.

351.    That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, Daane and Ninkovic searched A.D.J's vehicle for a third time.

352.    That A.D.J. did not consent to the third search of his vehicle conducted by Daane and Ninkovic.

353.    That Daane and Ninkovic did not have a warrant for the third search A.D.J.'s vehicle.

354.    That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, Daane, Ninkovic and Tracy arrested A.D.J. and placed him in the back seat of an MPD squad car.

355.    That Daane, Ninkovic, Tracy and Brock conveyed A.D.J. to the MPD District 2 Police Station.

356.    That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, or that A.D.J. was armed and/or dangerous, Miner conducted a fourth strip search and a body cavity search of A.D.J. in the fingerprint room of the MPD District 2 Police Station, and in view of other currently unknown MPD officers, by:  (a) placing his hands on A.D.J.'s groin; (b) separating A.D.J.'s scrotum from A.D.J.'s penis; (c) pushing against A.D.J.s' buttocks; and (d) inserting his fingers inside A.D.J.'s rear body cavity.

357.     That A.D.J. did not consent to the fourth strip search or the body cavity search conducted by Miner.

358.     That, upon information and belief, Miner did not have a warrant for the fourth strip search and the body cavity search of A.D.J.

359.     That, upon information and belief, Miner did not have prior written permission for the fourth strip search and the body cavity search of A.D.J.

360.     That, upon information and belief, Miner was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of A.D.J.

361.     That, upon information and belief, Miner did not prepare any report regarding the fourth strip search and the body cavity search of A.D.J., and did not provide a copy of any such report to A.D.J.

362.     That the fourth strip search and the body cavity search of A.D.J. conducted by Miner violated the provisions of Wisconsin Statute Section 968.255, and deprived A.D.J. of the liberty interests set forth in Section 968.255, without any process or procedure.

363.     That there were no exigent circumstances surrounding the fourth strip search and the body cavity search of A.D.J. conducted by Miner.

364.     That the other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the fourth strip search and the body cavity search of A.D.J. conducted by Miner.

365.     That the other currently unknown MPD officers took no action to prevent the fourth strip search and the body cavity search of A.D.J. conducted by Miner.

366.     That, upon information and belief, Daane notified Wilger to request authorization for a strip search, not a body cavity search, of A.D.J.

367.     That, upon information and belief, Wilger notified Smith of the request to conduct a strip search, not a body cavity search, of A.D.J.

368.     That, upon information and belief, Smith authorized a strip search, not a body cavity search, of A.D.J.

369.     That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, or that A.D.J. was armed and/or dangerous, Daane and Ninkovic conducted a fifth strip search of A.D.J. in a back room of the MPD District 2 Police Station, by ordering A.D.J., to remove his pants and expose his buttocks, and threatening A.D.J. with physical force if he did not comply.

370.     That A.D.J. did not consent to the fifth strip search conducted by Daane and Ninkovic.

371.     That, upon information and belief, Daane and Ninkovic did not have a warrant for the fifth strip search of A.D.J.

372.     That, upon information and belief, Daane and Ninkovic did not prepare any report regarding the fifth strip search of A.D.J., and did not provide a copy of any such report to A.D.J.

373.     That the fifth strip search of A.D.J. conducted by Daane and Ninkovic violated the provisions of Wisconsin Statute Section 968.255, and deprived A.D.J. of the liberty interests set forth in Section 968.255, without any process or procedure.

374.     That there were no exigent circumstances surrounding the fifth strip search of A.D.J. conducted by Daane and Ninkovic.

375.    That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, or that A.D.J. was armed and/or dangerous, Daane ordered A.D.J. to expose his rear body cavity for a body cavity search.

376.    That, in response, A.D.J. requested that Daane show him a search warrant that authorized a body cavity search.

377.    That Daane claimed that he had a search warrant authorizing a body cavity search of A.D.J., but Daane refused to show the alleged search warrant to A.D.J.

378.    That, with his hand on his Taser, Daane ordered A.D.J. to pull one leg out of his pants and expose his rear body cavity.

379.    That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, or that A.D.J. was armed and/or dangerous, Daane, Ninkovic and Miner led A.D.J. to a back room of the MPD District 2 Police Station where they conducted a sixth strip search of A.D.J., in view of a currently unknown MPD officer, by forcing A.D.J. to remove his pants and underwear, exposing A.D.J.'s rear body cavity.

380.    That A.D.J. did not consent to the sixth strip search conducted by Daane, Ninkovic and Miner.

381.    That, upon information and belief, Daane, Ninkovic and Miner did not have a warrant for the sixth strip search of A.D.J.

382.    That, upon information and belief, Daane, Ninkovic and Miner did not have prior written permission for the sixth strip search of A.D.J.

383.     That, upon information and belief, Daane, Ninkovic and Miner did not prepare any report regarding the sixth strip search of A.D.J., and did not provide a copy of any such report to A.D.J.

384.     That the sixth strip search of A.D.J. conducted by Daane, Ninkovic and Miner violated the provisions of Wisconsin Statute Section 968.255, and deprived A.D.J. of the liberty interests set forth in Section 968.255, without any process or procedure.

385.     That there were no exigent circumstances surrounding the sixth strip search of A.D.J. conducted by Daane, Ninkovic and Miner.

386.     That a currently unknown MPD officer was present during, and had a realistic opportunity to prevent, the sixth strip search of A.D.J. conducted by Daane, Ninkovic and Miner.

387.     That the currently unknown MPD officer took no action to prevent the sixth strip search of A.D.J. conducted by Daane, Ninkovic and Miner.

388.     That, without reasonable suspicion or probable cause to suspect that A.D.J. had committed, was committing, or was about to commit a crime, or that A.D.J. was armed and/or dangerous, Daane conducted a second body cavity search of A.D.J., in view of Ninkovic, Brock and Miner, by inserting a pen inside A.D.J.'s rear body cavity.

389.     That A.D.J. did not consent to the second body cavity search conducted by Daane.

390.     That, upon information and belief, Daane did not have a warrant for the second body cavity search of A.D.J.

391.     That, upon information and belief, Daane did not have prior written permission for the second body cavity search of A.D.J.

392.     That, upon information and belief, Daane did not prepare any report regarding the second body cavity search of A.D.J., and did not provide a copy of any such report to A.D.J.

393.    That the second body cavity search of A.D.J. conducted by Daane violated the provisions of Wisconsin Statute Section 968.255, and deprived A.D.J. of the liberty interests set forth in Section 968.255, without any process or procedure.

394.    That there were no exigent circumstances surrounding the second body cavity search of A.D.J. conducted by Daane.

395.    That Ninkovic, Brock and Miner were present during, and had a realistic opportunity to prevent, the second body cavity search of A.D.J. conducted by Daane.

396.    That Ninkovic, Brock and Miner took no action to prevent the second body cavity search of A.D.J. conducted by Daane.

397.    That, as a result of the actions and/or inactions of Daane, Ninkovic, Tracy, Brock, Miner, Wilger, Smith and the other currently unknown MPD officers, A.D.J. sustained property damage to his vehicle, suffered physical injuries, including, but not limited to, injuries to his rear body cavity, experienced pain and suffering, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

398.    That, upon information and belief, the actions and/or inactions of Daane, Ninkovic, Tracy, Brock, Miner, Wilger, Smith and the other currently unknown MPD officers were motivated by evil motive or intent.

399.    That the actions and/or inactions of Daane, Ninkovic, Tracy, Brock, Miner, Wilger, Smith and the other currently unknown MPD officers involved reckless and/or callous indifference to the federally protected rights of A.D.J.

**C.A.J.**

400.     That, on March 3, 2011, without reasonable suspicion or probable cause to suspect that C.A.J. had committed, was committing, or was about to commit a crime or a violation of the rules of the road, Vagnini, Knight and other currently unknown MPD officers stopped C.A.J.'s vehicle near the intersection of North 27th Street and West Atkinson Avenue in Milwaukee.

401.     That, on March 3, 2011, without reasonable suspicion or probable cause to suspect that: (a) C.A.J. had committed, was committing, or was about to commit a crime; (b) C.A.J. was armed and/or dangerous; or (c) C.A.J. was concealing weapons and/or contraband on his person, Vagnini detained C.A.J. and conducted a pat-down search of C.A.J.

402.     That, on March 3, 2011, without reasonable suspicion or probable cause to suspect that: (a) C.A.J. had committed, was committing, or was about to commit a crime; (b) C.A.J. was armed and/or dangerous; or (c) C.A.J. was concealing weapons and/or contraband on his person, Vagnini conducted a strip search and a body cavity search of C.A.J., on the street, in public view, and in view of Knight and other currently unknown MPD officers, by inserting his bare hand inside C.A.J.'s rear body cavity.

403.     That C.A.J. did not consent to the March 3, 2011 pat-down search, strip search or body cavity search conducted by Vagnini.

