IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| CHAZE BIAMI, CALVIN HOWARD,<br>CHRISTOPHER BARBOSA, JIMAR WILLIAMS,<br>CHRISTOPHER MCMILLIAN, DEMETRIUS RIMMER,<br>RICO WILLIAMS, MICHAEL TEAGUE,<br>ANGELO BARBOSA, DEVONTE GUERCY,<br>DEMONDRE POLK, and JOSHUA GRAY, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. *13 cv 771* |
| v. | ) ) | *Judge Lynn Adelman* |
| CITY OF MILWAUKEE, Milwaukee Police Chief<br>EDWARD FLYNN, Milwaukee Police Assistant Chief<br>EDITH HUDSON, Milwaukee Police Deputy Inspector<br>MICHAEL BRUNSON, Milwaukee Police Sergeant<br>JASON MUCHA, Milwaukee Police Sergeant<br>CHRISTOPHER ELSER, *Milwaukee Police Lieutenant*<br>*JAMES MACGILLIS*, and Milwaukee Police Officers<br>MICHAEL VAGNINI, ZACHARY THOMS,<br>JACOB KNIGHT, LOUIS KOPESKY,<br>GREGORY KUSPA, *THOMAS MAGLIO*<br>JEFFREY DOLLHOPF, PAUL MARTINEZ,<br>JEFFREY CLINE, JASON BLEICHWEHL,<br>KURT SALTZWADEL, ERICA TAUBENHEIM,<br>SHAWN BURGER, ROBERT WATTS,<br>JAMES SOMMER, JOSEPH ESQUEDA,<br>CHARLES CARABELLI, BRIAN BURCH,<br>DANIEL KNITTER, JOSEPH SZCYUBIALKA,<br>NAT THARPE, AARON BERKEN, JASON VETTER,<br>JEFFREY KRUEGER, STEPHANIE SEITZ,<br>and AMY BARTOL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | Jury Demand |

## [PROPOSED] AMENDED COMPLAINT

Plaintiffs CHAZE BIAMI, CALVIN HOWARD, CHRISTOPHER BARBOSA, JIMAR

WILLIAMS, CHRISTOPHER MCMILLIAN, DEMETRIUS RIMMER, RICO WILLIAMS,

MICHAEL TEAGUE, ANGELO BARBOSA, DEVONTE GUERCY, DEMONDRE POLK, and

1

JOSHUA GRAY, by their attorneys, PEOPLE'S LAW OFFICE and THE SHELLOW GROUP, for their complaint against Defendants CITY OF MILWAUKEE, Milwaukee Police Chief EDWARD FLYNN, Milwaukee Police Assistant Chief EDITH HUDSON, Milwaukee Police Deputy Inspector MICHAEL BRUNSON, *Milwaukee Police Lieutenant JAMES MACGILLIS,* Milwaukee Police Sergeant JASON MUCHA, Milwaukee Police Sergeant CHRISTOPHER ELSER and Milwaukee Police Officers MICHAEL VAGNINI, ZACHARY THOMS, JACOB KNIGHT, LOUIS KOPESKY, GREGORY KUSPA, *THOMAS MAGLIO*, JEFFREY DOLLHOPF, PAUL MARTINEZ, JEFFREY CLINE, JASON BLEICHWEHL, KURT SALTZWADEL, ERICA TAUBENHEIM, SHAWN BURGER, ROBERT WATTS, JAMES SOMMER, JOSEPH ESQUEDA, CHARLES CARABELLI, BRIAN BURCH, DANIEL KNITTER, JOSEPH SZCYUBIALKA, NAT THARPE, AARON BERKEN, JASON VETTER, JEFFREY KRUEGER, STEPHANIE SEITZ, and AMY BARTOL, state:

### Jurisdiction and Venue

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

2.      This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

3.      Venue is proper under 28 U.S.C. § 1391(b). Defendant City of Milwaukee is a municipal corporation located within this judicial district. Additionally, the events giving rise to the claims asserted herein occurred within this judicial district.

### Parties

4.      Plaintiffs Chaze Biami, Calvin Howard, Christopher Barbosa, Jimar Williams, Christopher McMillian, Demetrius Rimmer, Rico Williams, Michael Teague, Angelo Barbosa,

2

Devonte Guercy, Demondre Polk, and Joshua Gray are African American residents of the State of Wisconsin and the City of Milwaukee.

5.      Defendant City of Milwaukee is a Wisconsin municipal corporation and is and/or was the employer of the individual police officer defendants and is required to pay any tort judgment for damages for which its employees are liable for acts within the scope of their employment. Defendant City of Milwaukee is additionally responsible for the policies, practices, and customs of the Milwaukee Police Department.

6.      Defendant Edward Flynn is and was at all times relevant to this action, the Chief of the Milwaukee Police Department, acting under color of law and within the scope of his employment. Defendant Flynn is being sued in his individual and capacity.

7.      Defendant Edith Hudson is an Assistant Chief of Police of the Milwaukee Police Department, and was at all times relevant to this action, the Captain of Milwaukee Police District 5, acting under color of law and within the scope of her employment.  Defendant Hudson is being sued in her individual capacity

8.      Defendant Michael Brunson is a Deputy Inspector of the Milwaukee Police Department, and was at all times relevant to this action, the Lieutenant of Milwaukee Police District 5, acting under color of law and within the scope of his employment. Defendant Brunson is being sued in his individual capacity.

*9.      Defendant James MacGillis is a Lieutenant of the Milwaukee Police Department, and was at all times relevant to this action, the Lieutenant of Milwaukee Police District 5, acting under color of law and within the scope of his employment. Defendant MacGillis is being sued in his individual capacity.*

10.      At all times relevant to his action, Defendant Jason Mucha was a sergeant in

3

Milwaukee Police District 5 assigned to the proactive power shift unit, who acted under color of law and within the scope of his employment. He is being sued in his individual capacity.

11.     At all times relevant to this action, Defendant Christopher Elser was a sergeant in Milwaukee Police District 7, who acted under color of law and within the scope of his employment.  He is being sued in his individual capacity.

12.     At all times relevant to this action, Defendants Vagnini, Thoms, Knight, Kopesky, Kuspa, *Maglio*, Dollhopf, Martinez, Cline, Bleichwehl, Saltzwadel, Taubenheim, Burger, Watts, Sommer, Esqueda, Carabelli, Burch, Knitter, Szcyubialka, Tharpe, Berken, Vetter, Krueger, Seitz and Bartol were employed as police officers in the Milwaukee Police Department. Each of these Defendants is sued in his and her individual capacity.

### April 21, 2009 Search of Chaze Biami

13.     On the evening of April 21, 2009, Chaze Biami was driving on West Atkinson Street in Milwaukee when he was pulled over by Defendants Vagnini and *Maglio*.

14.     Defendants Vagnini and *Maglio* had no reasonable suspicion or probable cause to believe that Plaintiff Biami had committed, was committing, or was going to commit any offense when they stopped him.

15.     Defendant Vagnini approached the driver side of the vehicle and ordered Plaintiff Biami to exit the vehicle.

16.     Defendant Vagnini conducted a pat down search of Plaintiff Biami outside his clothing.

17.     Defendant Vagnini, who had no reasonable suspicion or probable cause to believe that Plaintiff possessed contraband on or about his person, then, in a public thoroughfare, with no

4

privacy, reached his hand inside Plaintiff Biami's underwear, inserted his finger or fingers inside Plaintiff Biami's anus and removed a plastic bag containing narcotics.

18.     Defendant *Maglio*, who was well aware of Defendant Vagnini's modus operandi, pattern and practice of conducting such invasive and unreasonable searches on African American men, held one of Plaintiff Biami's wrists during Defendant Vagnini's invasive and unreasonable search of Plaintiff, and took no action to intervene, even though he had the duty, ability, and opportunity to do so.

19.     Plaintiff Biami did not consent to Defendants' invasive and unreasonable search and he was unable to resist, given their status as Milwaukee police officers and that he was being restrained.

20.     Defendant Vagnini did not have a warrant to conduct this search, and did not have authorization from a Captain of police.

21.     Defendant Vagnini is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion.

22.     Defendants Vagnini and *Maglio* made out false and incomplete official reports and gave a false and incomplete version of these events to their superiors and prosecutors in order to cover up their misconduct.

23.     As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff suffered and continues to suffer, *inter alia*, *physical pain and suffering*, extreme mental distress, anguish, humiliation, shame and fear.

### July 9, 2011 Search of Chaze Biami

24.     On July 9, 2011, Plaintiff Biami was driving in the vicinity of North 29th and West Courtland Streets in Milwaukee.

5

25.    An unmarked vehicle stopped in front of Plaintiff Biami's car and a man exited the vehicle and pointed a handgun at Plaintiff Biami.

26.    This person did not identify himself as a police officer and Plaintiff Biami had no knowledge at the time that this person was a police officer.

27.    *The Defendants had no reasonable suspicion or probable cause to believe that Plaintiff Biami had committed, was committing, or was going to commit any offense when they initially stopped him.*

28.    Out of fear, Plaintiff Biami accelerated his vehicle and drove around this person.

29.    Subsequently, Plaintiff Biami noticed police lights behind him. He stopped his vehicle in the area of North 39th and West Capitol Streets.

30.    Plaintiff Biami was arrested and transported to the District 5 police station.

31.    At the District 5 police station, Defendant Vagnini escorted Plaintiff Biami to a small room, where he removed the handcuffs from Plaintiff Biami's wrists.

32.    Defendant Vagnini, who had no reasonable suspicion or probable cause to believe that Plaintiff Biami possessed contraband on his person, then reached his hand inside Plaintiff Biami's pants, between his pants and underwear, and inserted his finger or fingers inside Plaintiff Biami's anus using Plaintiff's underwear as a shield.

33.    No contraband or illegal substances were found on Plaintiff Biami's person during this search.

34.    Defendant Vagnini had no warrant to conduct such a search of Plaintiff Biami, nor did he have authorization of a Captain of police.

Case 2:13-cv-00771-LA   Filed 05/22/15   Page 6 of 60   Document 255

35.    Plaintiff Biami did not consent to Defendant Vagnini's invasive and unreasonable search and was helpless to resist, given Defendant Vagnini's status as a Milwaukee police officer and his presence inside a small room inside the police station.

36.    Defendant Vagnini is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion.

*37.    The defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct*

*38.*    As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff suffered and continues to suffer, *inter alia*, *physical* pain *and suffering*, extreme mental distress, anguish, humiliation, shame and fear.

**December 31, 2009 Search of Calvin Howard**

39.    On or about December 31, 2009, Calvin Howard, who at the time was 16 years old, was taken to the District 5 police station.