404.     That, upon information and belief, Vagnini did not have a warrant for the March 3, 2011 pat-down search, strip search and body cavity search of C.A.J.

405.     That, upon information and belief, Vagnini did not have prior written permission for the March 3, 2011 pat-down search, strip search and body cavity search of C.A.J.

406. That, upon information and belief, Vagnini was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the March 3, 2011 body cavity search of C.A.J.

407. That, upon information and belief, Vagnini did not prepare any report regarding the March 3, 2011 pat-down search, strip search and body cavity search of C.A.J., and did not provide a copy of any such report to C.A.J.

408. That the March 3, 2011 strip search and body cavity search of C.A.J. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived C.A.J. of the liberty interests set forth in Section 968.255, without any process or procedure.

409. That there were no exigent circumstances surrounding the March 3, 2011 pat-down search, strip search and body cavity search of C.A.J. conducted by Vagnini.

410. That Knight and the other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the March 3, 2011 pat-down search, strip search and body cavity search of C.A.J. conducted by Vagnini.

411. That Knight and the other currently unknown MPD officers took no action to prevent the March 3, 2011 pat-down search, strip search and body cavity search of C.A.J. conducted by Vagnini.

412. That, as a result of the actions and/or inactions of Vagnini, Knight and the other currently unknown MPD officers on March 3, 2011, C.A.J. suffered and continues to suffer physical injuries, including, but not limited to, injuries to his rear body cavity, experienced and continues to experience pain and suffering, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

413. That, upon information and belief, the actions and/or inactions of Vagnini, Knight and the other currently unknown MPD officers on March 3, 2011 were motivated by evil motive or intent.

414. That the actions and/or inactions of Vagnini, Knight and the other currently unknown MPD officers on March 3, 2011 involved reckless and/or callous indifference to the federally protected rights of C.A.J.

415. That, on July 7, 2011, Seitz and Bartol arrested C.A.J.

416. That, on July 7, 2011, Seitz and Bartol conveyed C.A.J. to the MPD District 7 Police Station.

417. That, on July 7, 2011, Seitz contacted Vagnini, who was assigned to MPD District 5, and requested that Vagnini join her at the MPD District 7 Police Station.

418. That, on July 7, 2011, Vagnini conducted a strip search and a body cavity search of C.A.J., in view of Seitz, Bartol and a currently unknown MPD officer, in the booking room of the MPD District 7 Police Station, by inserting his bare hand inside C.A.J.'s rear body cavity.

419. That C.A.J. did not consent to the July 7, 2011 strip search or body cavity search conducted by Vagnini.

420. That, upon information and belief, Vagnini did not have a warrant for the July 7, 2011 strip search and body cavity search of C.A.J.

421. That, upon information and belief, Vagnini did not have prior written permission for the July 7, 2011 strip search and body cavity search of C.A.J.

422. That, upon information and belief, Vagnini was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the July 7, 2011 body cavity search of C.A.J.

423. That, upon information and belief, Vagnini did not prepare any report regarding the July 7, 2011 strip search and body cavity search of C.A.J., and did not provide a copy of any such report to C.A.J.

424. That the July 7, 2011 strip search and body cavity search of C.A.J. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived C.A.J. of the liberty interests set forth in Section 968.255, without any process or procedure.

425. That there were no exigent circumstances surrounding the July 7, 2011 strip search and body cavity search of C.A.J. conducted by Vagnini.

426. That Seitz, Bartol and the other currently unknown MPD officer were present during, and had a realistic opportunity to prevent, the July 7, 2011 strip search and body cavity search of C.A.J. conducted by Vagnini.

427. That Seitz, Bartol and the currently unknown MPD officer took no action to prevent the July 7, 2011 strip search and body cavity search of C.A.J. conducted by Vagnini.

428. That, as a result of the actions and/or inactions of Vagnini, Seitz, Bartol and the currently unknown MPD officer on July 7, 2011, C.A.J. suffered physical injuries, including, but not limited to, injuries to his rear body cavity, experienced pain and suffering, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

429. That, upon information and belief, the actions and/or inactions of Vagnini, Seitz, Bartol and the other currently unknown MPD officer on July 7, 2011 were motivated by evil motive or intent.

430.    That the actions and/or inactions of Vagnini, Seitz, Bartol and the other currently unknown MPD officer on July 7, 2011 involved reckless and/or callous indifference to the federally protected rights of C.A.J.

**J.L.M.**

431.    That, on March 10, 2011, J.L.M. was lawfully operating his vehicle near the intersection of North 29th Street and West Courtland Avenue in Milwaukee.

432.    That, without reasonable suspicion or probable cause to suspect that J.L.M. had committed, was committing, or was about to commit a crime or a violation of the rules of the road, Vagnini, Toms, Mucha and Cline stopped J.L.M.'s vehicle.

433.    That, without reasonable suspicion or probable cause to suspect that J.L.M. had committed, was committing, or was about to commit a crime or a violation of the rules of the road, Vagnini and/or Toms ordered J.L.M. to exit his vehicle.

434.    That, without reasonable suspicion or probable cause to suspect that:  (a) J.L.M. had committed, was committing, or was about to commit a crime; (b) J.L.M. was armed and/or dangerous; or (c) J.L.M. was concealing weapons and/or contraband, Vagnini conducted a pat-down search of J.L.M.

435.    That J.L.M. did not consent to the pat-down search conducted by Vagnini.

436.    That, upon information and belief, Vagnini did not have a warrant for the pat-down search of J.L.M.

437.    That Toms, Mucha and Cline were present during, and had a realistic opportunity to prevent, the pat-down search of J.L.M. conducted by Vagnini.

438.    That Toms, Mucha and Cline took no action to prevent the pat-down search of J.L.M. conducted by Vagnini.

439.    That, without reasonable suspicion or probable cause to suspect that J.L.M. had committed, was committing, or was about to commit a crime, Vagnini and/or Toms handcuffed J.L.M.

440.    That, without probable cause or reasonable suspicion to suspect that: (a) J.L.M. had committed, was committing, or was about to commit a crime; (b) J.L.M. was armed and/or dangerous; or (c) J.L.M. was concealing weapons and/or contraband, Vagnini conducted a second pat-down search of J.L.M.

441.    That J.L.M. did not consent to the second pat-down search conducted by Vagnini.

442.    That, upon information and belief, Vagnini did not have a warrant for the second pat-down search of J.L.M.

443.    That Toms, Mucha and Cline were present during, and had a realistic opportunity to prevent, the second pat-down search of J.L.M. conducted by Vagnini.

444.    That Toms, Mucha and Cline took no action to prevent the second pat-down search of J.L.M. conducted by Vagnini.

445.    That, without reasonable suspicion or probable cause to suspect that J.L.M. had committed, was committing, or was about to commit a crime, Vagnini, Toms, Mucha and Cline arrested J.L.M.

446.    That MPD Officer Keyellia Morries conveyed J.L.M. to the MPD District 5 Police Station.

447.    That, without reasonable suspicion or probable cause to suspect that J.L.M. had committed, was committing, or was about to commit a crime, or that J.L.M. was armed and/or dangerous, Vagnini conducted a strip search and a body cavity search of J.L.M. in a holding cell,

in view of Toms and Cline by: (a) placing his bare hand inside J.L.M.'s pants and underwear and (b) inserting his bare hand inside J.L.M.'s rear body cavity.

448. That J.L.M. did not consent to the strip search or the body cavity search conducted by Vagnini.

449. That, upon information and belief, Vagnini did not have a warrant for the strip search and the body cavity search of J.L.M.

450. That, upon information and belief, Vagnini did not have prior written permission for the strip search and the body cavity search of J.L.M.

451. That, upon information and belief, Vagnini was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of J.L.M.

452. That, upon information and belief, Vagnini did not prepare any report regarding the strip search and the body cavity search of J.L.M., and did not provide a copy of any such report to J.L.M.

453. That the strip search and the body cavity search of J.L.M. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived J.L.M. of the liberty interests set forth in Section 968.255, without any process or procedure.

454. That Toms and Cline were present during, and had a realistic opportunity to prevent, the strip search and the body cavity search of J.L.M. conducted by Vagnini.

455. That Toms and Cline took no action to prevent the strip search and the body cavity search of J.L.M. conducted by Vagnini.

456. That, following the strip search and the body cavity search of J.L.M., Vagnini, upon information and belief, completed a "Strip Search Authorization" form.

457. That Mucha, upon information and belief, hand-carried the "Strip Search Authorization" form to the MPD District 3 Police Station, where Brunson, upon information and belief, authorized a strip search of J.L.M.