40.    Plaintiff Howard was issued a ticket and was in the process of being released.

41.    As Plaintiff Howard was leaving the station through the garage, Defendant Vagnini, with no reasonable suspicion or probable cause to believe that Plaintiff had committed, was committing, or was about to commit any offense, detained and handcuffed Plaintiff, and brought him to a small room off of the District 5 garage.

42.    While inside this room, Defendant Vagnini reached his hand down the back of Plaintiff Howard's pants and inserted his finger inside Plaintiff anus.

43.    Defendant Vagnini is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion.

7

44.     Defendant Vagnini did not have a warrant to conduct this search and did not have authorization from a Captain of police.

45.     Plaintiff Howard did not consent to Defendant Vagnini's invasive and unreasonable search and he was helpless to resist, given Defendant Vagnini's status as a Milwaukee police officer.

*46.     The Defendants made out false and incomplete official reports and gave false and incomplete versions of the events to their superiors and prosecutors in order to cover up their misconduct.*

*47.     As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff suffered and continues to suffer, inter alia, physical pain and suffering, extreme mental distress, anguish, humiliation, shame and fear.*

### January 12, 2011 Search of Calvin Howard

48.     On or around January 12, 2011, at approximately 3:00 p.m., Plaintiff Howard was stopped by Defendants Vagnini and Kopesky in the vicinity of 17th Street and Locust Street.

*49.     The Defendants had no reasonable suspicion or probable cause to believe that Plaintiff Howard had committed, was committing, or was going to commit any offense when they initially stopped him.*

50.     Defendant Kopesky slammed Plaintiff to the ground face first.

51.     Defendants Kopesky, Dollhopf, Mucha, and Knight restrained and choked Plaintiff Howard, while Defendant Vagnini, in a public thoroughfare, with no privacy, reached his hand inside the back of Plaintiff Howard's pants, inserted his fingers into Plaintiff Howard's anus and removed a plastic bag containing crack cocaine.

8

52.     Defendant Vagnini threw the plastic bag on the street in front of Plaintiff Howard's mouth and falsely claimed that the drugs came from Plaintiff's mouth.

53.     Defendants Kopesky, Dollhopf, Knight, and Mucha, who were well aware of Defendant Vagnini's modus operandi and pattern and practice of conducting illegal, invasive and unreasonable searches of African-American men, failed to intervene in order to prevent the violation of Plaintiff Howard's constitutional rights, despite having the duty, ability and opportunity to do so.

54.     Defendant Vagnini had no warrant to conduct such a search on Plaintiff and did not have authorization from a Captain of police.

55.     Plaintiff Howard did not consent to Defendant Vagnini's invasive and unreasonable search and he was helpless to resist, given that he was being restrained by Defendant Kopesky and others and Defendant Vagnini's status as a Milwaukee police officer.

56.     Defendant Vagnini is not a health care professional and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion.

57.     *The Defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct.*

58.      *As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff suffered and continues to suffer, inter alia, physical pain and suffering, extreme mental distress, anguish, humiliation, shame and fear.*

### Additional Searches of Calvin Howard

59.     Defendant Vagnini conducted *illegal stops and searches, including* strip and body cavity searches on Plaintiff Howard on numerous other occasions.

9

60.	*Defendant Vagnini made out false and incomplete official reports and gave false and incomplete versions of the events to his superiors and prosecutors in order to cover up his misconduct.*

61.	As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff suffered and continues to suffer, *inter alia*, *physical pain and suffering*, extreme mental distress, anguish, humiliation, shame and fear.

### November 5, 2010 Search of Christopher Barbosa

62.	On November 5, 2010, Christopher Barbosa was a passenger in a vehicle that was stopped by Defendants Vagnini, Mucha, Burch, Martinez, Knitter, Cline and Szcyubialka on West Glendale Avenue in Milwaukee.

63.	*The Defendants had no reasonable suspicion or probable cause to believe that anyone in the car had committed, was committing, or was going to commit any offense when they initially stopped him.*

64.	During the course of this traffic stop, Defendant Vagnini, in a public thoroughfare, with no privacy, and without reasonable suspicion or probable cause to believe that Plaintiff Barbosa possessed contraband on his person, reached his hand inside Plaintiff Barbosa's pants and inserted his finger into Plaintiff Barbosa's anus.

65.	Defendant Vagnini recovered no drugs or contraband from this illegal search.

66.	Defendants Mucha, Burch, Martinez, Knitter, Cline, and Szcyubialka, who were well aware of Defendant Vagnini's modus operandi, pattern and practice of conducting such invasive and unreasonable searches on African American men, stood by, watching, and took no action to intervene with Defendant Vagnini's invasive and unreasonable search of Plaintiff Barbosa, even though they had the duty, ability, and opportunity to do so.

67.     Defendant Vagnini had no warrant to conduct such a search on Plaintiff Barbosa.

68.     Plaintiff Barbosa did not consent to Defendant Vagnini's invasive and unreasonable search and he was helpless to resist, given Defendant Vagnini's status as a Milwaukee police officer.

69.     Defendant Vagnini is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion.

70.     *The Defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct.*

71.     *As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff suffered and continues to suffer, inter alia, physical pain and suffering, extreme mental distress, anguish, humiliation, shame and fear.*

### Additional Searches of Christopher Barbosa

72.     Defendant Vagnini conducted illegal *stops and searches, including* strip and body cavity searches on Plaintiff Christopher Barbosa on numerous other occasions.

73.     *Defendant Vagnini made out false and incomplete official reports and gave false and incomplete versions of the events to his superiors and prosecutors in order to cover up his misconduct.*

74.     As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff suffered and continues to suffer, *inter alia*, *physical pain and suffering,* extreme mental distress, anguish, humiliation, shame and fear.

## June 5, 2010 Search of Jimar Williams

75.    On June 5, 2010 at approximately 8:30 p.m., Plaintiff Jimar Williams was walking to his friend's house on North 23rd Street in the City of Milwaukee.

76.    Defendants Vagnini, Thoms Kopesky, Krueger and Knight, riding in a line of three or more police cars, stopped Plaintiff Williams while he was outside of his friend's house.

77.    Defendants had no reasonable suspicion or probable cause to believe that Plaintiff Williams had committed, was committing, or was going to commit any offense when they stopped him.

78.    While he was still in his police car, Defendant Vagnini asked Plaintiff Williams where he was going. He responded that he was going to his friend's house who lived at the address where he had been stopped.

79.    Defendants exited their police cars and approached Plaintiff Williams. Defendant Vagnini asked Plaintiff Williams if he had anything on him that he was not supposed to have. Plaintiff Williams responded that he had a small amount of marijuana in his pocket.

80.    Defendant Vagnini conducted a pat down search and removed the marijuana from Plaintiff Williams' pocket.

81.    Defendant Vagnini then, in a public thoroughfare, with no privacy, stuck his hand down the front of Plaintiff Williams' pants and grabbed and fondled Plaintiff Williams' genitals.

82.    Defendant Vagnini removed a plastic bag of cocaine that Plaintiff Williams had tied around his penis.

83.    Defendants Thoms, Kopesky, Krueger and Knight, well aware of Defendant Vagnini's modus operandi, pattern and practice of conducting such invasive and unreasonable searches on African American men, stood by, watching, and took no action to intervene with

12

Defendant Vagnini's invasive and unreasonable search of Plaintiff Williams, even though they had the duty, ability, and opportunity to do so.

84. Defendant Vagnini is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion.

85. Defendant Vagnini had no warrant to conduct such a search on Plaintiff Williams nor did he have authorization of a Captain of police.

86. Plaintiff Williams did not consent to Defendant Vagnini's invasive and unreasonable search and was helpless to resist, given Defendant Vagnini's status as a Milwaukee police officer and the presence of numerous other officers.

87. *The Defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct.*

88. As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff Williams suffered and continues to suffer, *inter alia*, *physical pain and* suffering, extreme mental distress, anguish, humiliation, shame and fear.

### June 9, 2010 Search of Christopher McMillian

89. On June 9, 2010 at approximately 3:00 p.m., Plaintiff Christopher McMillian was driving on North 51st Boulevard when he was stopped by Defendants Sommer, Esqueda and Carabelli.

90. Defendants had no reasonable suspicion or probable cause to believe that Plaintiff McMillian had committed, was committing, or was going to commit any offense when they stopped him.

13

91.     Defendant Sommer pulled Plaintiff McMillian out of his car, asked him where the drugs were, and began searching his vehicle along with Defendants Esqueda and Carabelli.

92.     Defendants did not recover any drugs or illegal contraband from their search of Plaintiff McMillian's vehicle.

93.     Without any probable cause or reasonable suspicion that Plaintiff McMillian possessed contraband on his person, Defendant Sommer approached Plaintiff, pulled the waist of Plaintiff's pants and underwear away from his body and looked down the inside of Plaintiff's underwear at Plaintiff's private parts.

94.     Defendant Sommer then put on a pair of black gloves and Defendants Esqueda and Carabelli each grabbed one of Plaintiff's arms

95.     Defendant Sommer, in a public thoroughfare, with no privacy, pulled the waist of Plaintiff's pants and underwear away from his body, reached his gloved hand between Plaintiff's underwear and skin, grabbed Plaintiff's genitals, and removed a bag of marijuana from Plaintiff's underwear.

96.     Defendant Sommer continued to look down the inside of Plaintiff's underwear and again reached his hand between Plaintiff's underwear and skin, grabbed Plaintiff's genitals and removed a bag of cocaine from Plaintiff's underwear.

97.     Defendants Esqueda and Carabelli participated in Defendant Sommer's invasive and unreasonable search by restraining Plaintiff, and took no action to intervene with Defendant Sommer's illegal search, even though they had the duty, ability, and opportunity to do so.

98.     Plaintiff McMillian did not consent to Defendants' invasive and unreasonable search and he was helpless to resist, given their status as police officers and that Defendants Esqueda and Carabelli were holding his arms.

14

99. Defendant Sommer is not a health care professional, and he conducted the invasive and unreasonable searches in an unsafe, unhygienic, and intentionally humiliating fashion, and without the authorization of a Captain of police.

*100. The Defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct.*

101. As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff suffered and continues to suffer, *inter alia*, *physical pain and suffering*, extreme mental distress, anguish, humiliation, shame and fear.

## June 9, 2010 Search of Demetrius Rimmer

102. On June 9, 2010, Plaintiff Rimmer was a passenger in a vehicle that was stopped by Defendants Sommer, Esqueda, Carabelli, Tharpe, Vetter, Berken, and Elser in a parking lot on West Fond Du Lac Avenue.

*103. The Defendants had no reasonable suspicion or probable cause to believe that anyone in the car had committed, was committing, or was going to commit any offense when they initially stopped the car.*

104. Defendants pulled Plaintiff Rimmer out of the passenger side of the vehicle, and, in public, with no privacy, unbuckled his shorts, causing them to drop to the ground.