458. That, without reasonable suspicion or probable cause to suspect that J.L.M. had committed, was committing, or was about to commit a crime, Vagnini conducted a second strip search and a second body cavity search of J.L.M. in a holding cell, in view of Toms, Cline and other currently unknown MPD officers, by inserting his bare hand inside J.L.M.'s rear body cavity.

459. That, while Vagnini conducted the second strip search and the second body cavity search of J.L.M., two currently unknown MPD officers held onto J.L.M.'s arms and two currently unknown MPD officers grabbed J.L.M.'s legs and lifted him up off the ground.

460. That J.L.M. did not consent to the second strip search or the second body cavity search conducted by Vagnini.

461. That, upon information and belief, Vagnini did not have a warrant for the second strip search and the second body cavity search of J.L.M.

462. That, upon information and belief, Vagnini did not have prior written permission for the second strip search and the second body cavity search of J.L.M.

463. That, upon information and belief, Vagnini did not prepare any report regarding the second strip search and the second body cavity search of J.L.M., and did not provide a copy of any such report to J.L.M.

464. That the second strip search and the second body cavity search of J.L.M. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and

deprived J.L.M. of the liberty interests set forth in Section 968.255, without any process or procedure.

465.     That there were no exigent circumstances surrounding the second strip search and the second body cavity search of J.L.M. conducted by Vagnini.

466.     That Toms, Cline and the other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the second strip search and the second body cavity search of J.L.M. conducted by Vagnini.

467.     That Toms, Cline and the other currently unknown MPD officers took no action to prevent the second strip search and the second body cavity search of J.L.M. conducted by Vagnini.

468.     That, as a result of the actions and/or inactions of Vagnini, Toms, Mucha, Cline, Brunson and the other currently unknown MPD officers, J.L.M. suffered physical injuries, including, but not limited to, injuries to his rear body cavity, experienced pain and suffering, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

469.     That, upon information and belief, the actions and/or inactions of Vagnini, Toms, Mucha, Cline, Brunson and the other currently unknown MPD officers were motivated by evil motive or intent.

470.     That the actions and/or inactions of Vagnini, Toms, Mucha, Cline, Brunson and the other currently unknown MPD officers involved reckless and/or callous indifference to the federally protected rights of J.L.M.

**D.M.**

471.     That, on February 13, 2012, D.M. was lawfully walking in the area of North 23rd Street, between West Chambers Street and West Burleigh Street in Milwaukee.

472.     That, without reasonable suspicion or probable cause to suspect that D.M. had committed, was committing, or was about to commit a crime, Vagnini, Knight and other currently unknown MPD officers detained D.M.

473.     That, without reasonable suspicion or probable cause to suspect that D.M. had committed, was committing, or was about to commit a crime, or that D.M. was armed and/or dangerous, Knight conducted a strip search and a body cavity search of D.M., on the street, in public view, and in view of Vagnini and the other currently unknown MPD officers, by:  (a) placing his bare hand in between D.M.'s pants and underwear and (b) inserting his bare hand inside D.M.'s rear body cavity.

474.     That D.M. did not consent to the strip search or the body cavity search conducted by Knight.

475.     That, upon information and belief, Knight did not have a warrant for the strip search and the body cavity search of D.M.

476.     That, upon information and belief, Knight did not have prior written permission for the strip search and the body cavity search of D.M.

477.     That, upon information and belief, Knight was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of D.M.

478.     That, upon information and belief, Knight did not prepare any report regarding the strip search and the body cavity search of D.M., and did not provide a copy of any such report to D.M.

479.     That the strip search and the body cavity search of D.M. conducted by Knight violated the provisions of Wisconsin Statute Section 968.255, and deprived D.M. of the liberty interests set forth in Section 968.255, without any process or procedure.

480.     That there were no exigent circumstances surrounding the strip search and the body cavity search of D.M. conducted by Knight.

481.     That Vagnini and the other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the strip search and the body cavity search of D.M. conducted by Knight.

482.     That Vagnini and the other currently unknown MPD officers took no action to prevent the strip search and the body cavity search of D.M. conducted by Knight.

483.     That, as a result of the actions and/or inactions of Knight, Vagnini and the other currently unknown MPD officers, D.M. suffered and continues to suffer physical injuries, including, but not limited to, injuries to his rear body cavity, experienced and continues to experience pain and suffering, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

484.     That, upon information and belief, the actions and/or inactions of Knight, Vagnini and the other currently unknown MPD officers were motivated by evil motive or intent.

485.    That the actions and/or inactions of Knight, Vagnini and the other currently unknown MPD officers involved reckless and/or callous indifference to the federally protected rights of D.M.

## C.M.

486.    That, on March 3, 2012, C.M. was lawfully operating his vehicle near 3401 West Burleigh Street in Milwaukee.

487.    That, without reasonable suspicion or probable cause to suspect that C.M. had committed, was committing, or was about to commit a crime or a violation of the rules of the road, Esqueda and Bradley stopped C.M.'s vehicle.

488.    That, without reasonable suspicion or probable cause to suspect that:  (a) C.M. had committed, was committing, or was about to commit a crime; (b) C.M. was armed and/or dangerous; or (c) C.M. was concealing weapons and/or contraband, Esqueda conducted a pat-down search of C.M., and Esqueda grabbed at C.M.'s groin area and rear body cavity.

489.    That C.M. did not consent to the pat-down search conducted by Esqueda.

490.    That, upon information and belief, Esqueda did not have a warrant for the pat-down search of C.M.

491.    That Bradley, Seitz, Bartol and Sommer were present during, and had a realistic opportunity to prevent, the pat-down search of C.M. conducted by Esqueda.

492.    That Bradley, Seitz, Bartol and Sommer took no action to prevent the pat-down search of C.M. conducted by Esqueda.

493.    That, without reasonable suspicion or probable cause to suspect that C.M. had committed, was committing, or was about to commit a crime, Esqueda arrested C.M. and placed him in the back of an MPD squad car.

494.    That, without reasonable suspicion or probable cause to suspect that C.M. had committed, was committing, or was about to commit a crime, or that C.M. was armed and/or dangerous, Esqueda removed C.M. from the MPD squad car and conducted a strip search and a body cavity search of C.M., on the street, in public view, and in view of Bradley, Seitz, Bartol and Sommer by:  (a) placing his bare hand inside C.M.'s pants and underwear and (b) inserting his bare hand inside C.M.'s rear body cavity.

495.    That C.M. did not consent to the strip search or the body cavity search conducted by Esqueda.

496.    That, upon information and belief, Esqueda did not have a warrant for the strip search and the body cavity search of C.M.

497.    That, upon information and belief, Esqueda did not have prior written permission for the strip search and the body cavity search of C.M.

498.    That, upon information and belief, Esqueda was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of C.M.

499.    That, upon information and belief, Esqueda did not prepare any report regarding the strip search and the body cavity search of C.M., and did not provide a copy of any such report to C.M.

500.    That the strip search and the body cavity search of C.M. conducted by Esqueda violated the provisions of Wisconsin Statute Section 968.255, and deprived C.M. of the liberty interests set forth in Section 968.255, without any process or procedure.

501.    That there were no exigent circumstances surrounding the strip search and the body cavity search of C.M. conducted by Esqueda.

502.     That Bradley, Seitz, Bartol and Sommer were present during, and had a realistic opportunity to prevent, the strip search and the body cavity search of C.M. conducted by Esqueda.

503.     That Bradley, Seitz, Bartol and Sommer took no action to prevent the strip search and the body cavity search of C.M. conducted by Esqueda.

504.      That, without reasonable suspicion or probable cause to suspect that C.M. had committed, was committing, or was about to commit a crime, Esqueda handcuffed C.M.

505.     That, without reasonable suspicion or probable cause to suspect that C.M. had committed, was committing, or was about to commit a crime, Esqueda conveyed C.M. to the MPD District 7 Police Station.

506.     That, without reasonable suspicion or probable cause to suspect that C.M. had committed, was committing, or was about to commit a crime, or that C.M. was armed and/or dangerous, Esqueda and Sommer conducted a second strip search and a second body cavity search of C.M., in Interview Room B of the MPD District 7 Police Station, by Esqueda and Sommer removing C.M.'s pants and underwear and spreading his rear body cavity, and by Esqueda placing his bare hand inside C.M.'s rear body cavity and inserting his bare hand in between C.M.'s rear body cavity and scrotum sack.

507.     That C.M. did not consent to the second strip search or the second body cavity search conducted by Esqueda and Sommer.

508.     That, upon information and belief, Esqueda and Sommer did not have a warrant for the second strip search and the second body cavity search of C.M.

509.     That, upon information and belief, Esqueda and Sommer did not have prior written permission for the second strip search and the second body cavity search of C.M.

510. That, upon information and belief, Esqueda and Sommer were not licensed by the State of Wisconsin as physicians, physician assistants or registered nurses at the time they conducted the second body cavity search of C.M.