105. One of the Defendant officers pulled Plaintiff Rimmer's underwear away from his body, reached his hand inside Plaintiff Rimmer's underwear and grabbed his genitals.

106. Defendants Sommer, Esqueda, Carabelli, Tharpe, Vetter, Berken and Elser are not health care professionals, and they conducted the invasive and unreasonable search in an unsafe,

15

unhygienic, and intentionally humiliating fashion, and without the authorization of a Captain of police.

107.    Defendants Sommer, Esqueda, Carabelli, Tharpe, Vetter, Berken and Elser made out false and incomplete official reports and gave a false and incomplete version of the events to their superiors and prosecutors in order to cover up their misconduct.

*108.    The Defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct.*

109.    As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff Rimmer suffered and continues to suffer, *inter alia, physical pain and suffering*, extreme mental distress, anguish, humiliation, shame and fear.

### *July 29*, 2010 Search of Rico Williams

110.    On *July 29,* 2010, Plaintiff Rico Williams was driving in the vicinity of 25th Street and Auer Avenue when he was stopped by several Milwaukee police cars.

*111.    The Defendants had no reasonable suspicion or probable cause to believe that Plaintiff Williams had committed, was committing, or was going to commit any offense when they initially stopped him.*

112.    The officers pulled Plaintiff out of his vehicle and one of the officers conducted a pat down search on Plaintiff over his clothing.

113.    No contraband was recovered from this pat down search.

114.    Following the first search, another officer conducted a pat down search of Plaintiff over his clothing and found no contraband.

115.   Defendant Vagnini then conducted a third pat down search of Plaintiff over his clothing and stated "he's got his butt tight."

116.   Defendant Vagnini, in a public thoroughfare with no privacy and with no reasonable suspicion or probable cause to believe that Plaintiff was concealing contraband on his person, pulled Plaintiff's pants down below his underwear and asked one of the other officers to hand him gloves.

117.   Defendant Vagnini put a glove on his hand and reached his hand inside Plaintiff's underwear.

118.   Before Defendant Vagnini was able to go any further with his search, Plaintiff told him that he would get the drugs out himself.

119.   Plaintiff then removed a plastic bag containing marijuana from his rectum and gave it to Defendant Vagnini.

120.   Defendant Vagnini asked Plaintiff if he had any more drugs on him and Plaintiff responded that he did not.

121.   Defendant Vagnini then reached his hand back inside Plaintiff's underwear, stuck his finger or fingers inside Plaintiff's rectum and removed a plastic bag containing drugs.

122.   Defendant Vagnini is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion.

123.   Defendant Vagnini had no warrant to conduct such a search on Plaintiff Williams, nor did he have the authorization of a Captain of Police.

124.   Plaintiff Williams did not consent to Defendant Vagnini's invasive and unreasonable search.

125.     *The Defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct.*

126.     As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff Williams suffered and continues to suffer, *inter alia, physical pain and suffering,* extreme mental distress, anguish, humiliation, shame and fear.

## April 21, 2011 Search of Michael Teague

127.     On April 21, 2011, Plaintiff Teague was stopped by Defendants Vagnini, Knight, Bleichwehl, Martinez, Dollhopf, Mucha, Cline and Kuspa in front of his mother's home on the 3500 block of North 25th Street in Milwaukee.

128.     Defendants had no reasonable suspicion or probable cause to believe that Plaintiff had committed, was committing, or was going to commit any offense when they stopped him.

129.     Plaintiff Teague exited his vehicle while speaking to his wife on his cellular telephone through an earpiece.

130.     Defendant Vagnini told Plaintiff to get off the phone and Defendant Knight struck Plaintiff in the face, knocking the ear piece out of his ear.

131.     Defendants Knight and Vagnini then handcuffed Plaintiff Teague, slammed him face first to the ground, and Defendant Knight said, "We are not the fuck around police."

132.     Defendant Knight or Defendant Vagnini, in a public thoroughfare, with no privacy, then reached a hand inside the back of Plaintiff's pants and underwear, *and conducted an illegal body cavity search.*

133.     Defendants Knight and Vagnini then brought Plaintiff Teague to his feet.

18

134.     Defendant Vagnini opened the front of Plaintiff's pants, reached his hand inside Plaintiff's underwear and fondled his genitals.

135.     No drugs or contraband were found on Plaintiff as a result of this invasive, illegal search.

136.     Defendants Bleichwehl, Martinez, Dollhopf, Mucha, Cline and Kuspa, who were well aware of Defendant Knight and Vagnini's modus operandi, pattern and practice of conducting such invasive and unreasonable searches of African American men, stood by, watching, and took no action to intervene with the invasive and unreasonable search of Plaintiff, and their use of excessive and unreasonable force even though they had the duty, ability, and opportunity to do so.

137.     Defendants Vagnini and Knight had no reasonable suspicion or probable cause to believe that Plaintiff possessed contraband on or about his person.

138.     Defendants Vagnini and Knight conducted this search without a warrant and without the authorization of a Captain of police.

139.     Plaintiff did not consent to Defendants' invasive and unreasonable search and he was helpless to resist, given their status as Milwaukee police officers.

140.     *The Defendants made out false and incomplete official reports and gave false and incomplete versions of each of these events to their superiors and prosecutors in order to cover up their misconduct.*

141.     As a direct and proximate result of Defendants' actions, as detailed above and below, Plaintiff suffered and continues to suffer, *inter alia*, bodily injury, *physical* pain and suffering, extreme mental distress, anguish, humiliation, shame and fear.

## Summer 2011 Search of Angelo Barbosa

142.    In or around the summer of 2011, Plaintiff Angelo Barbosa was walking with a friend in the area of 18th Street and Hampton Avenue in Milwaukee when he was stopped by Defendant Vagnini and other as of yet unidentified officers.

143.    Defendant Vagnini and the other officers had no reasonable suspicion or probable cause to believe that Plaintiff Barbosa had committed, was committing, or was going to commit any offense when they stopped him.

144.    One female and one male officer held Plaintiff Barbosa's arms while Defendant Vagnini conducted a pat down search on him over his clothes.

145.    Defendant Vagnini, who had no reasonable suspicion or probable cause to believe that Plaintiff possessed contraband on or about his person, said "I think he stuffed something," or words to that effect, and, in a public thoroughfare, with no privacy, pulled the waistband of Plaintiff's underwear back, reached his hand inside Plaintiff's underwear, and attempted to stick his finger inside Plaintiff's anus.

146.    Plaintiff yelled out and squeezed his buttocks to prevent Defendant Vagnini from sticking his finger inside his anus.

147.    Defendant Vagnini then moved his hand around to the front of Plaintiff's body and grabbed Plaintiff's penis and testicles.

148.    No contraband or illegal substances were found on Plaintiff Barbosa's person during this search.

149.    The male and female officers, well aware of Defendant Vagnini's modus operandi, pattern and practice of conducting such invasive and unreasonable searches on African American men, stood by, aided in Defendant Vagnini's invasive and unreasonable search by

20

restraining Plaintiff, and took no action to intervene, even though they had the duty, ability, and opportunity to do so.

150.    Defendant Vagnini is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion.

151.    Defendant Vagnini had no warrant to conduct this search on Plaintiff Barbosa nor did he have the authorization of a Captain of police.

152.    Plaintiff Barbosa did not consent to Defendant Vagnini's invasive and unreasonable search and was helpless to resist, given Defendant Vagnini's status as a Milwaukee police officer and the presence of numerous other officers.

153.    *The Defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct.*

154.    *As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff suffered and continues to suffer, inter alia, physical pain and suffering, extreme mental distress, anguish, humiliation, shame and fear.*

*Additional Searches of Angelo Barbosa*

155.    Plaintiff Barbosa was illegally searched *at least* two additional times.

156.    Later in the summer of 2011, Plaintiff Barbosa was stopped by a group of Milwaukee police officers who were executing a search warrant on Plaintiff Devonte Guercy's house. These officers detained Plaintiff Barbosa and subjected him to an illegal body cavity search.

157.    On information and belief, Defendant Vagnini was the officer who conducted the illegal body cavity search.

158.     In the summer of 2012, Plaintiff Barbosa was standing on the corner of 19th Place and Hampton Boulevard with a friend when he was stopped by two male and two female Milwaukee police officers. On information and belief, the two female officers were Defendants Stephanie Seitz and Amy Bartol.

159.     *The Defendants had no reasonable suspicion or probable cause to believe that Plaintiff had committed, was committing, or was going to commit any offense when they stopped him.*

160.     The male officers conducted a pat down search on Plaintiff Barbosa over his clothes and then made him sit on the curb.

161.     While Plaintiff Barbosa was sitting on the curb, one of the female officers made him stand up, searched him again, and, during the course of the search, reached her hand inside Plaintiff Barbosa's underwear and grabbed his penis and testicles.

162.     *The Defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct.*

163.     As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff Barbosa, who was 17 years old at the time of the first two searches, and 18 years old at the time of the third search, suffered and continues to suffer, *inter alia*, *physical pain and suffering*, extreme mental distress, anguish, humiliation, shame and fear.

### June 2011 Search of Devonte Guercy

164.     In or around June of 2011, Plaintiff Guercy was walking around the Teutonia Homes when he was stopped by several police officers mounted on bicycles, *including Defendants Martinez and Krueger*.

165.     *The Defendants had no reasonable suspicion or probable cause to believe that Plaintiff had committed, was committing, or was going to commit any offense when they stopped him.*

166.     One of these officers reached his hand inside Plaintiff's underwear, touched his genitals, and slid his hand through Plaintiff's butt cheeks.

167.     This officer is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion and without the authorization of a Captain of police.

168.     Other officers were present and failed to intervene in order to prevent the violation of Plaintiff Guercy's constitutional rights, despite having the duty, ability and opportunity to do so.

169.     *The Defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct.*

170.     *As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff suffered and continues to suffer, inter alia, physical pain and suffering, extreme mental distress, anguish, humiliation, shame and fear.*

**October or November 2011 Search of Devonte Guercy**

171.     In October or November of 2011, Plaintiff Guercy was driving in the vicinity of North Teutonia and West Center Streets, when he was stopped by Defendant Vagnini and another officer.

172. The Defendants had no reasonable suspicion or probable cause to believe that Plaintiff had committed, was committing, or was going to commit any offense when they stopped him.

173. Defendant Vagnini approached the driver's side of Plaintiff's vehicle and pulled Plaintiff Guercy out of the vehicle.

174. Defendant Vagnini then, in a public thoroughfare, with no privacy, turned Plaintiff Guercy around, bent him over the vehicle, inserted his hand inside Plaintiff Guercy's underwear, pinched at his anus, and inserted his finger into Plaintiff Guercy's anus and removed a plastic bag containing crack cocaine.