511. That, upon information and belief, Esqueda and Sommer did not prepare any report regarding the second strip search and the second body cavity search of C.M., and did not provide a copy of any such report to C.M.

512. That the second strip search and the second body cavity search of C.M. conducted by Esqueda and Sommer violated the provisions of Wisconsin Statute Section 968.255, and deprived C.M. of the liberty interests set forth in Section 968.255, without any process or procedure.

513. That there were no exigent circumstances surrounding the second strip search and the second body cavity search of C.M. conducted by Esqueda and Sommer.

514. That, during the second strip search and second body cavity search of C.M., Esqueda and Sommer physically assaulted C.M. by grabbing C.M.'s handcuffed arms, causing C.M. to fall forward and strike his head on a table.

515. That, as a result of the actions and/or inactions of Esqueda, Bradley, Seitz, Bartol and Sommer, C.M. suffered and continues to suffer physical injuries, including, but not limited to, injuries to his rear body cavity, head, neck and back, experienced and continues to experience pain and suffering, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

516. That, upon information and belief, the actions and/or inactions of Esqueda, Bradley, Seitz, Bartol and Sommer were motivated by evil motive or intent.

Case 2:13-cv-00771-LA   Filed 05/16/14   Page 73 of 107   Document 133

517. That the actions and/or inactions of Esqueda, Bradley, Seitz, Bartol and Sommer involved reckless and/or callous indifference to the federally protected rights of C.M.

**R.E.P.**

518. That, on July 29, 2011, R.E.P. was sitting in his parked vehicle near 3824 North Port Washington Road in Milwaukee.

519. That, without reasonable suspicion or probable cause to suspect that: (a) R.E.P. had committed, was committing, or was about to commit a crime; (b) R.E.P was armed and/or dangerous; or (c) R.E.P. was concealing weapons and/or contraband, Vagnini ordered R.E.P. to exit the vehicle, detained R.E.P., and conducted a pat-down search of R.E.P.

520. That R.E.P. did not consent to the pat-down search conducted by Vagnini.

521. That, upon information and belief, Vagnini did not have a warrant for the pat-down search of R.E.P.

522. That Thoms, Knight, GKuspa, Shipman, Kowalefski, Burger, Vandervast and Mucha were present during, and had a realistic opportunity to prevent, the pat-down search of R.E.P. conducted by Vagnini.

523. That Thoms, Knight, GKuspa, Shipman, Kowalefski, Burger, Vandervast and Mucha took no action to prevent the pat-down search of R.E.P. conducted by Vagnini.

524. That, without reasonable suspicion or probable cause to suspect that R.E.P. had committed, was committing, or was about to commit a crime, or that R.E.P. was armed and/or dangerous, Vagnini conducted a strip search and a body cavity search of R.E.P., on the street, in public view and in view of Thoms, Knight, GKuspa, Shipman, Kowalefski, Burger, Vandervast and Mucha by: (a) placing his hand inside R.E.P.'s pants and underwear and (b) inserting his hand inside R.E.P.'s rear body cavity.

525.     That R.E.P. did not consent to the strip search or the body cavity search conducted by Vagnini.

526.     That, upon information and belief, Vagnini did not have a warrant for the strip search and the body cavity search of R.E.P.

527.     That, upon information and belief, Vagnini did not have prior written permission for the strip search and the body cavity search of R.E.P.

528.     That, upon information and belief, Vagnini was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of R.E.P.

529.     That, upon information and belief, Vagnini did not prepare any report regarding the strip search and the body cavity search of R.E.P., and did not provide a copy of any such report to R.E.P.

530.     That the strip search and the body cavity search of R.E.P. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived R.E.P. of the liberty interests set forth in Section 968.255, without any process or procedure.

531.     That there were no exigent circumstances surrounding the strip search and the body cavity search of R.E.P. conducted by Vagnini.

532.     That Thoms, Knight, GKuspa, Shipman, Kowalefski, Burger, Vandervast and Mucha were present during, and had a realistic opportunity to prevent, the strip search and the body cavity search of R.E.P. conducted by Vagnini.

533.     That Thoms, Knight, GKuspa, Shipman, Kowalefski, Burger, Vandervast and Mucha took no action to prevent the strip search and the body cavity search of R.E.P. conducted by Vagnini.

534.    That, as a result of the actions and/or inactions of Vagnini, Thoms, Knight, GKuspa, Shipman, Kowalefski, Burger, Vandervast and Mucha, R.E.P. suffered physical injuries, including, but not limited to, injuries to his rear body cavity, experienced pain and suffering, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

535.    That, upon information and belief, the actions and/or inactions of Vagnini, Thoms, Knight, GKuspa, Shipman, Kowalefski, Burger, Vandervast and Mucha were motivated by evil motive or intent.

536.    That the actions and/or inactions of Vagnini, Thoms, Knight, GKuspa, Shipman, Kowalefski, Burger, Vandervast and Mucha involved reckless and/or callous indifference to the federally protected rights of R.E.P.

**B.J.S.**

537.    That, on August 11, 2011, Vagnini conducted a strip search and a body cavity search of B.J.S., on the street, in public view and in view of Shipman, Knight, Cline, Martinez, GKuspa and other currently unknown MPD officers, near 3957 North 22nd Street in Milwaukee, by:  (a) pulling down B.J.S.'s pants and underwear and (b) inserting his fingers inside B.J.S.'s rear body cavity.

538.    That B.J.S. did not consent to the strip search or the body cavity search conducted by Vagnini.

539.    That, upon information and belief, Vagnini did not have a warrant for the strip search and the body cavity search of B.J.S.

540.    That, upon information and belief, Vagnini did not have prior written permission for the strip search and the body cavity search of B.J.S.

541.     That, upon information and belief, Vagnini was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of B.J.S.

542.     That, upon information and belief, Vagnini did not prepare any report regarding the strip search and the body cavity search of B.J.S., and did not provide a copy of any such report to B.J.S.

543.     That the strip search and the body cavity search of B.J.S. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived B.J.S. of the liberty interests set forth in Section 968.255, without any process or procedure.

544.     That there were no exigent circumstances surrounding the strip search and the body cavity search of B.J.S. conducted by Vagnini.

545.     That Shipman, Knight, Cline, Martinez, GKuspa and the other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the strip search and the body cavity search of B.J.S. conducted by Vagnini.

546.     That Shipman, Knight, Cline, Martinez, GKuspa and the other currently unknown MPD officers took no action to prevent the strip search and the body cavity search of B.J.S. conducted by Vagnini.

547.     That, as a result of the actions and/or inactions of Vagnini, Shipman, Knight, Cline, Martinez, GKuspa and the other currently unknown MPD officers, B.J.S. sustained physical injuries, including, but not limited to, injuries to his rear body cavity, experienced pain and suffering, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

548. That, upon information and belief, the actions and/or inactions of Vagnini, Shipman, Knight, Cline, Martinez, GKuspa and the other currently unknown MPD officers were motivated by evil motive or intent.

549. That the actions and/or inactions of Vagnini, Shipman, Knight, Cline, Martinez, GKuspa and the other currently unknown MPD officers involved reckless and/or callous indifference to the federally protected rights of B.J.S.

**J.M.W.**

550. That, on October 12, 2011, J.M.W. was a passenger in a vehicle that had been stopped by MPD officers near 2011 West Capitol Drive in Milwaukee.

551. That, without reasonable suspicion or probable cause to suspect that J.M.W. had committed, was committing, or was about to commit a crime, or that J.M.W. was armed and/or dangerous, Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers removed J.M.W. from the vehicle, arrested J.M.W. and handcuffed J.M.W.

552. That, without reasonable suspicion or probable cause to suspect that (a) J.M.W. had committed, was committing, or was about to commit a crime; (b) J.M.W. was armed and/or dangerous; or (c) J.M.W. was concealing weapons and/or contraband, Molina conducted a pat-down search and attempted a strip search and a body cavity search of J.M.W.

553. That J.M.W. did not consent to the pat-down search conducted by Molina.

554. That Molina did not have a warrant for the pat-down search of J.M.W.

555. That Conway and/or SKuspa and/or Ivy and/or Navarrette and/or the other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the pat-down search of J.M.W. conducted by Molina.

78

556. That Conway and/or SKuspa and/or Ivy and/or Navarrette and/or the other currently unknown MPD officers took no action to prevent the pat-down search of J.M.W. conducted by Molina.

557. That, when J.M.W. exercised his constitutional rights by protesting the unreasonable search, Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers physically assaulted J.M.W., by: (a) taking J.M.W. to the ground; (b) restraining J.M.W.; (c) elbowing and kneeing J.M.W. in the back; (d) grabbing J.M.W.'s ankles and (e) twisting J.M.W.'s arm.

558. That Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the physical assault of J.M.W. committed by Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers.