175. Defendant Vagnini had no warrant to conduct this search on Plaintiff Guercy nor did he have the authorization of a Captain of police.

176. Plaintiff Guercy did not consent to Defendant Vagnini's invasive and unreasonable search and he was helpless to resist, given Defendant Vagnini's status as a Milwaukee police officer.

177. Defendant Vagnini is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion and without the authorization of a Captain of police.

178. The other officer, who was well aware of Defendant Vagnini's modus operandi and pattern and practice of conducting invasive and unreasonable searches of African-American men, stood by, watching, and took no action to intervene with Defendant Vagnini's invasive and unreasonable search of Plaintiff, even though he had the duty, ability, and opportunity to do so.

179.    *The Defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct.*

180.    *As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff suffered and continues to suffer, inter alia, physical pain and suffering, extreme mental distress, anguish, humiliation, shame and fear.*

### December 30, 2011 Search of Devonte Guercy

181.    On December 30, 2011, at approximately 9:00 p.m., Plaintiff Guercy was a passenger in a vehicle traveling in the vicinity of North 14th and West Burleigh Streets in Milwaukee when the vehicle was pulled over by Milwaukee police officers.

182.    An unknown Milwaukee police officer removed Plaintiff Guercy from the vehicle, and slammed him face down on the sidewalk.

183.    Defendant Knight held down one of Plaintiff Guercy's hands while Defendant Saltzwadel, in a public thoroughfare, with no privacy, pulled down Plaintiff's pants from behind, exposing his underwear.

184.    Then, at Defendant Vagnini's direction, Defendant Saltzwadel inserted his bare fingers, without gloves, into the crack of Plaintiff Guercy's buttocks and penetrated Plaintiff Guercy's anus with his finger.

185.    No drugs or illegal substances were recovered from Plaintiff Guercy as a result of this unlawful search.

186.    Defendants Vagnini, Knight, Burger, Kopesky, Kuspa, Mucha, Taubenheim Martinez and Watts were present and either participated in the unlawful cavity search of Plaintiff

Guercy by physically restraining him and/or failed to intervene in the illegal search despite having the duty, ability and opportunity to do so.

187. Plaintiff Guercy did not consent to Defendant Saltzwadel's invasive and unreasonable search and he was helpless to resist, given Defendant Saltzwadel's status as a Milwaukee police officer, the presence of numerous other officers, and the fact that he was being held down.

188. Defendant Saltzwadel had no warrant to conduct such a search on Plaintiff Guercy, nor did he have the authorization of a Captain of police.

189. Defendant Saltzwadel is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion.

190. *The Defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct.*

191. *As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff suffered and continues to suffer, inter alia, physical pain and suffering, extreme mental distress, anguish, humiliation, shame and fear.*

### Additional Searches of Devonte Guercy

192. Plaintiff Guercy was illegally searched on *at least* three additional occasions.

193. In the summer of 2011, Plaintiff Guercy was arrested and taken to the District 5 police station.

194. Defendant Vagnini brought Plaintiff Guercy into a small room with two other Milwaukee police officers, reached his hand inside Plaintiff Guercy's underwear, touched his

26

Case 2:13-cv-00771-LA Filed 05/22/15 Page 26 of 60 Document 25

genitals, pinched at *and penetrated* his anus, and swiped his hand through Plaintiff Guercy's butt cheeks.

195.     Defendant Vagnini did not recover any drugs or contraband during this search.

196.     On another occasion in 2011, Plaintiff Guercy was a passenger in a car which crashed after a short police chase.  Defendant Burger arrested Plaintiff Guercy and placed him inside a police car.

197.     Defendant Vagnini then removed Plaintiff Guercy from the police car, reached his hand inside Plaintiff Guercy's underwear, touched his genitals, pinched at *and penetrated* his anus and swiped his hand through Plaintiff Guercy's butt cheeks.

198.     Defendant Vagnini did not recover any drugs or contraband during this search.

199.     On another occasion in 2011, Plaintiff Guercy was a passenger in a car when Milwaukee Police officers stopped the car*, without any reasonable suspicion or probable cause,* near a Marathon gas station by Green Bay Avenue and Congress Street.

200.     Defendant Vagnini reached his hand inside Plaintiff Guercy's underwear, touched his genitals, pinched at *and penetrated* his anus and swiped his hand through Plaintiff Guercy's butt cheeks.

201.     Defendant Vagnini did not recover any drugs or contraband during this search.

202.     *The Defendants made out false and incomplete official reports and gave false and incomplete versions of these events to their superiors and prosecutors in order to cover up their misconduct.*

203.     As a direct and proximate result of Defendants' actions, as detailed above, Plaintiff Guercy suffered and continues to suffer, *inter alia*, *physical pain and suffering*, extreme mental distress, anguish, humiliation, shame and fear.

## September 3, 2011 Search of Demondre Polk

204. On September 3, 2011, at approximately 8:30 p.m., Plaintiff Demondre Polk was sitting in his car with two of his friends in the parking lot of a gas station on Green Bay Avenue in Milwaukee when he was stopped and detained by Defendants Knight, Thoms, Mucha, Vagnini and Kopesky.

205. Defendants Knight, Thoms, Mucha, Vagnini and Kopesky had no probable cause or reasonable suspicion that Plaintiff had committed, was committing, or was going to commit any offense when they stopped him.

206. Defendant Knight pulled Plaintiff from his vehicle and conducted a pat down search over Plaintiff's clothes.

207. Then, at Defendant Vagnini's direction, Defendant Knight, who had no probable cause or reasonable suspicion to believe that Plaintiff possessed contraband on or about his person, pulled Plaintiff's shorts back, and, in a public thoroughfare, with no privacy, reached his hand inside the back of Plaintiff's shorts in between his shorts and underwear, and, using Plaintiff's underwear as a shield, shoved his finger or fingers inside Plaintiff's anus.

208. Defendant Knight pulled a small plastic bag containing cocaine out of Plaintiff's anus, and it fell to the ground.

209. Defendants Thoms, Mucha and Kopesky, who were well aware of Defendants Knight and Vagnini's modus operandi, pattern and practice of conducting such invasive and unreasonable searches of African American men, stood by, watching, and took no action to intervene with Defendant Knight's invasive and unreasonable search of Plaintiff, even though they had the duty, ability, and opportunity to do so.

210.     Defendant Knight is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion.

211.     Defendant Knight had no warrant to conduct such a search on Plaintiff, nor did he have the authorization of a Captain of police.

212.     Plaintiff did not consent to Defendant Knight's invasive and unreasonable search and he was helpless to resist, given Defendant Knight's status as a Milwaukee police officer and the presence of numerous other officers.

213.     Defendants Knight, Thoms, Mucha, Vagnini and Kopesky made out false and incomplete official reports and gave a false and incomplete version of these events to their superiors and prosecutors in order to cover up their misconduct.

214.     As a direct and proximate result of Defendants' actions Plaintiff suffered and continues to suffer, *inter alia*, bodily injury, *physical* pain and suffering, extreme mental distress, anguish, humiliation, shame and fear.

### February 9, 2012 Search of Joshua Gray

215.     On February 9, 2012, Plaintiff Joshua Gray was driving with his girlfriend in the area of 9th and Concordia in Milwaukee.

216.     Plaintiff pulled into an alley when he was stopped by Defendants Vagnini and Kuspa.

217.     Defendants Vagnini and Kuspa had no reasonable suspicion or probable cause to believe that Plaintiff had committed, was committing, or was going to commit any offense, when they stopped Plaintiff Gray.

218.     Defendant Vagnini walked up to the driver's side of Plaintiff Gray's car and said, "Get the hell out of the car."

219. Defendant Vagnini made Plaintiff Gray face the vehicle and conducted a pat down search on him.

220. Defendant Vagnini, without reasonable suspicion or probable cause to believe that Plaintiff Gray was concealing contraband on his person, then pulled Plaintiff Gray's pants back with one hand, and, in a public thoroughfare, with no privacy, reached his other hand inside Plaintiff's pants and underwear, and stuck his finger inside Plaintiff's buttocks.

221. Plaintiff turned around, asked Defendant Vagnini what he was doing, Vagnini told him to "shut the fuck up and turn back around," and Vagnini then stuck his finger inside Plaintiff's rectum.

222. Defendant Kuspa, who was well aware of Defendant Vagnini's modus operandi, pattern and practice of conducting such invasive and unreasonable searches of African American men, stood by, watching, and took no action to intervene with Defendant Vagnini's invasive and unreasonable search of Plaintiff, even though he had the duty, ability, and opportunity to do so.

223. Defendant Vagnini had no warrant to conduct such a search on Plaintiff Gray nor did he have the authorization of a Captain of police.

224. Plaintiff Gray did not consent to Defendant Vagnini's invasive and unreasonable search and he was helpless to resist, given Defendant Vagnini's status as a Milwaukee police officer.

225. Defendant Vagnini is not a health care professional, and he conducted the invasive and unreasonable search in an unsafe, unhygienic, and intentionally humiliating fashion.

226. Defendants Vagnini and Kuspa made out false and incomplete official reports and gave a false and incomplete version of these events to their superiors and prosecutors in order to cover up their misconduct.

30

227.    As a direct and proximate result of Defendants' actions, as detailed above,

Plaintiff suffered and continues to suffer, *inter alia, physical pain and suffering,* extreme mental

distress, anguish, humiliation, shame and fear.

### Facts Related to the City of Milwaukee and its Police Department's Unconstitutional Policies, Practices and Customs

228.    Milwaukee Police District 5 is located in a community that is approximately 90%

African American.

229.    During the time period of 2008 to 2012, a small group of police officers within

District 5 were assigned to a proactive unit on the Power Shift whose mission was to heighten its

presence in, and concentrate on, "high-crime" neighborhoods.

230.    The unit utilized a policing technique that was known in the community as "the

train" because the District 5 officers would patrol the predominantly African American "high

crime" areas of the District in a line of several police cars, and would accelerate the number of

traffic stops, field interviews, arrests for minor offenses, and consequently, searches, in those

areas.

231.    This "proactive policing," which encouraged and rewarded high volume traffic

stops, field interviews, searches and arrests in the  African-American "high crime"

neighborhoods of District Five, as well as the Unit itself, was part of a conscious policy of the

MPD and its police Chief Edward Flynn that was known as CompStat.

232.    *According to former MPD Chief of Police Nannette Hegerty, the CompStat*

*program of encouraging stops, arrests, and searches was a "slippery slope" that led to officers*

*taking "liberties" concerning these activities.*

233.    The District 5 proactive Power Shift Unit, whose hours were 7 p.m. to 3 a.m., was

supervised by Defendant Sergeant Jason Mucha, and included among its members: Defendant

MPD officers Michael Vagnini, Gregory Kuspa, Jacob Knight, Zachary Thoms, Jeffrey Cline, Louis Kopesky, Brian Kozelek, Jason Bleichwehl, Paul Martinez, and Jeffrey Dollhopf.