559. That Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers took no action to prevent the physical assault of J.M.W. committed by Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers.

560. That, without reasonable suspicion or probable cause to suspect that J.M.W. had committed, was committing, or was about to commit a crime, or that J.M.W. was armed and/or dangerous, and while Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers had J.M.W. pinned down on the ground, Molina conducted a strip search and a body cavity search of J.M.W., on the street, in public view and in view of Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers, by: (a)

79

pulling J.M.W.'s pants down; (b) placing a bare hand inside J.M.W.'s underwear; and (c) inserting a bare hand inside J.M.W.'s rear body cavity.

561.    That J.M.W. did not consent to the strip search or the body cavity search conducted by Molina.

562.    That, upon information and belief, Molina did not have a warrant for the strip search and the body cavity search of J.M.W.

563.    That, upon information and belief, Molina did not have prior written permission for the strip search and the body cavity search of J.M.W.

564.    That, upon information and belief, Molina was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of J.M.W.

565.    That, upon information and belief, Molina did not prepare any report regarding the strip search and the body cavity search of J.M.W., and did not provide a copy of any such report to J.M.W.

566.    That the strip search and the body cavity search of J.M.W. conducted by Molina violated the provisions of Wisconsin Statute Section 968.255, and deprived J.M.W. of the liberty interests set forth in Section 968.255, without any process or procedure.

567.    That there were no exigent circumstances surrounding the strip search and the body cavity search of J.M.W. conducted by Molina.

568.    That Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the strip search and the body cavity search of J.M.W. conducted by Molina.

569.    That Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers took no action to prevent the strip search and the body cavity search of J.M.W. conducted by Molina.

570.    That, as a result of the actions and/or inactions of Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers, J.M.W. suffered and continues to suffer physical injuries, including, but not limited to, injuries to his rear body cavity, urinary tract, ribs, left leg, right ankle and back, experienced and continues to experience pain and suffering, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

571.    That, upon information and belief, the actions and/or inactions of Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers were motivated by evil motive or intent.

572.    That the actions and/or inactions of Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers involved reckless and/or callous indifference to the federally protected rights of J.M.W.

### S.D.W.

573.    That, on July 7, 2011, S.D.W. was lawfully operating his van near the 500 to 600 block of East Meinecke Avenue in Milwaukee.

574.    That, without reasonable suspicion or probable cause to suspect that S.D.W. had committed, was committing, or was about to commit a crime or a violation of the rules of the road, Vagnini and other currently unknown MPD officers stopped C.M.'s vehicle.

575.    That Vagnini removed S.D.W. from the van.

576. That, without reasonable suspicion or probable cause to suspect that S.D.W. had committed, was committing, or was about to commit a crime, or that S.D.W. was armed and/or dangerous, Vagnini conducted a strip search and a body cavity search of S.D.W., on the street, in public view and in view of other currently unknown MPD officers, by: (a) placing his bare hand inside S.D.W.'s pants and underwear; (b), inserting his bare fingers inside S.D.W.'s rear body cavity; and (c) pinching at S.D.W.'s rear body cavity.

577. That S.D.W. did not consent to the strip search or the body cavity search conducted by Vagnini.

578. That, upon information and belief, Vagnini did not have a warrant for the strip search and the body cavity search of S.D.W.

579. That, upon information and belief, Vagnini did not have prior written permission for the strip search and the body cavity search of S.D.W.

580. That, upon information and belief, Vagnini was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of S.D.W.

581. That, upon information and belief, Vagnini did not prepare any report regarding the strip search and the body cavity search of S.D.W., and did not provide a copy of any such report to S.D.W.

582. That the strip search and the body cavity search of S.D.W. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived S.D.W. of the liberty interests set forth in Section 968.255, without any process or procedure.

583. That there were no exigent circumstances surrounding the strip search and the body cavity search of S.D.W. conducted by Vagnini.

584. That other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the strip search and the body cavity search of S.D.W. conducted by Vagnini.

585. That the other currently unknown MPD officers took no action to prevent the strip search and the body cavity search of S.D.W. conducted by Vagnini.

586. That Vagnini and the other currently unknown MPD officers arrested S.D.W. and conveyed S.D.W. to the MPD District 5 Police Station.

587. That Vagnini and the other currently unknown MPD officers took S.D.W. inside a small room, which had one window, in the garage of the MPD District 5 Police Station.

588. That Vagnini conducted a second strip search of S.D.W., in view of Dollhopf, Kozelek other currently unknown MPD officers, by: (a) ordering S.D.W. to remove all his clothes except for his underwear; (b) ordering S.D.W. to pull down his underwear; (c) giving a brown box to S.D.W.; and (d) ordering S.D.W. to defecate into the box.

589. That S.D.W. did not consent to the second strip search conducted by Vagnini.

590. That, upon information and belief, Vagnini did not have a warrant for the second strip search of S.D.W.

591. That, upon information and belief, Vagnini did not have prior written permission for the second strip search of S.D.W.

592. That, upon information and belief, Vagnini did not prepare any report regarding the second strip search of S.D.W., and did not provide a copy of any such report to S.D.W.

593. That the second strip search of S.D.W. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived S.D.W. of the liberty interests set forth in Section 968.255, without any process or procedure.

594.    That there were no exigent circumstances surrounding the second strip search of S.D.W. conducted by Vagnini.

595.    That Dollhopf, Kozelek and other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the second strip search of S.D.W. conducted by Vagnini.

596.    That Dollhopf, Kozelek and the other currently unknown MPD officers took no action to prevent the second strip search of S.D.W. conducted by Vagnini.

597.    That, as a result of the actions and/or inactions of Vagnini, Dollhopf, Kozelek and the other currently unknown MPD officers, S.D.W. sustained physical injuries, including, but not limited to, injuries to his rear body cavity, experienced pain and suffering, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

598.    That, upon information and belief, the actions and/or inactions of Vagnini, Dollhopf, Kozelek and the other currently unknown MPD officers were motivated by evil motive or intent.

599.    That the actions and/or inactions of Vagnini, Dollhopf, Kozelek and the other currently unknown MPD officers involved reckless and/or callous indifference to the federally protected rights of S.D.W.

**A.L.W.**

600.    That, on February 4, 2012, A.L.W. was the driver of a car that was stopped by Vagnini, Thoms and other currently unknown MPD officers, near 3236 North 10th Street in Milwaukee.

601.    That, without reasonable suspicion or probable cause to suspect that A.L.W. had committed, was committing, or was about to commit a crime, or that A.L.W. was armed and/or dangerous, Vagnini removed A.L.W. from his car.

602.    That, without reasonable suspicion or probable cause to suspect that A.L.W. had committed, was committing, or was about to commit a crime, Thoms and the currently unknown MPD officers searched A.L.W.'s car.

603.    That A.L.W. did consent to the search of his car conducted by Thoms and/or currently unknown MPD officers.

604.    That Thoms and/or the currently unknown MPD officers did not have a warrant to search A.L.W.'s car.

605.    That, without reasonable suspicion or probable cause to suspect that A.L.W. had committed, was committing, or was about to commit a crime, Vagnini handcuffed A.L.W.

606.    That, without reasonable suspicion or probable cause to suspect that A.L.W. had committed, was committing, or was about to commit a crime, or that A.L.W. was armed and/or dangerous, Vagnini conducted a strip search and a body cavity search of A.L.W., on the street, in public view and in view of the other currently unknown MPD officers, by:  (a) searching A.L.W.'s pockets; (b) placing his bare hand inside A.L.W.'s pants and underwear; (c) touching and lifting A.L.W.'s testicles; and (d) inserting his bare hand inside A.L.W.'s rear body cavity.

607.    That, as Vagnini was touching and lifting A.L.W.'s testicles, A.L.W. was asking Thoms and/or the other currently unknown MPD officers for assistance, yelling "Help! Get a sergeant!"

608.    That Thoms and/or the currently unknown MPD officers ignored A.L.W.'s request for assistance and his request for an MPD sergeant.

609. That A.L.W. did not consent to the strip search or the body cavity search conducted by Vagnini.

610. That, upon information and belief, Vagnini did not have a warrant for the strip search and the body cavity search of A.L.W.

611. That, upon information and belief, Vagnini did not have prior written permission for the strip search and the body cavity search of A.L.W.

612. That, upon information and belief, Vagnini was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of A.L.W.

613. That, upon information and belief, Vagnini did not prepare any report regarding the strip search and the body cavity search of A.L.W., and did not provide a copy of any such report to A.L.W.

614. That the strip search and the body cavity search of A.L.W. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived A.L.W. of the liberty interests set forth in Section 968.255, without any process or procedure.

615. That there were no exigent circumstances surrounding the strip search and the body cavity search of A.L.W. conducted by Vagnini.

616. That Thoms and the currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the strip search and the body cavity search of A.L.W. conducted by Vagnini.