234.    No African-American officers were assigned to the proactive Power Shift Unit.

235.    Defendant Vagnini would typically ride in the lead car of the train, and was considered the *de facto* leader of the Unit.

236.    Defendant Mucha often rode in the back of the "train."

237.    The conscious purpose of the "train," according to its creator, MPD Captain Glenn Frankovis, and adopted by Sergeant Mucha, was to make the lives of "thugs" "miserable," while the Unit itself was a tool of CompStat.

*Pattern and Practice of Unconstitutional Searches by Vagnini and his Power Shift Unit*

238.    From 2008 to March of 2012, Defendant Vagnini and his Power Shift Unit were involved in a pattern *and practice* of conducting *improperly, illegally, unconstitutionally, and/or unreasonably invasive searches of the private parts of African Americans (i.e., buttocks, anus, rectum, penis, testicles, perineum, female breasts and vagina) including, but not limited to,* strip and body cavity searches, that totals more than *70 such searches* from the fall of 2007 to March of 2012.

239.    The first documented instance of Vagnini conducting an illegal body cavity search occurred on October 9, 2007, when he and another officer made a traffic stop which resulted in the arrest of D.E.

240.    District 5 Sergeant Gregory Flores conducted an administrative review related to Vagnini's use of force during the arrest of D.E.

241.    As part of the administrative review, Sergeant Flores interviewed Vagnini and D.E. concerning the incident.

242.    Vagnini told Flores that during his pat down search of D.E. he "felt a bump in between [D.E.'s] legs," and D.E. told Sergeant Flores that Vagnini "was digging in my ass."

243.    Lieutenant Kurt Leibold and Acting Deputy Chief Edward Liebrecht reviewed the reports concerning Vagnini's search of D.E.

244.    Lieutenant Liebold, who was acting Captain of District 5 at the time, and later became an Assistant Chief, did not open an administrative or criminal investigation into Vagnini's search of D.E.

245.    From June of 2008 through February of 2010, Defendant Vagnini conducted the following *improper, illegal, and/or otherwise unreasonably invasive searches of the private parts of African American men* that he and his fellow Unit officers had stopped. Each time, Vagnini was accompanied by other members of the power shift's proactive Unit:

- April 21, 2008          Joe Bohannon
- June 13, 2008           Carlando Mukes
- April 21, 2009          Plaintiff Chaze Biami
- July 31, 2009           Chavies Hoskin
- December 3, 2009        C.M. and J.B.
- December 31. 2009       Plaintiff Calvin Howard
- January 12, 2010        Plaintiff Calvin Howard
- February 17, 2010       J.A.E.

246.    On March 5, 2010, L.L.R., an African-American male, filed a complaint with the MPD against Vagnini, asserting that Vagnini subjected him to an illegal body cavity search.

247.    L.L.R. alleged that on February 27, 2010, he was pulled over by Vagnini, that Vagnini placed him in a chokehold, put his hand inside L.L.R.'s pants between the cheeks of his buttocks, probed around the area of his anus, causing bleeding, and removed a plastic bag containing crack cocaine.

248.    The MPD's Professional Performance Division (PPD) conducted a criminal investigation into L.L.R.'s complaint and in December of 2010 classified it as "unsubstantiated."

33

249. From April of 2010 through March of 2011, Vagnini conducted *improper,* illegal *and/or otherwise unreasonably invasive searches of the private parts of African Americans* whom the proactive Power Shift Unit had stopped:

- April 30, 2010         W.N.
- June 5, 2010          Plaintiff Jimar Williams
- July 24, 2010         W.C.
- *July 29*, 2010        Plaintiff Rico Williams
- November 5, 2010    A.H., R.R. and Plaintiff Chris Barbosa
- Nov. or Dec. 2010    W.C.
- February 2011       S.J.
- March 3, 2011        C.J.

250. On March 9, 2011, M.T. made a citizen complaint against Defendant Vagnini, alleging that Vagnini subjected him to an illegal body cavity search.

251. M.T. alleged that on March 8, 2011, he was a passenger in a vehicle that was stopped by Defendants Vagnini and Mucha.

252. M.T. alleged that Vagnini put his hand inside his underwear from behind and ran his hand upwards between his butt cheeks and placed a finger into M.T.'s anal cavity.

253. The MPD conducted a criminal investigation into M.T.'s complaint, determined that there was probable cause to charge Vagnini with a crime, and presented the case to the Milwaukee County District Attorney's Office for consideration of possible prosecution.

254. From April of 2011 through February of 2012, Vagnini conducted the following *improper, illegal and/or otherwise unreasonably invasive searches of the private parts of African Americans* that he and his fellow Unit officers stopped:

- April 11, 2011        B.C.
- April 21, 2011        Plaintiff Michael Teague
- May 9, 2011          M.T.W.
- May 20, 2011        K.J.B.
- May 20, 2011        D.B. and T.D.
- June 1, 2011         F.P.
- July 7, 2011         S.D.W. and Q.C.

- July 7, 2011                C.J.
- July 9, 2011                Plaintiff Chaze Biami
- July 29, 2011               S.D.W.
- July 29, 2011               R.E.P.
- August 11, 2011            B.S.
- August 18, 2011            S.D.W.
- September 3, 2011          D.P.
- September 30, 2011         D.B.
- November 6, 2011          A.P. and J.E.
- December 2011              X.H.
- December 15, 2011         M.W.
- December 17, 2011         Kevin Freeman
- December 30, 2011         Plaintiff Devonte Guercy and M.C.
- January 28, 2012          A.W.

255.    On January 31, 2012, B.C. and R.M. made citizen complaints to the Fire and

Police Commission (FPC) against Vagnini, alleging illegal body cavity searches.

256.     FPC Executive Director Michael Tobin referred the complaints to the Special

Investigations Section (SIS) of the MPD's Professional Performance Division (PPD), which

opened criminal investigations.

257.    MPD Lieutenant David Salazar, who was in charge of the criminal investigations,

recognized that there was a pattern of illegal searches after he received these complaints.

258.    Defendant Vagnini received a total of at least 47 citizen complaints alleging that

he conducted illegal body cavity and/or strip searches. All of Vagnini's victims were African-

American.

259.    *Of the 702 arrests that Defendant Vagnini made from 2008 to 2012, more than*

*96% were African American.*

*John Doe Investigation and Stripping of Police Powers*

260.    On March 2, 2012, Defendant Vagnini was informed by SIS Lieutenant Salazar of

the MPD's PPD that he was under criminal investigation for illegal strip searches and sexual

assaults, and that he was not to discuss the investigation.

35

261.     Defendant Jacob Knight was similarly informed.

262.     Shortly thereafter, the Milwaukee County District Attorney's Office initiated a secret John Doe proceeding to investigate allegations of illegal body cavity and strip searches.

263.     On March 20, 2012, Defendants Vagnini, Mucha, Knight, Kopesky, and Cline, and fellow Unit officer  Zachary Thoms, were stripped of their police powers, with pay, and reassigned. Defendant Dollhopf and Unit officer Kozelek were stripped of their police powers two months later.

264.      On March 21, 2012, Milwaukee Police Chief Edward Flynn held a press conference where he acknowledged that the MPD had received complaints of illegal strip and body cavity searches "a couple of years ago," but did not begin an investigation into the complaints because it "did not pick up a pattern," a pattern that Flynn has now admitted existed.

265.     In the ensuing days, Vagnini, Mucha, and some of the other suspended officers met on several occasions, including on March 28, 2012, when they met in a park and, in violation of a direct order from Chief Flynn, discussed several of the cases that were under investigation.

266.     At this time Defendant Sergeant Mucha suspected that Unit officer Thoms might be cooperating with the investigation, as did Vagnini *and several other Power Shift officers.*

267.     On April 3, 2012, District 5 Sergeants Mucha and Zieger were informed that Vagnini was very drunk, and acting irrationally at a local bar.

268.     Mucha requested that several Unit officers, including Thoms and Paul Martinez, find Vagnini.

269. That very morning, Thoms had *formally* agreed to cooperate with the investigation in exchange for immunity from prosecution, *and had given the first of several recorded statements to the investigators.*

270. During this time, Vagnini fought with his fellow officers, called Thoms a "snitch," and punched both Thoms and Martinez.

271. That night Vagnini sent a cell phone text to Thoms in which he called him a "snitch motherfucker."

272. No officer reported Vagnini or any of the Unit members for any of the more than 70 alleged illegal strip and cavity searches, and the conspiratorial meetings were of concern to Lt. Salazar, who was in charge of the criminal investigation, because the officers could have been getting their stories together.

*Prosecution and Conviction of Defendants Vagnini, Knight, Dollhopf*
*and Unit Member Kozelek*

273. On October 8, 2012, after the John Doe investigation concluded, Defendants Vagnini, Knight, Dollhopf and fellow Unit officer Kozelek were charged with multiple felonies and misdemeanors related to illegal body cavity and strip searches.

274. *Shortly thereafter, a bullet was anonymously placed in Thoms' police locker*.

275. In April of 2013, Defendant Vagnini pled no contest to four felony charges of misconduct in public office and four misdemeanor charges of conducting illegal strip searches on L.L.R., S.D.W., D.B., and W.C., was found guilty of these charges, and was sentenced to 26 months in prison and 34 months of extended supervision.

276. In July of 2013, Defendant Knight pled no contest to one misdemeanor count of being party to the crime of Vagnini's illegal strip search of D.B. and was sentenced to 20 days in the House of Corrections, ordered to pay a $300 fine, and complete 60 hours of community

service.

277.     In October of 2013, Defendant Dollhopf and Officer Kozelek both pled no contest to one misdemeanor disorderly conduct charge of being a party to Vagnini's crime of illegal strip search, Dollhopf was sentenced to 100 hours of community service and ordered to pay a $300 fine, and Kozelek was sentenced to 20 hours of community service and ordered to pay a $300 fine.

278.     At his sentencing, Vagnini, through his lawyer, made numerous admissions, including that Vagnini "accepts it was wrong. He violated the rights. He deserves to be punished."

*Defendants Mucha and Vagnini's Disciplinary and Psychological Histories*

279.     Defendant Jason Mucha was hired by the MPD in 1996 as a police aide with a bare bones application and no psychological screening.

280.     As a police aide, Mucha received a one day suspension for underage drinking.

281.     Mucha was promoted from police aide to police officer in early 2000 with no additional application process or psychological screening.

282.     Several months later, while he was in the training academy, Mucha was stopped by police while he was off-duty and charged with having an open vodka bottle by his feet in his car.