617. That Thoms and the currently unknown MPD officers took no action to prevent the strip search and the body cavity search of A.L.W. conducted by Vagnini.

618.    That, without reasonable suspicion or probable cause to suspect that A.L.W. had committed, was committing, or was about to commit a crime, Vagnini arrested A.L.W., placed A.L.W. inside an MPD squad car, and interrogated A.L.W.

619.    That, while inside the MPD squad car, Vagnini, without reasonable suspicion or probable cause to suspect that A.L.W. had committed, was committing, or was about to commit a crime, removed A.L.W.'s shoes and searched them.

620.    That, without reasonable suspicion or probable cause to suspect that A.L.W. had committed, was committing, or was about to commit a crime, Vagnini, Thoms and/or the other currently unknown MPD officers conveyed A.L.W. to the MPD District 5 Police Station.

621.    That, while at the MPD District 5 Police Station, A.L.W. continued to ask for an MPD supervisor.

622.    That A.L.W.'s request for an MPD supervisor while at the MPD District 5 Police Station was ignored.

623.    That, as a result of the actions and/or inactions of Vagnini, Thoms and the other currently unknown MPD officers, A.L.W. suffered physical injuries, including, but not limited to, injuries to his rear body cavity, experienced pain and suffering, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

624.    That, upon information and belief, the actions and/or inactions of Vagnini, Thoms and the other currently unknown MPD officers, were motivated by evil motive or intent.

625.    That the actions and/or inactions of Vagnini, Thoms and the other currently unknown MPD officers, involved reckless and/or callous indifference to the federally protected rights of A.L.W.

**G.L.W.**

626.	That, on February 26, 2012, G.L.W. was lawfully sitting in a car near 3551 North 10th Street in Milwaukee.

627.	That, without reasonable suspicion or probable cause to suspect that G.L.W. had committed, was committing, or was about to commit a crime, or that G.L.W. was armed and/or dangerous, Vagnini ordered G.L.W. to exit the car and detained G.L.W.

628.	That, without reasonable suspicion or probable cause to suspect that G.L.W. had committed, was committing, or was about to commit a crime, or that G.L.W. was armed and/or dangerous, Vagnini conducted a strip search and a body cavity search of G.L.W., on the street, in public view, and in view of other currently unknown MPD officers, by:  (a) placing his bare hand inside G.L.W.'s pants and underwear and (b) inserting his bare fingers inside G.L.W.'s rear body cavity.

629.	 That G.L.W. did not consent to the strip search or the body cavity search conducted by Vagnini.

630.	That, upon information and belief, Vagnini did not have a warrant for the strip search and the body cavity search of G.L.W.

631.	That, upon information and belief, Vagnini did not have prior written permission for the strip search and the body cavity search of G.L.W.

632.	That, upon information and belief, Vagnini was not licensed by the State of Wisconsin as a physician, a physician assistant or a registered nurse at the time he conducted the body cavity search of G.L.W.

633. That, upon information and belief, Vagnini did not prepare any report regarding the strip search and the body cavity search of G.L.W., and did not provide a copy of any such report to G.L.W.

634. That the strip search and the body cavity search of G.L.W. conducted by Vagnini violated the provisions of Wisconsin Statute Section 968.255, and deprived G.L.W. of the liberty interests set forth in Section 968.255, without any process or procedure.

635. That there were no exigent circumstances surrounding the strip search and the body cavity search of G.L.W. conducted by Vagnini.

636. That other currently unknown MPD officers were present during, and had a realistic opportunity to prevent, the strip search and the body cavity search of G.L.W. conducted by Vagnini.

637. That the other currently unknown MPD officers took no action to prevent the strip search and the body cavity search of G.L.W. conducted by Vagnini.

638. That, as a result of the actions and/or inactions of Vagnini and the other currently unknown MPD officers, G.L.W. suffered physical injuries, including, but not limited to, injuries to his rear body cavity, experienced pain and suffering, sustained lost wages, and suffered and continues to suffer emotional injuries, including, but not limited to, humiliation, embarrassment, loss of dignity, fear, anxiety, nightmares and sleep disturbance.

639. That, upon information and belief, the actions and/or inactions of Vagnini and the other currently unknown MPD officers, were motivated by evil motive or intent.

640. That the actions and/or inactions of Vagnini and the other currently unknown MPD officers involved reckless and/or callous indifference to the federally protected rights of G.L.W.

# CLAIMS FOR RELIEF

## First Claim for Relief
## Title 42, United States Code, Section 1983
## Unreasonable Search

641.    Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

642.    That the Plaintiffs had a constitutionally protected right to be free from unreasonable searches.

643.    That, as set forth in the preceding paragraphs, certain Defendants deprived certain Plaintiffs of their constitutionally protected right to be free from unreasonable searches.

644.    That the Defendants intentionally caused the deprivation of the Plaintiffs' constitutionally protected right to be free from unreasonable searches.

645.    That the Defendants acted under color of law.

646.    That, because of the Defendants' deprivation of the Plaintiffs' constitutionally protected right to be free from unreasonable searches, the Plaintiffs sustained damages as set forth in the preceding paragraphs.

647.    That the following Plaintiffs bring the Title 42, United States Code, Section 1983 Unreasonable Search claim against the following Defendants:

      a.    D.J.B. brings this claim against Vagnini, Knight and Dollhopf;

      b.    B.G.C. brings this claim against Vagnini and other currently unknown MPD officers;

      c.    S.F.F. brings this claim against Vagnini;

      d.    A.D.J. brings this claim against Daane, Ninkovic, Miner and a currently unknown MPD officer;

e. C.A.J. brings this claim against Vagnini;

f. J.L.M. brings this claim against Vagnini;

g. D.M. brings this claim against Knight;

h. C.M. brings this claim against Esqueda and Sommer;

i. R.E.P. brings this claim against Vagnini;

j. B.J.S. brings this claim against Vagnini;

k. J.M.W. brings this claim against Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers;

l. S.D.W. brings this claim against Vagnini;

m. A.L.W. brings this claim against Vagnini, Thoms and other currently unknown MPD officers; and

n. G.L.W. brings this claim against Vagnini.

**Second Claim for Relief**
**Title 42, United States Code, Section 1983**
**Substantive Due Process**

648. Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

649. That the Plaintiffs had a constitutionally protected right to body integrity.

650. That, as set forth in the preceding paragraphs, certain Defendants deprived certain Plaintiffs of their constitutionally protected right to body integrity.

651. That the Defendants intentionally caused the deprivation of the Plaintiffs' constitutionally protected right to body integrity.

652. That the conduct of the Defendants in depriving the Plaintiffs of their constitutionally protected right to body integrity, as set forth in the preceding paragraphs, was arbitrary, egregious, outrageous and conscious-shocking.

653. That the Defendants acted under color of law.

654. That, because of the Defendants' deprivation of the Plaintiffs' constitutionally protected right to body integrity, the Plaintiffs sustained damages as set forth in the preceding paragraphs.

655. That the following Plaintiffs bring the Title 42, United States Code, Section 1983 Substantive Due Process claim against the following Defendants:

    a. D.J.B. brings this claim against Vagnini, Knight and Dollhopf;

    b. B.G.C. brings this claim against Vagnini;

    c. S.F.F. brings this claim against Vagnini;

    d. A.D.J. brings this claim against Daane, Ninkovic and Miner;

    e. C.A.J. brings this claim against Vagnini;

    f. J.L.M. brings this claim against Vagnini;

    g. D.M. brings this claim against Knight;

    h. C.M. brings this claim against Esqueda and Sommer;

    i. R.E.P. brings this claim against Vagnini;

    j. B.J.S. brings this claim against Vagnini;

    k. J.M.W. brings this claim against Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers;

    l. S.D.W. brings this claim against Vagnini;

    m. A.L.W. brings this claim against Vagnini; and

n.  G.L.W. brings this claim against Vagnini.

**Third Claim for Relief**
**Title 42, United States Code, Section 1983**
**Procedural Due Process**

656.    Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

657.    That, by enacting Wisconsin Statute Section 968.255, the State of Wisconsin created liberty interests in:  (a) having a strip search be conducted by a person who is the same sex as the person to be searched; (b) the person to be strip searched not being exposed to the view of any person not conducting the strip search; and (c) having a physician, physician assistant or registered nurse licensed to practice in the State of Wisconsin conduct a body cavity search.

658.    That the liberty interests set forth in Wisconsin Statute Section 968.255 are entitled to due process protection.

659.    That, as set forth in the preceding paragraphs, certain Defendants deprived certain Plaintiffs of the liberty interests set forth in Wisconsin Statute Section 968.255 without any process or procedure.

660.    That the Defendants intentionally caused the deprivation of the Plaintiffs' liberty interests set forth in Wisconsin Statute Section 968.255.