283.     Mucha was found guilty by a judge, was ordered to pay a fine, and was given a three day suspension by the police department.

284.     At his deposition, Mucha claimed that the officer who stopped him lied about where she found the bottle.

285.     Between 2000 and 2004, Mucha was involved in at least 27 incidents of alleged

38

excessive force, theft and planting of drugs.

286. The vast majority of these incidents arose in 2003 and 2004 while Defendant Mucha was working at District 3 as a member of a proactive Unit, which, according to former MPD Chief of Police Nannette Hegerty, was disbanded in early 2004 due to "problems" with citizens' complaints, though, according to Mucha, the name was changed and the Unit continued to function in the same manner.

287. Mucha was not disciplined for any of these incidents, but rather was promoted to Sergeant in 2005 with Chief Hegerty's blessing.

288. In August of 2005, a Milwaukee County Court Judge ruled that several persons who had accused Mucha of using excessive force and/or planting drugs could testify in a criminal case where the defendant made similar accusations against Mucha.

289. In March of 2006, the Wisconsin Court of Appeals decided that another criminal defendant could use evidence of Mucha's previous disciplinary history at his re-trial.

290. The MPD conducted investigations, both criminal and administrative, in each of the 27 cases and cleared Mucha, both criminally and administratively, in each and every case, including in all of the 10 complaints set forth in the court cases.

291. In January of 2008, Mucha went to the website of one of the lawyers who represented one of his alleged victims and wrote an anonymous email addressed to "goodjobfuckingasshole."

292. In a follow-up email he called the lawyer an "ambulance chaser," called his accusers "thugs," and ridiculed the lawyer's representation of the accusers.

293. After the MPD charged him administratively with being discourteous, Mucha wrote a letter of explanation directly to Chief Flynn, in which he defended his conduct and

39

apologized only for the unfavorable publicity he brought on the MPD and himself.

294. He asserted that he was under a great deal of stress due to all the previous allegations, and that he had considered resigning from the force.

295. Nonetheless, Defendant Chief Flynn, who was aware of Mucha's prior disciplinary history, only issued a reprimand, did not remove Mucha as a supervisor of the proactive Power Shift Unit at District 5, or order any specific re-training, counseling, or closer monitoring.

296. As supervisor of the proactive Power Shift Unit, Defendant Mucha was in charge of evaluating Defendant Vagnini and the rest of the Unit, whom he repeatedly praised; and also of investigating use of force reports filed by his Unit, which he always found justified.

297. From 2008, when the proactive Power Shift Unit under Sergeant Mucha was initiated by Defendant Lieutenant Michael Brunson and Defendant Captain Edith Hudson, until March 20, 2012, when Mucha, Vagnini, and most of the entire Unit were stripped of their police powers, Mucha was present for numerous illegal strip and body cavity searches by Vagnini and his Unit, as well as, on at least two occasions, when force was used.

298. Mucha's direct supervisors at District 5, including Lieutenant Brunson, Captain Hudson, and Lieutenant MacGillis, were aware of Mucha's background, yet consistently gave him glowing evaluations, lauding him for the number of stops and arrests his Unit made, and Lieutenant MacGillis even encouraged him to seek promotion to lieutenant during the very time period when the illegal strip searches were taking place.

299. In July of 2012, Mucha applied for and received duty disability based on his claim that newspaper publicity regarding his long history of misconduct complaints, starting in September of 2007, left him paranoid, depressed, suicidal, and under extreme stress.

300.     In his disability application, Mucha admitted that he had job related mental issues since 2007, which included paranoia and extreme anger.

301.     Mucha further admitted that, as a result of the mental trauma he had suffered, he could not "pursue suspects, detain suspects or criminal defendants or determine whether subordinates have pursued or apprehended properly, fight with or control prisoners because of my  inability to determine who is a criminal or prisoner or determine whether subordinates use the appropriate amount of force."

302.     He further stated that he could not "respond to my fellow officers who need assistance due to my inability to discern when they need help or when to use my firearm," and that he could not "investigate major crimes due to my inability to ascertain facts/details or whether subordinates have conducted a thorough or proper investigation for prosecution." *Id.* He further stated that he could not "interview witnesses, suspects, or subordinates and reduce to writing facts because of my inability to reduce that which I don't understand and [am] unable to analyze the truth."

303.     Finally, he stated that:

I can't protect the Constitutional or civil rights of innocent persons due to my inability to focus through circumstances and variables that change minute to minute in policing. Supervision of those that are dedicated to protect our Constitutional Rights and Civil Rights is the cornerstone of public policing and not being able to supervise this function places too many people in harm's way. Any amount of stress I have to endure [redacted] and my mind goes into a state of panic.

304.     According to MPD Lieutenant Jackson, in October of 2012, Mucha told a psychiatrist that he had thoughts of "suicide by cop" and dreamed of attending a department command staff meeting with a rifle and shooting up the command staff until he was shot.

305.     As a result of this statement, MPD Tactical Unit members placed Mucha into Emergency Detention, and transported him to a Mental Health Complex where he was detained

for several days.

306. Despite the fact that the MPD had several open administrative investigations concerning Mucha's supervisory conduct during the strip search/body cavity search cases, as well as concerning whether he and his Unit members violated a direct order of the Chief of Police by meeting and discussing the accusations against them, Mucha was placed on disability, with the right to return to active duty sometime in the future if found competent.

307. Before Defendant Vagnini was hired by the MPD, he was a dispatcher with the West Allis Police Department and lied about his residence to get the job.

308. While working for the West Allis Police Department, he had alcohol problems, had drunken driving accidents, and was accused of sexual assault *by a female officer whose story was corroborated by three fellow officers.*

309. Nonetheless, in 2004, he was hired by the Milwaukee Police Department, *which had access to the entire record of his alleged sexual assault,* without undergoing a clinical interview conducted by a psychiatrist or psychologist*, and without an adequate background investigation.*

310. As a MPD officer he was accused of being a racist, an alcoholic, and a pathological liar.

311. At some point while working on the District 5 proactive Power Shift Unit, Vagnini punched one of his fellow officers, but neither one of them reported it.

*312. Vagnini also used sexually derogatory statements to an African American officer, had an emotional breakdown, and unsuccessfully sought a transfer from the Power Shift due to the pressure and stress that he was subjected to at this assignment.*

313. From 2006 to 2011, Vagnini was one of the top six "repeaters" in the Milwaukee

Police Department with 13 citizen complaints of misconduct.

*MPD Command Staff's Failure to Properly Discipline, Monitor and Supervise*

314.    In June of 2006, Richard Jerome of the Police Assessment Resource Center issued a report titled "Promoting Police Accountability in Milwaukee: Strengthening the Fire and Police Commission," which made the following findings:

- "The FPC citizen complaint process is broken beyond repair."

- "The FPC complaint process is structurally flawed in ways that make it very difficult for a citizen to establish a claim of misconduct, even if meritorious."

- The results of the FPC citizen complaint process "are troubling, and demonstrate the FPC's structural defects."

- Out of the 550 complaints filed from 1992 to 1999 with the FPC, only six cases resulted in sustained charges against only 8 MPD officers.

- Out of the 437 complaints filed from 2000 to 2005 with the FPC, charges were sustained against only 2 MPD officers.

- The PPD, which reviewed about 91% of citizens' complaints as of 2005, sustained approximately 5%, whereas the typical sustained rate is about 10%.

- There should be significant changes in the procedures for addressing citizen complaints against MPD officers, including an independent monitor.

- "One of the goals of police oversight is to go beyond the review of individual citizen complaints to assess trends or patterns of police misconduct, as well as to address community concerns about police policies and practices."

- The FPC has failed to use its power and fulfill its responsibility to conduct policy reviews of the MPD.

- "While the [FPC] has responsibility for policy review, it has not established a program of systematic monitoring or auditing of the MPD, analysis and study of MPD policies and procedures, or of trends in complaints or the MPD use of force."

- The FPC performed "[n]o audits of FPC citizen complaints, nor any audit or evaluation of complaints received and investigated by MPD."

- The FPC performed "[l]imited collection and analysis of MPD use of force information, or evaluation of MPD's efforts to analyze its own use of force statistics."

- The FPC performed "[n]o review of civil actions and tort claims relating to MPD actions."

- It is central to the monitoring process to identify and address trends and patterns in police behavior as well as issues that recur in the investigative process.

315. Fire and Police Commission (FPC) Executive Director Michael Tobin, who took over in 2007, is a former MPD officer who previously worked at District 5, and a former assistant City attorney.

316. In 2006, by Tobin's own admission, the citizens' complaint system was ineffective and required improvement and modification; the community did not have confidence in the complaint system.

317. Prior to 2008, the MPD failed to maintain a computer database of citizen complaints against, or use of force by, MPD officers and the computer system still does not work effectively.

318. FPC Executive Director Tobin was aware of Defendant Mucha's background since 2005.

319. Chief Hegerty was aware of Mucha and the problems of his Unit at District 3 as early as 2004.

320. Despite this knowledge, Hegerty approved Mucha's promotion to Sergeant in 2005.

321. In 2007, when the media publicly exposed Mucha's excessive force and planting of drugs cases, Chief Hegerty was quoted as saying that Mucha, who was then a Sergeant at District 5, was doing a great job.

44

322.    In the fall of 2007, Hegerty personally called and emailed Mucha and praised him and his work.

323.    Defendant Chief Flynn was also aware of Mucha and his background in 2008 soon after he became Chief.

324.    Defendant Edith Hudson, who was the Captain of District 5 from 2008 to 2011, did not know how Mucha's Unit operated, never went out with them on the street, did not know how the Unit did pat down searches, and made no effort to find out.

325.    Defendant Hudson was not concerned with the court rulings concerning Mucha's extensive bad acts so long as there were no sustained complaints, and she was unaware of any complaints of strip searches while Captain, although L.L.R. made such a complaint in March of 2010, M.T. made one in early 2011, and MPD complaint records show that there were at least 12 complaints for illegal searches, including illegal strip searches, lodged against District Five officers from September of 2006 to August of 2011.

326.    Defendant Brunson, who was Mucha and the Power Shift's direct supervisor from 2008 to 2010, was also aware of Mucha's background, *as was Defendant MacGillis, who succeeded Brunson,* and *Brunson* claimed to be monitoring *Mucha*, but in fact he almost never went out on the street with Mucha's Unit, and gave it a great deal of freedom.

327.    Defendant Hudson frequently took Defendants Vagnini and Mucha to CompStat meetings presided over by Defendant Flynn and attended by his command staff.

328.    At these meetings, Vagnini was singled out for praise by the Chief, and the Unit's proactive policing methods were applauded and encouraged.

329.    Since 2008, Mucha had, every six months, evaluated Vagnini's performance, praising him as an extraordinary officer who, with his fellow Unit officers, was responsible for

seizing large quantities of drugs and guns.