661.    That the Defendants acted under color of law.

662.    That, because of the Defendants' deprivation of the Plaintiffs' liberty interests set forth in Wisconsin Statute Section 968.255, the Plaintiffs sustained damages as set forth in the preceding paragraphs.

663. That the following Plaintiffs bring the Title 42, United States Code, Section 1983 Procedural Due Process claim against the following Defendants:

    a. D.J.B. brings this claim against Vagnini, Knight and Dollhopf;

    b. B.G.C. brings this claim against Vagnini;

    c. S.F.F. brings this claim against Vagnini;

    d. A.D.J. brings this claim against Daane, Ninkovic and Miner;

    e. C.A.J. brings this claim against Vagnini;

    f. J.L.M. brings this claim against Vagnini;

    g. D.M. brings this claim against Knight;

    h. C.M. brings this claim against Esqueda and Sommer;

    i. R.E.P. brings this claim against Vagnini;

    j. B.J.S. brings this claim against Vagnini;

    k. J.M.W. brings this claim against Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers;

    l. S.D.W. brings this claim against Vagnini;

    m. A.L.W. brings this claim against Vagnini; and

    n. G.L.W. brings this claim against Vagnini.

**Fourth Claim for Relief**
**Title 42, United States Code, Section 1983**
**Excessive Force**

664. Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

665. That the Plaintiffs had a constitutionally protected right not to have excessive force used against them.

666. That, as set forth in the preceding paragraphs, certain Defendants used excessive force against certain Plaintiffs.

667. That the Defendants intentionally used excessive force against the Plaintiffs.

668. That the Defendants acted under color of law.

669. That, because of the Defendants' use of excessive force against the Plaintiffs, the Plaintiffs sustained damages as set forth in the preceding paragraphs.

670. That the following Plaintiffs bring the Title 42, United States Code, Section 1983 Excessive Force claim against the following Defendants:

    a. S.F.F. brings this claim against Vagnini, Knight and other currently unknown MPD officers;

    b. C.M. brings this claim against Esqueda and Sommer; and

    c. J.M.W. brings this claim against Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers.

**Fifth Claim for Relief**
**Title 42, United States Code, Section 1983**
**False Arrest/Unlawful Detention**

671. Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

672. That the Plaintiffs had a constitutionally protected right not to be falsely arrested and/or unlawfully detained.

673. That, as set forth in the preceding paragraphs, certain Defendants falsely arrested and/or unlawfully detained certain Plaintiffs.

674. That the Defendants intentionally falsely arrested and/or unlawfully detained the Plaintiffs.

95

675. That the Defendants acted under color of law.

676. That, because of the Defendants falsely arresting and/or unlawfully detaining the Plaintiffs, the Plaintiffs sustained damages as set forth in the preceding paragraphs.

677. That the following Plaintiffs bring the Title 42, United States Code, Section 1983 False Arrest/Unlawful Detention claim against the following Defendants:

    a. D.J.B. brings this claim against Vagnini, Knight, Dollhopf and other currently unknown MPD officers;

    b. B.G.C. brings this claim against Vagnini, Knight and other currently unknown MPD officers;

    c. S.F.F. brings this claim against Vagnini, Knight and other currently unknown MPD officers;

    d. A.D.J. brings this claim against Daane, Ninkovic and Tracy;

    e. C.A.J. brings this claim against Vagnini, Knight and other currently unknown MPD officers;

    f. J.L.M. brings this claim against Vagnini, Thoms, Mucha and Cline;

    g. D.M. brings this claim against Knight, Vagnini and other currently unknown MPD officers;

    h. C.M. brings this claim against Esqueda and Bradley;

    i. R.E.P. brings this claim against Vagnini;

    j. J.M.W. brings this claim against Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers;

    k. S.D.W. brings this claim against Vagnini and other currently unknown MPD officers;

l.   A.L.W. brings this claim against Vagnini; and

m.  G.L.W. brings this claim against Vagnini.

**Sixth Claim for Relief**
**Title 42, United States Code, Section 1983**
**Failure of "Bystander" Officer to Intervene**

678.   Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

679.   That, as set forth in the preceding paragraphs, certain Defendants committed constitutional violations against certain Plaintiffs.

680.   That, as set forth in the preceding paragraphs, certain Defendants knew that other certain Defendants were and/or were about to commit constitutional violations against certain Plaintiffs.

681.   That, as set forth in the preceding paragraphs, certain Defendants had a realistic opportunity to do something to prevent harm from occurring to certain Plaintiffs.

682.   That, as set forth in the preceding paragraphs, certain Defendants failed to take reasonable steps to prevent harm from occurring to certain Plaintiffs.

683.   That the certain Defendants' failure to act caused certain Plaintiffs to suffer harm, as set forth in the preceding paragraphs.

684.   That the Defendants acted under color of law.

685.   That the following Plaintiffs bring the Title 42, United States Code, Section 1983 Failure of "Bystander" Officer to Intervene claim against the following Defendants:

a.   D.J.B. brings this claim against Knight, Dollhopf and other currently unknown MPD officers;

b. B.G.C. brings this claim against Knight and other currently unknown MPD officers;

c. S.F.F. brings this claim against Knight and other currently unknown MPD officers;

d. A.D.J. brings this claim against Ninkovic, Tracy, Brock, Miner and a currently unknown MPD officer;

e. C.A.J. brings this claim against Knight, Seitz, Bartol and other currently unknown MPD officers;

f. J.L.M. brings this claim against Thoms, Mucha, Cline and other currently unknown MPD officers;

g. D.M. brings this claim against Vagnini and other currently unknown MPD officers;

h. C.M. brings this claim against Bradley, Seitz, Bartol and Sommer;

i. R.E.P. brings this claim against Thoms, Knight, GKuspa, Shipman, Kowalefski, Vandervast and Mucha;

j. B.J.S. brings this claim against Shipman, Knight, Cline, Martinez, GKuspa and other currently unknown MPD officers;

k. J.M.W. brings this claim against Molina and/or Conway and/or SKuspa and/or Ivy and/or Navarrette and/or other currently unknown MPD officers;

l. S.D.W. brings this claim against Dollhopf, Kozelek and other currently unknown MPD officers;

m. A.L.W. brings this claim against Thoms and other currently unknown MPD officers; and

n.  G.L.W. brings this claim against currently unknown MPD officers.

**Seventh Claim for Relief**
**Title 42, United States Code, Section 1983**
**Liability of Supervisors**

686.    Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

687.    That, as set forth in the preceding paragraphs, certain Defendant MPD officers committed constitutional violations against certain Plaintiffs.

688.    That, as set forth in the preceding paragraphs, certain Defendant MPD supervisors knew that certain Defendant MPD officers that he or she supervised had a practice of committing constitutional violations in similar situations.

689.    That, as set forth in the preceding paragraphs, certain Defendant MPD supervisors approved, assisted, condoned and/or purposely ignored the Defendant MPD officers' constitutional violations.

690.    That, as a result of the actions and/or inactions of the Defendant MPD supervisors, the Plaintiffs were injured.

691.    That the following Plaintiffs bring the Title 42, United States Code, Section 1983 Liability of Supervisors claim against the following Defendants:

a.  All Plaintiffs bring this claim against Flynn;

b.  D.J.B. brings this claim against Hudson and/or Gordon;

c.  B.G.C. brings this claim against Gordon;

d.  S.F.F. brings this claim against Gordon;

e.  A.D.J. brings this claim against Wilger and Smith;

f.  C.A.J. brings this claim against Hudson and Howard;

99

g. J.L.M. brings this claim against Brunson, Mucha and Hudson;

h. D.M. brings this claim against Gordon;

i. C.M. brings this claim against Howard;

j. R.E.P. brings this claim against Mucha and Hudson;

k. B.J.S. brings this claim against Hudson;

l. J.M.W. brings this claim against Gordon;

m. S.D.W. brings this claim against Hudson;

n. A.L.W. brings this claim against Gordon; and

o. G.L.W. brings this claim against Gordon.

**Eighth Claim for Relief**
**Wisconsin Statute Section 895.46**
**Indemnification**

692. Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

693. That, at all times material hereto, the individual Defendants were carrying out their duties as MPD officers, and were acting within the scope of their employment with Milwaukee.

694. That the actions and/or inactions of the individual Defendants were a direct and proximate cause of the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

695. That Milwaukee is liable pursuant to Wisconsin Statute Section 895.46, for payment of any judgment entered against the individual Defendants in this action because said Defendants were carrying out their duties as MPD officers, and were acting within the scope of

their employment with Milwaukee, when they caused the injuries and damages to Plaintiffs, as set forth in the preceding paragraphs.

**Ninth Claim for Relief**
**Title 42, United States Code, Section 1983**
**Deficient Hiring and Continued Employment Policy**

696. Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

697. That, at all relevant times herein, Milwaukee was a "person" for purposes of Title 42 of the United States Code, Section 1983.