330.     These evaluations were approved by Mucha's supervising Lieutenants at District 5, who also consistently praised and encouraged Mucha in their evaluations of him.

331.     In the 62 strip/body cavity search complaints that were investigated by MPD's PPD, the only ones that were sustained were the ones that formed the basis for the charging and convictions of Defendants Vagnini, Knight, Dollhopf and Unit officer Kozelek.

332.     After conviction, Vagnini, Knight, Dollhopf and Kozelek resigned, so that they would not be terminated, and other Unit participants who failed to intervene, to report misconduct, or to obey a direct order, including Gasser, Kopesky, Kuspa, Cline, and Bleichwehl and Sergeants Mucha and Zieger, have not been disciplined by the MPD, and are either still on the job or on disability.

333.     The PPD initiated an investigation of Mucha's supervision in 10 of the illegal strip search cases, but no report or findings were made before Mucha went on disability in 2013, nor has there subsequently been a determination.

334.     A large number of the PPD strip and body cavity search complaints where criminal charges were either refused or not sought, were referred to the IAS of the PPD for consideration of whether internal discipline should be imposed by the MPD.

335.     In each of the cases, Defendant Vagnini was the subject of the investigation for the illegal strip and body cavity searches, together with numerous fellow Unit members who were present at the searches, including those who are named as Defendants herein.

336.     These fellow officers were subjects of the investigations for failing to intervene to stop the searches and for failing to report the illegal searches to a supervisor.

46

337.    From February through April of 2014, Deputy Inspector Michael Brunson, who was formerly Vagnini and Mucha's supervising lieutenant at District 5, approved the closing of at least eleven of these cases without imposing discipline on any officers. The cases were closed with the designation "Member Resigned."

338.    With regard to the officers still on the force, the allegations against them were closed because, in Defendant Brunson's view, the IAD's preponderance of the evidence standard was not met—a standard which always requires that the victim have corroborative evidence.

339.    Defendant Chief Flynn reviewed, discussed, and approved at least some of these determinations.

340.    With regard to officer Thoms, who admitted in his IAS interview to witnessing what he now believed to be an illegal strip search by Vagnini, Brunson testified that Chief Flynn had decided that Thoms should be exempt from discipline because of his immunity from criminal prosecution.

341.    The MPD has made no public report to the City Council about its investigations into the strip search scandal.

342.    Chief Flynn approved multiple promotions of District 5 supervisors Brunson and Hudson despite the strip search scandal at District 5.

343.    The MPD's Early Intervention System (EIP) was essentially non-functional before 2008.

344.    Subsequently, a computer tracking system was installed which would identify problem officers.

345.     However, the identification by the EIP was, by Defendant Flynn's own admission, highly restrictive as it was limited to officers who had one citizen complaint, one squad car accident, and one use of force complaint within a 90 day period.

*Training on Pat-Down, Strip and Body Cavity Searches*

346.     In March of 2012, Chief Flynn stated that the issue of conducting strip searches and body cavity searches was "a serious, serious, training issue."

347.     The President of the Milwaukee Police Association stated that the officers involved in the illegal searches were failed by their supervisors because of a lack of training and a lack of checks and balances.

348.     The Officer Defendants received no training on when or under what conditions he could conduct strip or body cavity searches.

349.     Mucha and Knight have stated that they believed it was proper to put their hands in a person's pants during a pat down search if they felt an object that they suspected to be drugs.

350.     Unit members Michael Gasser and Thoms have both stated that it was not unusual for Defendant Vagnini to put his hands in a person's pants, that they saw Vagnini do this, and that they thought at the time that it was okay.

351.     Defendant Knight testified that officers were not trained on strip and cavity searches, but what they were doing on the street was pursuant to what he understood the MPD policies and practices to be.

352.     At his sentencing, Knight's lawyer, speaking on his behalf and with his authorization, made the following statements concerning a lack of proper training that Knight later adopted at his deposition:

> The way Milwaukee police officers were trained either at the academy or once they got on the street, I don't believe that what they thought was correct procedure was in fact

48

correct procedure. And Jake Knight's participation could have been the participation, I believe, of any officer on the department at the time it happened. . . It is amazing to me . . . that there was such a grave question amongst so many police officers of not knowing what can we do, what can we not do. . . There was a lack of education, of knowledge that I believe the general population of police officers had as to these particular issues.

353.     This lack of proper training with regard to searches was echoed by at least two other District 5 Officers, as well as an investigator, one of whom stated that Vagnini was created, trained and encouraged by the Milwaukee Police Department.

354.     Following the John Doe investigation, Defendant Flynn instituted department-wide retraining on policies for searches.

*Code of Silence*

355.     During the state criminal investigation into the 2004 beating and torture of Frank Jude by MPD officers, former Milwaukee County District Attorney E. Michael McCann stated that the MPD's code of silence hampered the investigation, a frustration that was echoed by Chief Hegerty.

356.     In 2006, when MPD officer Nicole Belmore broke the code of silence and testified against her fellow officers who beat Jude, she was retaliated against by MPD officers who called her a rat, vandalized her property, interfered with her radio communications, and refused to provide her backup.

357.     *Former Chief Hegerty has admitted that the police code of silence was in operation while she was chief, and continued until she left in the fall of 2007.*

358.     In the strip search cases, no officer reported Defendant Vagnini or any of his fellow officers for any of the more than 70 illegal strip and cavity searches.

359.     Unit Officer Thoms, who grudgingly cooperated with the investigation after being granted immunity from prosecution, was called a "snitch motherfucker" by Vagnini who

punched him out, and a bullet was anonymously placed in his police locker.

360.    *Thoms has admitted that the code of silence still exists in the MPD, and his treatment is an example of the code at work.*

361.    *The code's continued existence has also been admitted by a district 7 officer.*

362.    *Despite all this evidence, Chief of Police Edward Flynn denies that the code exists within the MPD.*

363.    Vagnini and the other Unit officers met repeatedly and attempted to get their stories together for their appearances at the John Doe investigation, and to discourage cooperation at these meetings.

364.    Additionally, in their statements to the IAS, they all claimed to have not seen any wrongdoing when accompanying Vagnini on his illegal searches.

365.    In 2013, several MPD officers refused to testify during the inquest into the death of Derek Williams, who was in the custody of District 5 officers when he died.

### U.S.C. § 1983 Conspiracy Allegations

366.    *Defendants Mucha, Elser, Vagnini, Thoms, Knight, Kopesky, Kuspa, Maglio , Dollhopf, Martinez, Cline, Bleichwehl, Saltzwadel, Taubenheim, Burger, Watts, Sommer, Esqueda, Carabelli, Burch, Knitter, Szcyubialka, Tharpe, Berken, Vetter, Krueger, Seitz and Bartol, acting within the scope of their employment and under color of state law, agreed between and among themselves to act jointly and in concert in order to deprive Plaintiffs of their Fourth Amendment right to be free from unreasonable stops, searches and seizures, as described in the various paragraphs of this Complaint.*

367.    *In this manner, the Defendants conspired by concerted action to accomplish an unlawful purpose by unlawful means.  Their misconduct was undertaken willfully, intentionally,*

*and/or with reckless indifference to Plaintiffs' rights.*

368. *In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated the unreasonable stops, searches and seizures of each of the named Plaintiffs and was an otherwise willful participant in the joint activity.*

369. *As part of this conspiracy, Defendants Mucha, Elser, Vagnini, Thoms, Knight, Kopesky, Kuspa, Maglio, Dollhopf, Martinez, Cline, Bleichwehl, Saltzwadel, Taubenheim, Burger, Watts, Sommer, Esqueda, Carabelli, Burch, Knitter, Szcyubialka, Tharpe, Berken, Vetter, Krueger, Seitz and Bartol agreed to conceal from responsible authorities that they had committed, in this case and several others, unlawful body cavity searches.*

## Count I – 42 U.S.C. § 1983
## Unreasonable Search and Seizure

370. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

371. As set forth in the foregoing paragraphs, the actions of Defendants Vagnini, Knight, Saltzwadel, Sommer, Esqueda, Carabelli, Tharpe, Vetter, Berken and Elser, Seitz and Bartol, *individually, jointly and/or in conspiracy,* in *stopping and* seizing Plaintiffs without reasonable suspicion or probable cause, *improperly,* illegally *and/or unreasonably* searching *their private parts*, and physically abusing Plaintiffs violated Plaintiffs' Fourth Amendment rights, *as guaranteed by the Fourteenth Amendment,* to be free from unreasonable searches and seizures, *and to be free from the excessive use of force* and caused the injuries set forth above.

372. The following Plaintiffs bring unreasonable search and seizure claims against the following Defendants:

    a. Chaze Biami brings this claim against Defendant Vagnini.

    b. Calvin Howard brings this claim against Defendant Vagnini.

    c. Christopher Barbosa brings this claim against Defendant Vagnini.

    d.   Jimar Williams brings this claim against Defendant Vagnini.

    e.   Christopher McMillian brings this claim against Defendants Sommer, Esqueda and Carabelli.

    f.   Demetrius Rimmer brings this claim against Defendants Sommer, Esqueda, Carabelli, Tharpe, Vetter, Berken and Elser.

    g.   Rico Williams brings this claim against Defendant Vagnini.

    h.   Michael Teague brings this claim against Defendants Vagnini and Knight.

    i.   Angelo Barbosa brings this claim against Defendants Vagnini, Seitz, and Bartol.

    j.   Devonte Guercy brings this claim against Defendants Vagnini and Saltzwadel.

    k.   Demondre Polk brings this claim against Defendant Knight.

    l.   Joshua Gray brings this claim against Defendant Vagnini.

### Count II – 42 U.S.C. § 1983
### Excessive Force

373.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

374.    The actions of Defendants Vagnini, Knight, Kopesky, Dollhopf, and Mucha, *individually, jointly and/or in conspiracy,* in physically abusing Plaintiffs constituted unreasonable and excessive force and violated Plaintiffs' Fourth Amendment rights to be free from unreasonable searches and seizures, and caused the injuries set forth above.

375.    The following Plaintiffs bring excessive force claims against the following Defendants:

    a.   Calvin Howard brings this claim against Defendants Kopesky, Dollhopf, Mucha, and Knight.

    b.   Michael Teague brings this claim against Defendants Vagnini and Knight.