698. That, prior to 2005, Milwaukee had an official policy with respect to the hiring and continued employment of MPD officers.

699. That, prior to 2005, the policy-makers of Milwaukee made a conscious choice from various alternatives to follow its official policy with respect to the hiring and continued employment of MPD officers.

700. That, prior to 2005, Milwaukee's official policy with respect to the hiring and continued employment of MPD officers was deficient in that it did not include administration of complete psychological testing of police officer candidates.

701. That, prior to 2005, the policy-makers of Milwaukee permitted the hiring of certain individual Defendant MPD officers, even though complete psychological testing would lead an objectively reasonable policy-maker to conclude, as set forth in the preceding paragraphs, that said police officers would be highly likely to deprive third parties of their constitutional rights, including, but not limited to: (a) the right to be free from unreasonable searches; (b) the right to body integrity; (c) the liberty interests created by Wisconsin Statute

101

Section 968.255; (d) the right not to have excessive force used against them; and (e) the right not to be falsely arrested and/or unlawfully detained.

702.     That, prior to 2005 and continuing to the present, the policy-makers of Milwaukee permitted/permit the continued employment of certain police officers, even though complete psychological testing would lead an objectively reasonable policy-maker to conclude, as set forth in the preceding paragraphs, that said police officer candidates and police officers would be highly likely to deprive third parties of their constitutional rights, including, but not limited to: (a) the right to be free from unreasonable searches; (b) the right to body integrity; (c) the liberty interests created by Wisconsin Statute Section 968.255; (d) the right not to have excessive force used against them; and (e) the right not to be falsely arrested and/or unlawfully detained.

703.     That the policy-makers of Milwaukee knew or should have known that, as set forth in the preceding paragraphs, complete psychological testing of police officer candidates was needed to avoid highly likely deprivations of constitutional rights, including, but not limited to:  (a) the right to be free from unreasonable searches; (b) the right to body integrity; (c) the liberty interests created by Wisconsin Statute Section 968.255; (d) the right not to have excessive force used against them; and (e) the right not to be falsely arrested and/or unlawfully detained; and/or that this was plainly obvious to the policy-makers of Milwaukee.

704.     That Milwaukee's deficient policy with respect to the hiring and continued employment of MPD officers caused the violation of the Plaintiffs' constitutional rights, and the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

705.     That, upon information and belief, Milwaukee's official policy with respect to the hiring of MPD officers is currently deficient in that it does not include administration of complete psychological testing of police officer candidates.

**Tenth Claim for Relief**
**Title 42, United States Code, Section 1983**
**Failure to Train Policy**

706.    Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

707.    That, at all relevant times herein, Milwaukee was a "person" for purposes of Title 42 of the United States Code, Section 1983.

708.    That, prior to 2008 and continuing to the present, Milwaukee had/has an official policy with respect to the training of MPD officers.

709.    That, prior to 2008 and continuing to the present, the policy-makers of Milwaukee made/make a conscious choice from various alternatives to follow its official policies with respect to the training of MPD officers.

710.    That, as set forth in the preceding paragraphs, prior to 2008 and continuing to the present, Milwaukee's official policies with respect to the training of MPD officers were/are inadequate with respect to the recurring situations of conducting strip searches and facilitating body cavity searches.

711.    That, prior to 2008 and continuing to the present, the policy-makers of Milwaukee knew or should have known/know or should know that more and/or different training of MPD officers was/is needed to avoid likely unreasonable strip searches and body cavity searches; and/or that this was/is plainly obvious to the policy-makers of Milwaukee.

712.    That Milwaukee's failure to provide adequate training MPD officers caused the violation of the Plaintiffs' constitutional rights, and the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

713. That, upon information and belief, Milwaukee's official policies with respect to the training of MPD officers are currently inadequate with respect to the recurring situations conducting strip searches and facilitating body cavity searches.

**Eleventh Claim for Relief**
**Title 42, United States Code, Section 1983**
**Failure to Discipline Policy**

714. Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

715. That, at all relevant times herein, Milwaukee was a "person" for purposes of Title 42 of the United States Code, Section 1983.

716. That, prior to 2008 and continuing to the present, Milwaukee had/has an official policy with respect to the discipline of MPD officers.

717. That, prior to 2008 and continuing to the present, the policy-makers of Milwaukee made/make a conscious choice from various alternatives to follow its official policies with respect to the discipline of MPD officers.

718. That, as set forth in the preceding paragraphs, prior to 2008 and continuing to the present, Milwaukee's official policies with respect to the discipline of MPD officers were/are inadequate with respect to recurring situations, including, but not limited to: (a) conducting unreasonable strip searches and body cavity searches; (b) effectuating false arrests and unlawful detentions; and (c) using excessive force.

719. That, prior to 2008 and continuing to the present, the policy-makers of Milwaukee knew or should have known/know or should know that more and/or different policies with respect to the discipline of MPD officers were/are needed to avoid likely deprivations of constitutional rights, including but not limited to: (a) conducting unreasonable strip searches and

body cavity searches; (b) effectuating false arrests and unlawful detentions; and (c) using excessive force; and/or that this was/is plainly obvious to the policy-makers of Milwaukee.

720.     That Milwaukee's failure to discipline MPD officers caused the violation of the Plaintiffs' constitutional rights, and the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

721.     That, upon information and belief, Milwaukee's official policies with respect to the discipline of MPD officers are currently inadequate with respect to recurring situations, including, but not limited to:  (a) conducting unreasonable strip searches and body cavity searches; (b) effectuating false arrests and unlawful detentions; and (c) using excessive force.

**Twelfth Claim for Relief**
**Title 42, United Stated Code, Section 1983**
**Custom of Condoning Constitutional Rights Violations**

722.     Plaintiffs reallege, and incorporate by reference, the allegations in the preceding paragraphs.

723.     That, at all relevant times herein, Milwaukee was a "person" for purposes of Title 42 of the United States Code, Section 1983.

724.     That the actions and/or inactions of the individual Defendant MPD officers, including, but not limited to:  (a) conducting unreasonable strip searches and body cavity searches; (b) effectuating false arrests and unlawful detentions; and (c) using excessive force, were done in accordance with Milwaukee's custom of condoning constitutional rights violations.

725.     That Milwaukee's custom of condoning constitutional rights violations was/is so persistent and widespread, as set forth in the preceding paragraphs, that it was/is Milwaukee's official policy.

726.   That Milwaukee's custom of condoning constitutional rights violations permitted, encouraged, tolerated or ratified the actions and/or inactions of the individual Defendant MPD officers, all in malicious or reckless disregard or with deliberate indifference regarding the constitutional rights of the Plaintiffs.

727.   That the policy-makers of Milwaukee made/make a conscious choice from various alternatives to follow its custom of condoning constitutional rights violations.

728.   That the policy-makers of Milwaukee acted with deliberate indifference to the consequences of its custom of condoning constitutional rights violations.

729.   That Milwaukee's custom of condoning constitutional rights violations caused the violations of the Plaintiffs' constitutional rights, and the injuries and damages to the Plaintiffs, as set forth in the preceding paragraphs.

## DEMAND FOR JUDGMENT

WHEREFORE, the Plaintiffs demand judgment against the Defendants as follows:

a.   In favor of the Plaintiffs and against the individual Defendant MPD officers and Milwaukee, as set forth in the preceding paragraphs, jointly and severally, for compensatory and special damages;

b.   In favor of the Plaintiffs and against the individual Defendant MPD officers, as set forth in the preceding paragraphs, for punitive damages;

c.   In favor of the Plaintiffs and against Milwaukee, as set forth in preceding paragraphs, for its liability pursuant to Wisconsin Statute Section 895.46;

d.   For injunctive and other equitable relief reforming the policies and customs of Milwaukee, to prevent like actions and harms in the future; and

e.  For all costs, disbursements and reasonable attorneys' fees pursuant to Title 42 of the United States Code, Section 1988, and for such other relief as the Court deems just and equitable.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL OF THIS ACTION ON ALL ISSUES SO TRIABLE.**

> _/s/Jonathan S. Safran_
> Jonathan S. Safran
> SBN:  1000881
> Jerome A. Konkel
> SBN:  1000149
> Jeffrey D. Patza
> SBN:  1030512
> SAMSTER, KONKEL, & SAFRAN, S.C.
> Attorneys for the Plaintiffs
> 1110 North Old World Third Street
> Suite 405, Riverfront Plaza
> Milwaukee, WI 53203
> Phone:  (414)224-0400
> Fax:  (414)224-0280
> Email:  jsafran@skslawyers.com
> Email:  jkonkel@skslawyers.com
> Email:  jpatza@skslawyers.com

Date:   April 21, 2014