52

### Count III – 42 U.S.C. § 1983
### Equal Protection Claim

*376.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.*

*377.    Each and every Defendant named in this complaint, individually, jointly, and in conspiracy, conducted the stops, seizures, detentions, arrests and searches of each and every Plaintiff, as alleged above, with discriminatory motive and intent, and racial animus toward Plaintiffs and therefore violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.*

### Count IV – 42 U.S.C. § 1983
### Failure to Intervene

378.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

379.    As set forth in the foregoing paragraphs, Defendants Vagnini, *Maglio*, Kopesky, Dollhopf, Mucha, Krueger, Knight, Burch, Martinez, Knitter, Cline, Szcyubialka, Thomas, Sommer, Esqueda, Carabelli, Tharpe, Vetter, Berken, Elser, Bleichwehl, Kuspa, Burger, Taubenheim, and Watts, *individually, jointly and/or in conspiracy,* had the opportunity, duty and ability to intervene on behalf of Plaintiff during Defendants' *illegal stops and seizures of Plaintiffs, including the*  invasive and unreasonable searches, but failed to do so and thereby caused the injuries to Plaintiff as set forth above.

380.    The following Plaintiffs bring failure to intervene claims against the following Defendants:

    a.    Chaze Biami brings this claim against Defendant *Maglio*.

    b.    Calvin Howard brings this claim against Defendants Vagnini, Kopesky, Dollhopf, Mucha, and Knight.

c.  Christopher Barbosa brings this claim against Defendants Mucha, Burch, Martinez, Knitter, Cline, and Szcyubialka.

d.  Jimar Williams brings this claim against Defendants Thoms, Kopesky, Krueger, and Knight.

e.  Christopher McMillian brings this claim against Defendants Esqueda and Carabelli.

f.  Demetrius Rimmer brings this claim against Defendants Sommer, Esqueda, Carabelli, Tharpe, Vetter, Berken and Elser.

g.  Michael Teague brings this claim against Defendants *Knight, Vagnini,* Mucha, Bleichwehl, Martinez, Dollhopf, Cline, and Kuspa.

h.  Devonte Guercy brings this claim against Defendants Vagnini, Knight, Burger, Kopesky, Kuspa, Mucha, Watts and Taubenheim.

i.  Demondre Polk brings this claim against Defendants Vagnini, Thoms, Mucha and Kopesky.

j.  Joshua Gray brings this claim against Defendant Kuspa.

## Count V - 42 U.S.C. §§ 1985, 1986
## Racially Motivated Conspiracy to Deprive Plaintiffs of Their Constitutional Rights

381.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

382.  Defendants Flynn, Hudson, Brunson, Mucha, Elser, *MacGillis*, Vagnini, Thoms, Knight, Kopesky, Kuspa, *Maglio*, Dollhopf, Martinez, Cline, Bleichwehl, Saltzwadel, Taubenheim, Burger, Watts, Sommer, Esqueda, Carabelli, Burch, Knitter, Szcyubialka, Tharpe, Berken, Vetter, Krueger, Seitz and Bartol, together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to commit the unconstitutional overt acts set forth in the facts above.

54

383. Because said conspiracy or conspiracies and the overt actions in furtherance thereof were done with the knowledge and purpose of depriving Plaintiffs, who are all African American, and numerous other African American victims of illegal strip and body cavity searches of the equal protection of the laws and/or of equal privilege and immunities under the law, and with racial animus toward the Plaintiffs and the other victims of this racially motivated conspiracy, the Defendants also deprived Plaintiffs of their right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. § 1985.

384. Additionally or alternatively, Defendants Flynn, Hudson, Brunson, Mucha, Elser, *MacGillis*, Vagnini, Thoms, Knight, Kopesky, Kuspa, *Maglio*, Dollhopf, Martinez, Cline, Bleichwehl, Saltzwadel, Taubenheim, Burger, Watts, Sommer, Esqueda, Carabelli, Burch, Knitter, Szcyubialka, Tharpe, Berken, Vetter, Krueger, Seitz and Bartol, knowing that the above § 1985 conspiracy to illegally *stop and* search Plaintiffs was about to be committed, and having the power to prevent or aid in preventing the commission of the acts in furtherance of said conspiracy, neglected and/or refused to do so, in violation of 42 U.S.C. § 1986.

### Count VI – 42 U.S.C. § 1983
### *Monell* Policy, Pattern, and Practice Claim

385. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

386. The actions of Defendants as alleged above, were done pursuant to one or more interrelated *de facto* policies, practices and/or customs of the City of Milwaukee, its Police Department, its Fire and Police Commission, its Internal Affairs Division and/or its Police Chief.

387. At all times material to this complaint Defendant City of Milwaukee and its Police Department, Fire and Police Commission, Professional Performance Division, Internal Affairs Division and/or Police Chief had interrelated *de facto* policies, practices, and customs which included, *inter alia*: (a) a widespread pattern and practice of *improper, illegal,*

*unconstitutional, and/or otherwise unreasonably invasive searches of the private parts of African Americans, including, but not limited to, strip and body cavity searches;* (b) a failure to adequately hire, train, discipline, supervise, monitor, counsel, and control its police officers, particularly those repeater officers, including, but not limited to, Defendants Vagnini and Mucha, who had histories of serious citizen abuse; (c) a police code of silence; and (d) the encouragement of unreasonable *stops,* searches, seizures and wrongful arrests *inter alia through an overly aggressive program called CompStat.*

388.    The policy, practice, and custom of a police code of silence results in police officers refusing to report instances of police misconduct of which they are aware, despite their obligation to do so, and also includes police officers either remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability, or criminal charges, and to perjure themselves in criminal cases where they and their fellow officers have falsely arrested and/or unreasonably searched a criminal defendant.

389.    The *de facto* policies, practices and customs of failing to properly hire, train, supervise, monitor, discipline, counsel and control police officers, the code of silence, and the encouragement of unreasonable searches and seizures and wrongful arrests are interrelated and exacerbate the effects of each other to institutionalize police lying and immunize police officers from discipline.

390.    At the time of the incidents giving rise to this complaint, officers of the Milwaukee Police Department, as a matter of widespread practice so prevalent as to comprise municipal policy, abused citizens in a manner similar to that alleged by Plaintiffs in this

Complaint on a frequent basis, yet the Milwaukee Police Department made findings of wrongdoing by officers in a disproportionately small number of cases.

391.    Additionally, the involvement in, and ratification of, the unconstitutional actions of the Defendants by municipal supervisors and policymakers, including Defendant Chief Flynn, Defendant Assistant Chief Hudson, Defendant Deputy Inspector Brunson, and Defendant Sergeant Mucha, further establishes that these acts were part of a widespread municipal policy, practice and custom. This involvement and ratification is further demonstrated, *inter alia*, by the Department's failure for several years to investigate the unconstitutional conduct of the Defendants and other officers or to discipline these officers, including, but not limited to Defendants Vagnini and Mucha, in this and other similar cases of citizen abuse, for their unconstitutional conduct.

392.    The aforementioned policies, practices and/or customs of failing to hire, train, supervise, monitor, discipline, counsel and control police officers, the police code of silence, and the encouragement of unreasonable *stops,* searches and seizures and wrongful arrests, *inter alia through the CompStat program,* separately and together, proximately caused injury to the Plaintiffs in this case, *inter alia*, because the Defendants had good reason to believe that their misconduct would not be revealed or reported by fellow officers or their supervisors, that these denials would go unchallenged by these supervisors and fellow officers, from the Police Chief, Fire and Police Commission, on down, and that they were effectively immune from disciplinary action, thereby protecting them from the consequences of their unconstitutional conduct.

393.    But for the belief that they would be protected, both by fellow officers and by the Department, from serious career and criminal consequences, the Defendants would not have engaged in the conduct that resulted in the injuries to Plaintiffs.

394.    Said interrelated policies, practices and customs, as set forth above, both individually and together, were maintained and implemented with deliberate indifference, and encouraged the Defendants to commit the aforesaid acts against Plaintiffs and therefore acted as a moving force and were, separately and together, direct and proximate causes of said constitutional violations, and injuries to Plaintiffs.

### Count VII – 42 U.S.C. § 1983
### Supervisory Liability

395.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

396.    Defendants Flynn, Hudson, Brunson, *MacGillis* and Mucha, who were command and/or supervisory officers of the MPD,  knew or reasonably should have known that Defendants Vagnini, Thoms, Knight, Kopesky, Kuspa, *Maglio*, Dollhopf, Martinez, Cline, Bleichwehl, Saltzwadel, Taubenheim, Burger, Watts, Sommer, Esqueda, Carabelli, Burch, Knitter, Szcyubialka, Tharpe, Berken, Vetter, Krueger, Seitz and Bartol would violate citizens' constitutional rights in one or more of the ways described above, and/or knew or reasonably should have known that these officers had a pattern of engaging in improper, illegal, unconstitutional*, and/or otherwise unreasonably invasive searches of the private parts of African Americans,* including*, but not limited to,* strip and *body* cavity searches.

397.    Defendants Flynn, Hudson, Brunson, *MacGillis*, and Mucha facilitated, approved, condoned, turned a blind eye to, and/or purposely ignored th*is* pattern of misconduct by Defendants Vagnini, Thoms, Knight, Kopesky, Kuspa, *Maglio*, Dollhopf, Martinez, Cline, Bleichwehl, Saltzwadel, Taubenheim, Burger, Watts, Sommer, Esqueda, Carabelli, Burch, Knitter, Szcyubialka, Tharpe, Berken, Vetter, Krueger, Seitz and Bartol.

398.    As a result of this misconduct Plaintiffs suffered the damages set forth above.

58

## Count VIII – Indemnification

399.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

400.     Wisconsin law, Wis. Stat. § 895.46, requires public entities to pay any tort judgment for damages for which employees are liable for acts within the scope of their employment.

401.     At all times relevant to this action, the Defendants committed the acts alleged above in the scope of their employment with the City of Milwaukee.

WHEREFORE, Plaintiffs ask that this Court enter judgment in their favor and against Defendants Flynn, Hudson, Brunson, *MacGillis*, Mucha, Elser, Vagnini, Thoms, Knight, Kopesky, Kuspa, *Maglio*, Dollhopf, Martinez, Cline, Bleichwehl, Saltzwadel, Taubenheim, Burger, Watts, Sommer, Esqueda, Carabelli, Burch, Knitter, Szcyubialka, Tharpe, Berken, Vetter, Krueger, Seitz and Bartol, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: May 27, 2015                         Respectfully submitted,

                                           /s/ G. Flint Taylor
                                           G. Flint Taylor, IL Bar #2802058
                                           Ben H. Elson, IL Bar #6286106
                                           Sarah Gelsomino, IL Bar #6298391
                                           John L. Stainthorp, IL Bar #3128243
                                           PEOPLE'S LAW OFFICE
                                           1180 N. Milwaukee Ave.
                                           Chicago, IL 60642

59

(773) 235-0070
flint.taylor10@gmail.com

Robin Shellow, #1006052
THE SHELLOW GROUP
324 West Vine Street
Milwaukee, WI 53212
(414) 263-4488
tsg@theshellowgroup.com

Attorneys for Plaintiffs